IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Walker D. Miller

Civil Action No. 10cv-00059-WDM-MEH

GRAY PETERSON,

     Plaintiff,

v.

ALVIN LACABE, individually and in his official capacity as Manager of Safety for the City and
County of Denver,

     Defendant,

JOHN W. SUTHERS, Attorney General for the State of Colorado,

     Intervenor.

---

## ATTORNEY GENERAL'S RESPONSE TO PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

---

Intervenor John W. Suthers, in his official capacity as Attorney General for the State of

Colorado ("the Attorney General"), responds to Plaintiff's motion for summary judgment as

follows.

### INTRODUCTION AND PROCEDURAL HISTORY

Plaintiff Gray Peterson filed suit against Alvin LaCabe, as Denver's *ex officio* sheriff, and

Peter Weir, as Director of the Colorado Department of Public Safety, challenging Denver's

refusal to issue him a permit to carry a concealed handgun ("CHP").  Peterson is a resident of the

state of Washington, and holds CHPs from Washington and Florida.  With respect to LaCabe,

Peterson's challenge was primarily based on Colorado's statutory prohibition on issuing CHPs to

non-residents.  Peterson's claims against Weir contested Colorado's requirements for reciprocal

recognition of CHPs issued by other states.  Peterson asserted broad challenges to Colorado's

permitting scheme under the Second and Fourteenth Amendments.

Weir moved to dismiss. (Doc.6).  At the same time, the Attorney General filed a motion

to be heard on the constitutionality of the challenged statutes. (*Id.*).  LaCabe filed an Answer and

subsequently moved for summary judgment, asserting that he was not a properly named

defendant.  (Doc. 19).  Neither Weir's motion to dismiss nor LaCabe's summary judgment

motion addressed the merits of Plaintiff's claims.

The Court granted Weir's motion, dismissing the claims (Counts 2 and 4) that had been

filed exclusively against him. (Doc. 26).  In the same Order, the Court admitted the Attorney

General as an Intervenor and found that LaCabe was, in fact, a properly named defendant.

Hence, the Court denied LaCabe's motion for summary judgment but reserved ruling on the

merits of the remaining claims pending further briefing.

## STATEMENT OF UNDISPUTED FACTS

Prior to Attorney General's inclusion as a party to this case, the parties stipulated to

several facts that are listed in the scheduling order. (Doc. 13).  The Attorney General does not

dispute these stipulations, which establish Peterson's standing under Article III.  In a declaration

attached to his motion for summary judgment, Peterson asserted several additional facts relating

to his desire to carry a handgun while in Colorado.  The Attorney General responds to these

point-by-point below.

1.   "I [Peterson] am a frequent visitor to Colorado and Denver in particular."

*Response:* No dispute.

2.   "I exercise my right to carry a handgun for the purpose of self-defense wherever possible, and desire to do so when I visit Denver."

*Response:* The Attorney General does not dispute Peterson's claim that he carries a pistol when allowed to do so, and that he wishes to do so here.  The Attorney General does dispute that Peterson has a "right" to do so "for the purpose of self-defense" in any place not specifically authorized by Colorado statute and Denver ordinance.  The Attorney General also disputes the materiality and relevance of this statement.

3.   "My primary method of carrying a handgun is openly, however I would comply with the requirement under Denver's laws prohibiting any form of carry besides concealed with a CHL."

*Response:* The Attorney General does not dispute Peterson's claim that he prefers to carry his handgun openly, or that he would carry concealed in Denver were he permitted to do so. The Attorney General does dispute the assertion that Denver's laws forbid "any form of carry besides concealed with a CHL."  Plaintiff's repeated assertions that he is "completely barred...from carrying the quintessential self-defense weapon anywhere in the city" are demonstrably <u>false</u>. Denver's ordinances do not prohibit carrying a pistol on property controlled or owned by the person at the time of carrying, D.R.M.C. 38-117(a), while in a private automobile, D.R.M.C. 38-117(f)(2), or for defense of an immediate threat to "home, person, or property." D.R.M.C. 38-118(b)(1).  The relevance and materiality of this statement are disputed.

4.   "I have no dwelling or place of business in Colorado."

*Response:* Absent the opportunity to conduct discovery, the Attorney General has no reason to dispute that Peterson does not have a place of business in Colorado.  The Attorney General does

3

dispute, however, Peterson's claim that he has no "dwelling" here.  This assertion is a legal

conclusion and is, moreover, simply incorrect.  It is also worth noting Plaintiff's elision of

explicit language in § 18-12-105(2)(a) that also permits concealed or open carry on "property

owned or under [a person's] control at the time of the act of carrying."

5.   "I have a CHL from both Washington and Florida."

*Response:* Although the Attorney General had no opportunity to conduct discovery as to this

statement, he does not dispute its accuracy.  However, because it relates exclusively to Plaintiff's

now-dismissed claims concerning the validity of Colorado's reciprocity scheme, it is irrelevant

and immaterial.  The related assertions of fact concerning reciprocity contained in Plaintiff's

Motion for Summary judgment, at page 3, are likewise now irrelevant and immaterial.

6.   "Except for my lack of Colorado residency, I meet the statutory criteria for obtaining a

    CHL."

*Response:* The Attorney General has no knowledge of Peterson's background or qualifications.

However, the Attorney General does not dispute that Plaintiff's application for a permit was

denied because he failed to satisfy the requirements of § 18-12-203(1)(a).

## SUMMARY OF THE ARGUMENT

The Amended Complaint challenged Denver's refusal to issue Peterson a CHP on two

grounds: 1) his out-of-state residency, and 2) Colorado's reciprocity requirements.  The dismissal

of the claims concerning Colorado's lack of reciprocity has substantially limited the scope of

Plaintiff's Amended Complaint going forward.  Peterson's remaining claims assert only that

various provisions of the United States Constitution require Colorado to issue him a CHP despite

his non-residency.[1]  None of these claims are availing.  First, Plaintiff's constitutional right to travel, as guaranteed by the Privileges and Immunities Clause, is not implicated by a statutory scheme that denies CHPs to non-residents because Colorado's denial of CHPs to non-residents is strongly related to its substantial interest in ensuring and monitoring the eligibility of those who wish to carry concealed handguns within the state.  Likewise, Plaintiff's Second Amendment rights are not infringed by the implementation of a reasonable regulatory scheme such as the one currently in effect in the City and County of Denver.  The combined effects of state law and city ordinance faithfully preserve Plaintiff's right to carry a pistol for protection of hearth and home, and easily survive the intermediate scrutiny review required by the Second Amendment.

## SUMMARY JUDGMENT STANDARDS

Federal Rule of Civil Procedure 56(c)(2) establishes that summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  However, an issue must be both genuine and material to preclude the entry of summary judgment.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).  A "complete failure of proof concerning an essential element of the non-moving party's case necessarily renders other facts immaterial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Plaintiff contends that the United States Constitution requires Colorado to issue CHPs to out-of-state residents who meet all of the other requirements outlined in § 18-12-203(1), C.R.S.

---

[1] Peterson has not moved for summary judgment on Count 3 of the Amended Complaint, which asserted a violation of equal protection.  The lack of disputed facts nonetheless renders this claim amenable to resolution on summary judgment.  Hence, the Attorney General is simultaneously filing a cross-motion for summary judgment on all counts.  In the interest of brevity, the Attorney General's brief addresses Peterson's equal protection claim in detail, but presents somewhat shortened arguments on the claims that are thoroughly addressed herein.

(2010).  Peterson's pleadings, however, fail to clarify whether he raises a facial or as-applied

challenge.  On the one hand, Peterson's prayer for relief seeks a broad declaration "that C.R.S.

§ 18-12-203(1)(a) is unconstitutional to the extent it does not allow nonresidents of Colorado to

apply for and obtain a CHL," and further requests "[a]n injunction prohibiting Defendants from

denying nonresidents of Colorado the right to apply for and obtain a CHL, solely on account of

their nonresident status." *Am. Compl.* at ¶ 61, 62. [2]  This is clearly a facial challenge.   On the

other hand, Peterson also appears to raise an as-applied challenge based on the combined effect

of Denver ordinance and Colorado statute.  Together, these provisions prohibit him from

carrying a pistol in parts of Denver.  Counts 5 and 6, for example, assert that the confluence of

city ordinance and state law violate the Second and Fourteenth Amendments by "prohibiting any

meaningful opportunity for Plaintiff to bear arms in the City and County of Denver." *Am.*

*Compl.* at ¶ 59, 60.  Thus, Peterson contends that, as applied to him when he is visiting Denver,

Colorado's refusal to grant CHPs to non-residents is unconstitutional because it prevents him

from carrying a weapon in parts of the city.   Although Peterson failed to denominate it as such,

this is an as-applied challenge to Colorado's statutory scheme.

> _Facial challenges_: "A facial challenge to a legislative Act is…the most difficult to mount

successfully, since the challenger must establish that no set of circumstances exists under which

the Act would be valid."  *United States v. Salerno,* 481 U.S. 739, 745 (1987).  Thus, a successful

facial challenge may only be based on a showing that the statute is unconstitutional in *all* of its

applications.  *See, e.g. Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515

---

[2] Peterson's Amended Complaint also raised an as-applied challenge to Colorado's reciprocity
rules.  Those claims (and the correlative portion of the prayer for relief) were specifically
directed to Defendant Weir, however, and were dismissed on Eleventh Amendment grounds.

U.S. 687, 699-700 (1995). "[A] facial challenge must fail where the statute has a 'plainly

legitimate sweep.'" *Wash. State Grange v. Wash. State Rep. Party,* 128 S.Ct. 1184 (2008),

*quoting Wash. v. Glucksberg,* 521 U.S. 702, 739-40 & n.7 (1997) (Stevens, J., concurring in

judgment).

    *As-applied challenges*: As-applied challenges involve the application of a statute to a

particular plaintiff in his particular circumstances.  A party asserting an as-applied constitutional

challenge to a state law bears the burden of proving that the law is unconstitutional beyond a

reasonable doubt.  *United States v. Platte*, 401 F.3d 1176, 1189 (10th Cir. 2005); *United States v.

Day*, 223 F.3d 1225, 1228 (10th Cir. 2000).  When considering a statute's constitutionality,

"courts must accord substantial deference to the predictive judgments" of the legislature. *Turner

Broadcasting Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997).  Legislatures qualify for this

deference because they are "far better equipped than the judiciary to amass and evaluate the vast

amounts of data bearing upon legislative questions." *Id.* (internal quotation omitted).  "Local

officials, by virtue of their proximity to, and the expertise with, local affairs, are exceptionally

well qualified to make determinations of public good within their respective spheres of

authority." *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 544 (1989) (internal quotation omitted).

## ARGUMENT

**I.**  **The constitutional right to travel, as guaranteed by the Privileges and Immunities Clause, does not require Colorado to make CHPs available to non-residents.**

    Plaintiff contends that the constitutional right to travel requires Colorado to issue CHPs

to residents and non-residents alike.  He advances his argument in an odd way, bifurcating the

right to travel from the rights conferred by the Privileges and Immunities Clause.  In so doing,

Peterson distorts the applicable standard of review and only succeeds in confusing the issues that he attempts to raise.

> **A.**      **The right to travel as asserted in the Amended Complaint is coextensive with the Privileges and Immunities Clause.**

The right to travel protects: 1) the right of a citizen of one State to enter and to leave another State; 2) the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and 3) for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State.  *Saenz v. Roe,* 526 U.S. 489, 501 (1999).[3]  The right is not separately enumerated by the Constitution.   Rather, depending on the specific practice being challenged, it has been derived from several different sources.  *See Attorney General of N.Y. v. Soto-Lopez,* 476 U.S. 898, 903 (1986).

Peterson does not (indeed, could not) allege that the challenged law deprives him of the right to enter or leave Colorado.  Nor does he seek to become a permanent resident here.  Thus, the Amended Complaint alleges only that Colorado's law violates the second component of the right to travel: the right to be treated as a welcome visitor rather than an unfriendly alien when visiting Colorado.  *Saenz* holds in no uncertain terms that this right derives from the Privileges and Immunities Clause of Art. IV, § 2.  526 U.S. at 489 ("by virtue of a person's state citizenship, a citizen of one State who travels in other States, intending to return home at the end of his journey, is entitled to enjoy the 'Privileges and Immunities of Citizens in the several States' that he visits").

---

[3] Prior to *Saenz,* the Tenth Circuit held that "a state law implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right." *Buchwald v. University of New Mexico School of Medicine,* 159 F.3d 487, 498 (10th Cir. 1998), *quoting Attorney General of N.Y. v. Soto-Lopez,* 476 U.S. 898, 903 (1986).

B.      **Standard of review.**

Peterson virtually ignores *Saenz*, insisting that the right to travel as asserted in the Amended Complaint derives from some (unnamed) source other than the Privileges and Immunities Clause.  The source of the right being asserted, however, is critically important because it controls the standard of review applicable to Peterson's claims.  Strict scrutiny applies to asserted violations of the right to enter and leave a state, *United States v. Guest,* 383 U.S. 745 (1966), and also applies to durational residency requirements.  *See Zobel v. Williams,* 457 U.S. 55, 74 (1982) (O'Connor, J., concurring in judgment).

But the component of the right to travel at issue here is subject to a less stringent standard of review.  With respect to the rights that it covers, the Privileges and Immunities Clause bars discrimination against residents of other states only "where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States."  *Saenz,* 526 U.S. at 502, *quoting Toomer v. Witsell,* 334 U.S. 385, 396 (1948).  This is not strict scrutiny.  *Compare Citizens United v. Federal Elections Comm'n,* 130 S.Ct. 876, 898 (2010) (strict scrutiny test requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest).

Even prior to *Saenz,* the Tenth Circuit recognized that strict scrutiny does not necessarily apply to all right to travel claims.  The opinion in *Buchwald v. University of New Mexico School of Medicine,* 159 F.3d 487, 498 (10th Cir. 1998), noted that the Supreme Court has avoided determining whether a state-created classification penalizes the right to travel "either by determining the purposes advanced by the government are illegitimate or, if legitimate, that the created distinction does not even rationally further the stated goal." *Buchwald,* 159 F.3d at 497-

9

98. *Buchwald* suggested that right to travel claims be reviewed under a "purpose scrutiny" standard. This approach is more stringent than rational basis review. However, contrary to Peterson's claims, *Buchwald* also confirms that strict scrutiny does not apply to this case.[4]

### C.    Analysis.

The Privileges and Immunities Clause does not enumerate "the particular subjects as to which [non-residents] are guaranteed equality of treatment," *Austin v. New Hampshire,* 420 U.S. 656, 660 (1975), and Supreme Court precedent demonstrates that the "privileges" protected by Clause are not particularly numerous. To the contrary, the Clause applies only to rights that "bear upon the vitality of the Nation as a single entity," and are thus "sufficiently basic to the livelihood of the Nation" so as to fall within its purview. *Supreme Court v. Friedman,* 487 U.S. 59, 64-65 (1988); *see also Baldwin v. Montana Fish & Game Comm'n,* 436 U.S. 371, 383, 388 (1978). In other words, the Supreme Court prohibits classification based on residency only where the privilege at issue is "basic to the maintenance or well-being of the Union." *Id.* at 388.

Accordingly, a right to travel challenge brought under Art. IV requires a plaintiff to first demonstrate the asserted right falls within the scope of the Privileges and Immunities Clause. *Id.* Assuming that the Clause applies, the reviewing court must then consider the justifications advanced by the state for that restriction. Strict scrutiny does not apply. Rather, no violation occurs so long as: 1) "there is a substantial reason for the difference in treatment;" and 2) "the

---

[4] Peterson relies on the opinion in *Peruta v. County of San Diego,* 678 F.Supp.2d 1046, 1059-60 (S.D. Cal. 2010), in support of his claim that strict scrutiny applies. As the holding in *Saenz* makes clear, any suggestion in *Peruta* that strict scrutiny applies to all right to travel claims is plainly incorrect. To the extent that *Peruta* correctly applied a strict scrutiny standard, the case can only be interpreted as a challenge to durational residency requirements set by the defendant county for CHP qualification.

discrimination practiced against nonresidents bears a substantial relationship to the State's objective." *Supreme Court of New Hampshire v. Piper,* 470 U.S. 274, 284 (1985).

### 1.   The Plaintiff cannot demonstrate that Colorado's statute implicates a fundamental right.

Peterson claims that the challenged statute violates his "fundamental right" "to carry a handgun for self defense in case of confrontation." *Pl. MSJ* at 8.  In the context of this case, this actually comprises two distinct claims: 1) that there is a fundamental right to carry a pistol outside the home (*Am. Compl.*, ¶ 55), and 2) that there is a fundamental right to carry a <u>concealed</u> pistol outside the home.  The second of these claims is easily dismissed.  The Supreme Court noted more than a century ago that "the right of the people to keep and bear arms...is not infringed by laws prohibiting the carrying of concealed weapons." *Robertson v. Baldwin,* 165 U.S. 275, 281-82 (1897).  More recent commentary from the Court only reinforces this statement. *See Heller v. District of Columbia,* 128 S.Ct. 2783, 2816 (2008) (noting with approval that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues").  These cases clearly demonstrate that the asserted right to carry a concealed weapon is not a "privilege" protected by Art. IV, § 2.

Peterson's other claim arises from the confluence of Denver's open carry ban and § 18-12-203(1), which combine limit the times and places where Peterson can carry a pistol while in Denver.  He asserts that *Heller* and *McDonald v. City of Chicago,* 120 S.Ct. 3020 (2010), which together establish that individuals may keep arms for self-defense <u>within the home</u>, also compel a finding that individuals have a fundamental right to carry pistols <u>outside the home</u>.  Whether this claim is correct depends on just how far the Second Amendment right extends.  If, as argued

11

below, the challenged law is consistent with the Second Amendment, Peterson's Privileges and Immunities claim fails at the threshold because the limitations on Peterson's ability to carry in Denver will not have implicated a fundamental right.  If the regulatory scheme does implicate a fundamental right, then the Court must consider the analysis below.

> **2.     There is a substantial reason for distinguishing between resident and non-resident CHP applicants, and Colorado's reason for doing so bears a substantial relationship to Colorado's goal of promoting public safety.**

Governments exist, in large part, to ensure the safety of their citizenry.  *See, e.g., Salerno,* 481 U.S. at 755 (a "primary concern of every government [is] the safety and indeed the lives of its citizens").   Reasonable regulation of firearms has long been acknowledged as an essential component of public safety.  *See, e.g., People v. Blue,* 544 P.2d 385, 390-91 (Colo. 1975) (upholding ban on felon firearm possession based in part upon "the state's right, indeed its duty under its inherent police power, to make reasonable regulations for the purpose of protecting the health, safety, and welfare of the people"); *Kelley v. Johnson,* 425 U.S. 238, 247 (1975) ("[t]he promotion of the safety of persons and property is unquestionably at the core of the State's police power"); *Parker v. District of Columbia,* 478 F.3d 370, 399 (D.C. Cir. 2007) (noting the existence of various firearm regulations that "promote the government's interest in public safety consistent with our common law tradition").

With respect to rights qualifying as "privileges" under Art. IV, a state can treat residents and non-residents differently so long as 1) "there is a substantial reason for the difference in treatment;" and 2) "the discrimination practiced against nonresidents bears a substantial relationship to the State's objective." *Piper,* 470 U.S. at 284.  Colorado's limitation on non-resident CHPs meets both of these criteria.

Colorado has an obvious and substantial reason for treating residents and non-residents differently: the availability of information.  Permitting authorities have access to far more information about Coloradans than they do about residents of other states.  Exh. A, ¶ 8-10. Legislative committees heard extensive testimony on this precise point in 2007.  Boulder County Sheriff Joe Pelle pointed out that databases containing information about state offenses are accessible statewide, but not to law enforcement officials in other states.  Exh. C, pp. 8-10. Permits issued by Colorado authorities are flagged by the Colorado Bureau of Investigation, and fingerprints associated with the permit will "flash" on the CBI's system if a permit holder is arrested within the state.  Exh. B, ¶ 12.  Intrastate tracking systems of this type are common, but they typically do not cross state lines.  *Id.*  Thus, aside from self-reporting, Colorado authorities would have virtually no way of ensuring the continued eligibility of a non-resident to whom they issued a CHP.

Colorado is generally considered to be a "shall issue" state for CHPs, but the issuing authority may still deny a CHP based upon "a reasonable belief that documented previous behavior by the applicant makes it likely the applicant will present a danger to self or others if the applicant receives a permit to carry a concealed handgun[.]"  § 18-12-203(2), C.R.S. (2010). Information about eligibility to purchase and/or own firearms under federal law is accessed via the CBI's InstaCheck system.  Exh. B, ¶ 7-9.  Local information, which often bears on an applicant's eligibility under Colorado law, however, often does not appear on national databases, nor is it commonly shared between states.  Exh. A, ¶ 8-9; Exh. B, ¶ 9.  For obvious reasons, information about an applicant's previous behavior is more widely available in the community where an applicant lives.

There is thus an obvious and substantial reason underlying Colorado's decision to issue CHPs to residents while denying the same to non-residents.  There is, moreover, a strong relationship between this decision and the state's objective of ensuring public safety.  This conclusion is entirely consistent with the few courts that have addressed the question.  *See Bach v. Pataki,* 408 F.3d 75, 87 (2d Cir. 2005) ("New York's interest in monitoring gun licensees is substantial and that New York's restriction of licenses to residents and persons working primarily within the State is sufficiently related to this interest.").  Requiring Colorado to issue CHPs to non-residents would compromise the safety of the state's citizens by undermining the reliability of the extensive background check that is a required component of every CHP application.  Accordingly, even if Peterson is correct in his assertion that the challenged regulatory scheme implicates a "privilege" under Art. IV, § 2, as a matter of law he is unable to demonstrate that Colorado's reasonable regulation of that right violates his constitutional right to travel as protected by the Privileges and Immunities Clause.

II.     **The challenged regulatory scheme does not violate the Second Amendment.**

Peterson's challenge under the Second Amendment fares no better.  Indeed, beyond making bald assertions concerning the standard of review, he makes virtually no substantive arguments on the issue.  This fact alone should prevent him from obtaining summary judgment.  Nonetheless, for the reasons outlined below, Peterson's contention that he has been deprived of rights conferred by the Second Amendment is simply wrong.

A.     **Standard of review.**

Resolving Peterson's Second Amendment claim potentially involves several steps.  First, the Court must determine whether the challenged statute implicates the Second Amendment at

all.  If the Second Amendment is implicated, the Court must then determine the applicable standard of review and apply it to Peterson's claim.  Aside from ruling out "rational basis" review, *Heller* left the standard of review open.  *Heller,* 128 S.Ct. at 2817-18, n.27.  Most post-*Heller* decisions have applied intermediate scrutiny to Second Amendment claims.  *See, e.g., Heller v. District of Columbia ("Heller II"),* 698 F.Supp.2d 179, 186-88 (D.C. 2010) ("the court joins the majority of courts to have considered this issue in holding that intermediate scrutiny is the most appropriate standard of review"); *see also United States v. Skoien,* 614 F.3d 638 (7th Cir. 2010) (en banc)); *but see United States v. Engstrum,* 609 F.Supp.2d 1227 (D. Utah 2009) (applying strict scrutiny but still upholding challenged regulation).  Assuming that the Second Amendment applies to Peterson's claim at all, the Attorney General urges this Court to apply an intermediate standard of review, and uphold the challenged law as substantially related to an important public interest.  *See Clark v. Jeter,* 486 U.S. 456, 461 (1988).

> **B.**     **Plaintiff's facial challenge fails.**

As already noted, Peterson's pleadings hint at a facial challenge under the Second Amendment. To the extent that he does so, this claim is easily dismissed because there is no fundamental right to carry a concealed pistol.  *See Robertson v. Baldwin, supra*; *see also Thomas v. Members of City Council of Portland,* 730 F.2d 41, 42 (1st Cir. 1984) ("Established case law makes clear that the federal Constitution grants appellant no right to carry a concealed handgun.").  Indeed, *Heller* itself acknowledges that not even the right to possess a firearm in the home is universal; to the contrary, it may be restricted based on factors such as criminal history or mental health problems.  *Heller,* 128 S.Ct. 2816-17.  Given this precedent, Peterson comes

nowhere near being able to satisfy the *Salerno* standard by demonstrating that there are <u>no</u> circumstances under which a state may prohibit an individual from carrying a concealed weapon.

### C. Plaintiff's as-applied challenge fails.

Peterson's as-applied claim challenges the confluence of municipal ordinance and state law that, together, prevent him from carrying a handgun in parts of Denver. This claim requires somewhat more analysis that Peterson's facial challenge, but it is ultimately no more successful.

### 1. The scope of the challenged regulations.

At the threshold, it is important to note the scope and effect of the laws that Peterson challenges.[5] Because he cannot acquire a CHP, when and where Peterson can carry a weapon is controlled primarily by Denver ordinance. Peterson claims that Denver's laws forbid him from carrying a pistol "anywhere in the city." *Pl. MSJ* at 10. Denver's laws do nothing of the sort. When Peterson visits Denver, he may carry a pistol in his dwelling, his place of business, any property he owns or controls, in private automobiles, and for defense of an immediate threat to "home, person, or property." He may do so openly or concealed.

### 2. The challenged regulations do not burden a Second Amendment right.

Accurately assessing the scope of permissible and prohibited conduct is important, because Peterson cannot prevail unless "the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *United States v. Marzzarella,* 614 F.3d 85, 89 (3d Cir. 2010). This is doubly true in the context of this case because, despite

---

[5] As the City and County of Denver has previously pointed out, Peterson did not expressly challenge Denver's open carry ban. Why he did not do so is a mystery, particularly in light of the fact that his as-applied challenge stems from an allegation that Peterson has no "meaningful opportunity…to bear arms in the City and County of Denver." *Am. Compl.* ¶ 59. If Denver's open carry ban were repealed, Peterson would have no claim whatsoever since, as discussed above, there is no Second Amendment right to carry a concealed weapon.

Peterson's claims to the contrary, *Heller*'s holding is far narrower than he suggests. To be sure, *Heller* took a complete ban of handguns "off the table," 128 S.Ct. at 2822, and further declared that the core conduct protected by the Second Amendment is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 2821. But the Supreme Court has gone no further. Together, *Heller* and *McDonald* hold that no government – whether federal, state, or local – may prohibit qualified individuals from possessing a functional handgun within the home for the purpose of self-defense. Nonetheless this core right, while fundamental, remains narrow. Governments may still enact licensing requirements and may still restrict those who are "disqualified from the exercise of Second Amendment rights" from possessing a firearm at all. *See Heller,* 128 S.Ct. at 2816, 2821-22. Just as importantly, nothing in *Heller* or *McDonald* credibly suggests that the core Second Amendment right extends beyond the home's four walls.

Given the narrow scope of *Heller*'s holding, it is at least arguable that state and local governments may still prohibit non-residents – who by definition have no "home" in a foreign state – from bringing their firearms with them when they visit. Indeed, the New York law upheld in the pre-*Heller* case of *Bach v. Pataki, supra*, did precisely that. In this case, however, the combined effect of Denver ordinance and Colorado statute is nowhere near so restrictive. Peterson may keep and bear a pistol for self-defense in his dwelling while he is visiting Denver. The Second Amendment demands nothing more. Peterson thus fails to state a cognizable claim under the Second Amendment because the combined effect of Denver ordinance and Colorado statute does not impose a burden on conduct falling within the scope of the Second Amendment's guarantee.

**3.      Assuming, *arguendo,* that the restrictions established by the challenged regulations implicate the Second Amendment, Plaintiff's claim still fails because those restrictions pass muster under immediate scrutiny.**

If Peterson shows that the combined effect of Denver ordinance and Colorado statute burden the Second Amendment, the Court must then apply a level of scrutiny that is appropriate to the burden imposed by those laws.  As already discussed, courts applying the Second Amendment post-*Heller* have nearly universally adopted intermediate scrutiny with respect to the <u>core</u> right of handgun possession for self-defense in the home.  *Heller*, of course, did not address whether and, if so, to what extent the Second Amendment applies to conduct outside the home.  It is fair to assume, however, that future jurisprudence on this question will largely mirror First Amendment cases that scrutinize most closely those restrictions that are placed on the core right.  *See, e.g., Burdick v. Taskushi,* 504 U.S. 428, 434 (1992) ("the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights); *see also* Joseph Blocher, *Categoricalism & Balancing in First & Second Amendment Analysis,* 84 N.Y.U. L. Rev. 375, 394-95 (2009).

As developed by post-*Heller* case law, intermediate scrutiny in the context of the Second Amendment requires (1) that the asserted governmental interest be "important or substantial" or "significant," and (2) that "the fit between the challenged regulation and the proffered objective be reasonable, not perfect."  *Marzzarella,* 614 F.3d at 98; *see also Skoien,* 614 F.3d at 641 (intermediate scrutiny requires the challenged law to be "substantially related to an important governmental objective").  Here, where the combined effect of two laws is being challenged, both governmental objectives must be considered.

18

Although Denver has thus far declined to respond substantively to Peterson's claims, the city has previously made its case for enforcement of its open carry ban.  In *City and County of Denver v. State of Colorado,* Denver District Court Case No. 03CV3809, *aff'd by operation of law in State of Colorado v. City and County of Denver,* 139 P.3d 635 (Colo. 2006), the city sought a declaratory judgment that several of its gun control ordinances were not preempted by state law.  In support of its argument that the open carry ban was a matter of a local concern (and was thus not preempted), Denver relied almost exclusively on public safety issues, including population density, organized crime rates, and the fact that "a bullet fired in Denver--whether maliciously by a criminal or negligently by a law-abiding citizen is more likely to hit something or somebody than a bullet fired in rural Colorado."  *See* Exh. E at 10.

Preemption issues notwithstanding, these are substantial public safety concerns and, assuming that the ordinance even implicates the Second Amendment right, Denver's decision to address them by adopting an open carry ban represents easily passes constitutional muster.  Intermediate scrutiny only requires that "the fit between the challenged regulation and the proffered objective be reasonable, not perfect."  *Marzzarella,* 614 F.3d at 98.

Colorado's residency requirement for the issuance of CHPs approaches the same public safety concern from a different, but equally legitimate, angle.  As already discussed in detail in Section I.C.2, *supra,* the State has an abiding interest in ensuring that those who apply for permission to carry concealed pistols are qualified to do so.  Much of the information that is crucial to assessing the initial and ongoing eligibility of CHP holders is simply unavailable with respect to non-residents.  Given these limitations, there is surely a reasonable fit between Colorado's goal of promoting public safety and its policy decision to restrict concealed carry

permits to residents of the state.  Hence, assuming that Peterson has asserted a cognizable claim under the Second Amendment, Colorado's residency requirement for the issuance of CHPs easily survives intermediate scrutiny.

To summarize, although Denver ordinance and Colorado statute do combine to limit where Peterson may carry his pistol when he visits Denver, those laws still permit Peterson to arm himself in all of the locations protected by the Second Amendment.  And even if the challenged laws implicate the Second Amendment, they still pass constitutional muster under the intermediate scrutiny test that would be applicable to Peterson's claims.

## CONCLUSION

Based on the foregoing reasoning and authorities, the Attorney General respectfully requests that this Court deny Plaintiff's motion for summary judgment.

JOHN W. SUTHERS
Attorney General


s/Matthew D. Grove
MATTHEW D. GROVE, 34269*
Assistant Attorney General
Public Officials/PUC Unit
State Services Section
Attorney for Attorney General Suthers

1525 Sherman Street, 7th Floor
Denver, Colorado  80203
Telephone:  303-866-5264
FAX:  303 866-5671
E-Mail:  matthew.grove@state.co.us
*Counsel of Record

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2010, I filed a true and complete copy of the within **RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using CM/ECF Filer, which will automatically send email notification of such filing to all attorneys of record.

*s/ Thomas R. Bovee*
THOMAS R. BOVEE
Legal Assistant
Public Officials/PUC Unit
State Services Section
Office of the Attorney General
