# EXHIBIT C

Page 1

1    RECORDED TRANSCRIPTION
2       SENATE BILL 34 (2007)
3    Senate Judiciary Committee
4          January 29, 2007
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 2

1  (The following is the testimony
2  concerning Senate Bill 34, from 2007. This is the
3  testimony before the Senate Judiciary Committee.
4  This took place on January 29, 2007, in Senate
5  Committee Room 352. This begins at 1:34 p.m.)
6  ******
7  CHAIRMAN: Further questions?
8  Senator --
9  UNIDENTIFIED SPEAKER: Do you know if
10 he ever lived in (inaudible) Florida?
11 UNIDENTIFIED SPEAKER: I do not.
12 UNIDENTIFIED SPEAKER: So possibly he
13 lived there, got the permit, and then moved back
14 here and tried to get it through our process,
15 couldn't get it. So you don't know when he got his
16 permit. So you picked one person out of the whole
17 state to use as an example. You don't know when he
18 got it or anything like that, or if he ever had a
19 problem -- if he ever had a gun problem?
20 CHAIRMAN: (Inaudible.)
21 UNIDENTIFIED SPEAKER: I don't know if
22 he ever had a, quote, gun problem. What I do know
23 is that he was fully aware of the policies of the
24 community colleges, that students don't bring any
25 weapons on campus, whether a gun or any kind -- any

Page 3

1  other kind of weapon (inaudible). He made the
2  decision to ignore that.
3  So in that case, I think that was a
4  gun issue incident. He was not threatening. And I
5  really want to stress that. He was not threatening.
6  But he chose to simply ignore a policy that he had
7  been personally advised of (inaudible).
8  CHAIRMAN: Further questions for the
9  witness? Seeing none. Thank you very much for your
10 time.
11 UNIDENTIFIED SPEAKER: Thank you.
12 (inaudible). More chairs, because there are still a
13 couple of people.
14 CHAIRMAN: I have Susan Pritcher.
15 Ms. Pritcher, please come forward. Introduce
16 yourself and who you represent, and then proceed
17 with your testimony.
18 MS. PRITCHER: My name is Susan
19 Pritcher. I'm an agent in charge of Colorado Bureau
20 of Investigation. I'm here to testify on behalf of
21 the Department of Public Safety.
22 I'd like to go over, just real briefly
23 the permit process that was established by the 2003
24 legislation, and then discuss a little bit about
25 reciprocity.

Page 4

1  The 2003 bill essentially establishes
2  a five-year permit to be issued by sheriffs in
3  Colorado. There are certain criteria that have to
4  be met, including some firearm training, you have to
5  be a resident of Colorado, 21 years of age and
6  older, not ineligible pursuant to state or federal
7  law from having firearms, not convicted of perjury
8  for lying on the application, not chronically or
9  habitually using alcohol, unlawful drugs, not under
10 a restraining order, and not a documented danger to
11 yourself or others.
12 The sheriffs are required to submit
13 two sets of fingerprints to the CBI in order to run
14 a fingerprint check at the state and federal level.
15 The fingerprints that are sent to the CBI actually
16 (inaudible), so that during that five years that the
17 person holds a valid permit, if they're subsequently
18 arrested in this state, we immediately notify the
19 sheriffs, if they need to, they can revoke the
20 permit. That's the process that you can't
21 (inaudible) with out-of-state permits.
22 We also do, besides the fingerprint
23 test, the name-based InstaCheck through state and
24 federal databases, which include checks of the CCIC,
25 that's the CBI database, and the ICON, the Colorado

Page 5

1  courts' database, neither of which are accessible to
2  other states.
3  From my experience in the InstaCheck,
4  where we do background checks on all firearm
5  transfers in this state, I think (inaudible) about
6  30 percent of all of our denials are based on
7  information that comes from those two databases that
8  are not accessible to other states.
9  (Inaudible). Currently, we have
10 reciprocity (inaudible). The reciprocity that
11 provision that's currently in statute says that
12 Colorado will recognize the permit from another
13 state, if it's issued to somebody 21 years of age or
14 older, and if the state that the permit comes from
15 recognizes Colorado permits in that state.
16 Currently, Colorado -- in Colorado, we
17 have reciprocity with 25 other states. Nine states
18 in the United States issue permits to non-residents.
19 Five states don't recognize non-resident permits in
20 their reciprocity provisions. Interestingly enough
21 there are two states that issue to non-residents,
22 but also don't recognize non-resident permits in
23 their state, the State of Florida and the state of
24 New Hampshire.
25 One of the benefits that people seek

Page 6

1  acquiring a Florida permit is -- well, there's
2  actually two reasons. The Florida permit is valid
3  for 10 years, as opposed to five years. It's also
4  recognized in more states than any other permit it's
5  actually recognized in 29 states, plus the state of
6  Vermont, which you don't have to have a concealed
7  weapon permit to carry concealed there.
8           The CBI has processed approximately
9  30,000 applications for concealed weapon permits,
10 since the implementation of the 2003 statute.
11 During that time period, we make eligibility
12 determinations based on the information that we're
13 looking at.
14          The sheriff is also conducting an
15 investigation of his own, above and beyond what we
16 do. We refer eligibility determinations to the
17 sheriff. Some of those require further research,
18 and some of them are pretty clear cut. Either
19 they're approvable by virtue of what we're looking
20 at, they may be ineligible and require further
21 research, because we don't (inaudible) criminal
22 arrest that they have, or they are totally
23 ineligible.
24          Of the 30,000 that we've processed so
25 far, 653 we referred back to the sheriff that maybe

Page 7

1  ineligible for a variety of reasons requiring some
2  further research to make a decision one way or
3  another. And then 104, in addition to that, were --
4  determined to currently be prohibited from having a
5  firearm.
6           CHAIRMAN: Thank you. Any questions
7  for the witness? Senator Morse.
8           SENATORE MORSE: Thank you,
9  Mr. Chairman. Could another requirement that -- are
10 they required to physically present -- is the
11 applicant required to physically present themselves
12 to the sheriff?
13          MS. PRITCHER: Yes.
14          CHAIRMAN: Ms. Pritcher.
15          MS. PRITCHER: I'm sorry. Yes
16 (inaudible).
17          CHAIRMAN: Senator?
18          SENATORE MORSE: No further questions.
19 Thank you.
20          UNIDENTIFIED SPEAKER: Does Colorado
21 issue non-resident permits?
22          MS. PRITCHER: No.
23          CHAIRMAN: Further questions? Seeing
24 none. Thank you very much for coming down today.
25          The next is Sheriff Pelle. Sheriff,

Page 8

1  welcome to the Senate Judiciary. Good afternoon.
2  How was the drive in?
3           MR. PELLE: Not bad. I'm here --
4           CHAIRMAN: Please introduce yourself,
5  indicate who you represent and proceed with your
6  testimony.
7           MR. PELLE: My name is Joe Pelle. I'm
8  the sheriff of Boulder County. I'm also the
9  president of the County Sheriffs of Colorado. The
10 County Sheriffs of Colorado, we're very interested
11 in support of this bill for a number of reasons.
12          First and foremost, the responsibility
13 for issuing permits in Colorado has been given to
14 us, and we take that responsibility seriously. In
15 my county alone we've issued about 1200 permits.
16          I can also tell you that we've revoked
17 a number of permits and denied a number permits.
18 That's based sometimes on Instacheck, and things
19 that are readily available and could be readily
20 available out of state, but it's also sometimes
21 based on information that's in ICON or the court
22 systems, has to do with restraining orders, and
23 sometimes has to do with mental health issues. All
24 of that information -- none of that information
25 available to people in other states.

Page 9

1           We believe that a mail-order system to
2  issue permits by other states undermines the entire
3  process of local control and local initiative in our
4  state. And we know that there are actually firearm
5  instructors in the metro area that are teaching home
6  defense in weapons -- pistol classes and are
7  advising their clients to go to other states because
8  it's cheaper, has a longer expiration date, and
9  easier to get.
10          Again, we think that undermines the
11 process.
12          We just urge a yes vote on this and
13 think it's important to maintain our ability to
14 manage the system and the responsibility we've been
15 given by the state.
16          CHAIRMAN: Thank you. Are there any
17 questions? Senator Mitchell.
18          SENATOR MITCHELL: Thank you,
19 Mr. Chairman. And, Sheriff, thank you for being
20 here with us today. Ms. Reinarken (phonetic) shared
21 the incident of a student whose possession of a
22 firearm frightened some of -- the student's
23 classmates.
24          Apart from that incident, which
25 apparently, did not involve in any uncovert activity

Page 10

1  or menacing activity by a student, are you aware of
2  any (inaudible) where there's ever been a problem or
3  someone with an out-of-state permit behaved
4  unlawfully?
5            MR. PELLE:  (Inaudible) not
6  (inaudible).
7            UNIDENTIFIED SPEAKER:  (Inaudible.)
8            UNIDENTIFIED SPEAKER:  (Inaudible.)
9            CHAIRMAN:  Further questions?
10 (Inaudible.)
11           UNIDENTIFIED SPEAKER:  Thank you, Mr.
12 Chair.
13           Sheriff Pelle, what sort of public
14 safety concerns are addressed in the revocation and
15 the denial that you mention that you have some of
16 those in (inaudible) county?
17           CHAIRMAN:  Sheriff Pelle.  We're being
18 recorded, and for the record, I need to introduce
19 the person before they speak, so if you would please
20 go through the chair.  Thank you.
21           Mr. Smith:  Thank you.  (Inaudible).
22 We -- under (inaudible) the Instacheck systems,
23 there are a number of -- and under the statute,
24 there are a number of things that makes a person
25 ineligible to possess a firearm, or to have a

Page 11

1  permit, to begin with.
2            And then there's this sort of safety
3  clause that says if the sheriff determines that a
4  person is a danger to the community, the sheriff can
5  revoke or deny a permit based on that.  What falls
6  under that category commonly, and the experience
7  I've had in my county, are things that don't involve
8  a criminal arrest or a violation of a crime, but it
9  may involve mental health issues.
10           And we've had a number of -- I'm not
11 going to say a number.  We've had several cases
12 where we've had people who have had hallucinations,
13 auditory, and have actually taken shots at intruders
14 they thought they saw.
15           We'd had cases of suicidal people who
16 threatened to harm themselves.
17           When those cases are brought to my
18 attention, we revoked or denied a permit based on
19 that information.  That information is available
20 only on a local basis, only to local law
21 enforcement.  It wouldn't be available to other
22 states' issuing authorities.
23           CHAIRMAN:  (Inaudible).  Senator
24 Morse.
25           SENATORE MORSE:  Thank you

Page 12

1  Mr. Chairman.
2            Sheriff Pelle, Senator Mitchell asked
3  you about instances where folks that (inaudible)
4  permits have gotten into trouble and would have
5  gotten those permits revoked.  How would you know
6  that they got on out-of-state permit.
7            CHAIRMAN:  (Inaudible).
8            MR. PELLE:  That's the difficulty with
9  allowing the out-of-state or mail-order system, in
10 Colorado, when a permit holder commits a crime or
11 becomes involved in a mental health issue, law
12 enforcement can come to us to notify us that it is
13 an issue, and we can then have a hearing and do a
14 revocation.
15           I have no idea how you handle a
16 problem with an out-of-state permit issued by
17 someone through the mail.  There's no personal
18 attachment, and I have no idea how you go about
19 revoking an out-of-state permit.
20           You know, the first thing, you would
21 request a hearing.  In Florida, for instance, the
22 permits are issued by the State Department of
23 Agricultural, which I'm sure is some huge onerous
24 organization, and doesn't come down to the level of
25 having, you know, a local (inaudible) a person

Page 13

1  responsible for arms training and administering
2  permits.
3            CHAIRMAN:  Additional questions?
4  Seeing none.  Thank you very much.
5            Senator Morse, I got the top three.
6  And then I think you have four and five.  And I have
7  Chief Sloan from Arvada.
8            Chief Sloan, would you please come
9  forward.  Welcome to Senate Judiciary.  Please
10 introduce yourself and indicate who you represent
11 and proceed with your testimony.
12           MR. SLOAN:  Thank you.  My name is Ron
13 Sloan.  I'm the chief of police in Arvada.  I'm here
14 today representing the Colorado Association of
15 Chiefs of Police.  My comments will be very short.
16           The Colorado Association of Chiefs of
17 Police believe that this particular bill is, in
18 essence, a clean-up bill which clarifies what the
19 original intent was for reciprocity in the
20 concealed-carry bill we passed in '03.  And we
21 support this bill.  We believe that reciprocity --
22 the intent of reciprocity was to allow for folks who
23 live in other states that recognize Colorado as a
24 concealed carry permitting process.
25           When they visit Colorado, if they have

Page 14

1  a concealed carry permit from those states, be able
2  to carry in this state. And that was the expressed
3  and the understood intent of reciprocity, and
4  likewise for Coloradoans who visit those states.
5       And the Colorado Chiefs, again,
6  support this bill as a way of assuring that that's,
7  in fact, the way reciprocity is applied.
8       CHAIRMAN: Thank you. Any questions
9  for Chief Sloan? Seeing none. Thank you very much
10 for coming down.
11      Ms. Terry, Ann Terry (phonetic).
12 Introduce yourself, indicate who you represent and
13 proceed with your testimony. Why don't you go ahead
14 and sign in after you're done.
15      MS. TERRY: Thank you, Mr. Chair. Ann
16 Terry, Colorado Department of Public Safety. And on
17 behalf of the Department of Public Safety, we'd like
18 to (inaudible) in support for this bill, for all the
19 reasons that have already been stated here today.
20 Thank you.
21      MS. PRITCHER: Any questions for
22 Ms. Terry? Seeing none. Thank you.
23      MS. TERRY: Thank you.
24      SENATORE MORSE: Mr. Chair?
25      CHAIRMAN: Senator Morse.

Page 15

1       SENATORE MORSE: If I could ask if
2  there's anybody else that signed up in support that
3  I'm not aware of, we could have them now, just for
4  the sake of consistency. And then yield to the
5  opposition.
6       CHAIRMAN: Let me check here. Marilyn
7  Shoe (phonetic). Did I get that right? Marilyn,
8  please come forward. Please introduce yourself and
9  indicate who you represent for the record, and then
10 proceed with the testimony.
11      MS. SHOE: My name is Marilyn Shoe,
12 and I'm representing the League of Women Voters for
13 Colorado, and for Senate Bill 34.
14      We heard questions (inaudible)
15 reciprocity that was first opposed in law. And the
16 questions we had were do other states meet Colorado
17 issuing requirements, what about accountability, who
18 benefits, who doesn't, and does it make sheriffs'
19 and chiefs' jobs harder.
20      Because this bill speaks to these
21 issues, and closes a loophole, that let's people end
22 run Colorado law. We ask the committee for a yes
23 vote on this bill. Thank you.
24      CHAIRMAN: Any questions for Ms. Shoe?
25 Seeing none. Thank you very much for coming down.

Page 16

1       Senator Morse, I have Amber Tafoya.
2  She doesn't indicate how she (inaudible). Please
3  come forward, Ms. Tafoya. Introduce yourself,
4  indicate who you represent, and proceed with your
5  testimony.
6       MS. TAFOYA: Good Afternoon, Chairman,
7  members of the committee. My name is Amber Tafoya.
8  I'm the public policy director with the Colorado
9  Coalition Against Domestic Violence. We're a
10 non-profit membership association. We have 86
11 members. We serve over 40,000 victims of domestic
12 violence (inaudible) each year.
13      I'm here today to encourage you to
14 support SB 34 concerning clarification of
15 (inaudible). We support this legislation as an
16 important step in reducing gun violence, especially
17 domestic violence. The reason (inaudible) more than
18 70 percent of domestic violence homicides are
19 committed with guns. And that's a Colorado
20 statistic from private safeguards.
21      The most conservative estimate
22 suggests that women are three times more likely to
23 be killed if there is a gun in the home. We're not
24 saying that concealed carry causes this, but conceal
25 carry (inaudible).

Page 17

1       We are saying that it's important that
2  people who are residents of Colorado follow Colorado
3  laws regarding concealed carry. And that's why we
4  support this bill. It promotes responsible gun
5  ownership, and it ensures that those carrying
6  concealed weapon permits here in Colorado cannot
7  circumvent Colorado law. It just makes sense to
8  provide important protections for victims from those
9  who want the privilige to carry concealed weapons.
10      The protections in the current law
11 include the fact that people who have a current
12 protection order in place, whether it be temporary
13 or permanent, are ineligible for a concealed weapons
14 permit. We cannot be certain of that for people who
15 are coming in from other states or who get mail-in
16 permits.
17      It also gives the sheriffs the
18 opportunity to (inaudible) applicant. We feel that
19 that's essential to maintain a safety in concealed
20 weapons permit.
21      So we just consider it (inaudible)
22 violence. And so it makes sense. We don't question
23 the ability of other residents of other states to
24 have a permit. We just think that Colorado
25 residents should be governed by Colorado law.

Page 18

So if there's no other questions, we would like to just ask you to support this bill.

CHAIRMAN: Senator Mitchell?

SENATOR MITCHELL: Thanks, Mr. Chairman.

I'm sorry, Ms. Tafoya, thank you for being with us today. Your organization does a lot of very important work on that urgent and ugly problem, and I thank you for that work.

Because of the importance of addressing domestic violence, and because you represent a vulnerable population, there's a human tendency to give a lot of moral deference to your policy position, but I hope you'll appreciate that I need to think analytically for a minute about the connection between the problem and this bill on the table today.

So you mentioned that most of the gun violence that occurred in a domestic violence situation happens in the home; is that right?

MS. TAFOYA: Let me refer to my statistics. I'm sorry. Yeah, the information that I have is that women are three times more likely to be killed if there is a gun in the home.

SENATOR MITCHELL: By the way, you're

Page 19

fresh and new, and I'm old and tired. So we're probably about even.

CHAIRMAN: Senator Mitchell.

SENATOR MITCHELL: Thanks, Mr. Chairman.

If it were in the home, concealed weapons laws wouldn't apply anyway, right, because the gun would be somewhere in the home. And we're not talking about concealing any gun and going out on the street. So for that bulk of the cases, this law wouldn't address conceal carry at all. It wouldn't address the kind of situations that you're describing there.

CHAIRMAN: Ms. Tafoya.

MS. TAFOYA: The statistic refers to gun ownership within the home. The homicide rate's message is, look at recent cases in Colorado, not necessarily that the murder case occurs in the home. Murders are taking place, in recent cases, anywhere from somebody next door to somebody else's home.

So I think that the term in the home refers to the fact that the gun is a household gun.

CHAIRMAN: Senator Mitchell.

SENATOR MITCHELL: Thank you. Okay. So some unknown percentage of the 70 percent that

Page 20

happens when there's a gun in the home, might happen outside of the home. I guess what I want to point out is maybe the gap between emotional reaction and the facts that really apply. Because if the horrific crime takes place in the home, conceal to carry laws are irrelevant.

If it takes place out of the home, I can't imagine someone who is so far gone that they will contemplate murder, and they want to track down their spouse and shoot them, but they're going to be deterred by the fact that they don't have a concealed carry permit.

So I'm just wondering -- while I give all kinds of support and appreciation and deference to the cause you address, I'm not quite sure that this proposal helps your cause.

CHAIRMAN: Ms. Tafoya.

MS. TAFOYA: Senator Mitchell, I fully understand your points, and I think that they're very good points. The statistics regarding 70 percent is that 70 percent of domestic violence homicides in Colorado are committed with guns, not that they necessarily occur in the home.

So I think it's just an issue of who's carrying guns. And what we want to know in

Page 21

Colorado, as a coalition, is that people who have guns are following Colorado law. And Colorado legislature has seen fit to (inaudible) to domestic violence (inaudible) if you have a protection order in place, you can't get a concealed weapon.

I agree with you. I don't think that someone who is on the verge of murder is going to go out and say, well, I need to get that concealed weapon permit first. I think that's illogical. But I think that a person who has a concealed weapon permit, who has the weapon on them would have more of an opportunity to use that weapon in that situation.

Murder doesn't happen over night. It's usually a series of gradual steps in a domestic violence situation which eventually leads to the victim's death.

So our concern is that somebody who has weapons, a protection order in place in Colorado, who would be ineligible for a protection order -- ineligible for a concealed carry permit here could, by mail, go to one of these other states and get a concealed weapon permit, and have that weapon (inaudible).

It's not just murder we're talking

**Page 22**

1  about. There is stalking. There's assault.
2  There's harassment. There's a variety of crimes
3  (inaudible). So it's not just an issue of murder.
4  It's an issue of workplace safety. It's an issue of
5  community safety.
6         CHAIRMAN: Senator Mitchell.
7         SENATOR MITCHELL: Thank you, Mr.
8  Chairman. I appreciate that thoughtful explanation.
9  I think there is one thing that we do agree on,
10 though, which is by the time someone has criminal
11 intent, even if they haven't gotten to the point of
12 murder, if they want to torment or stalk or
13 terrorize someone, I'm guessing that that submitting
14 themselves to the authority and going through the
15 permitting process is the last thing on their mind.
16        Once they have (inaudible) intent,
17 conceal to carry is almost irrelevant.
18        CHAIRMAN: Ms. Tafoya.
19        MS. TAFOYA: Yes, we do agree on that
20 point. Where we disagree is that through our
21 experience in doing this work, we know that -- well,
22 I think my (inaudible) familiarity breeds contempt,
23 and it doesn't start at that point.
24        So our concern, as I rest, is that
25 initial conceal to carry weapon's permit where they

**Page 23**

1  would have a domestic violence order in place for
2  something. If you can start with, you know, a
3  permit from the state of Florida that lasts for 10
4  years, but you have a Colorado protection order in
5  place, what's going to happen intervening 10 years?
6  What could be the chain of events?
7         We want to make sure that Colorado
8  residents are following Colorado law.
9         CHAIRMAN: Thank you. Any additional
10 questions? (Inaudible).
11        Bob Edmonson; is that the right
12 (inaudible). Please come forward. Please introduce
13 yourself to the committee. Indicate who you
14 represent, if anybody, and then proceed with your
15 testimony.
16        MR. EDMONSON: My name is Bob
17 Edmonson, and I represent the Firearm Coalition in
18 Colorado, and we are opposing Senate Bill 34. Thank
19 you, Mr. Chair, and thank you committee members for
20 allowing me to speak here.
21        Our position here is that if
22 law-abiding Colorado permit holder has a permit from
23 another state which has reciprocity with Colorado,
24 the attorney general must have determined that the
25 issuing state meets Colorado requirement. For

**Page 24**

1  instance, we do no have reciprocity with Vermont,
2  because Vermont has no requirements for concealed
3  carry, as well. Colorado has not entered into an
4  agreement with Vermont.
5         We don't understand why there would be
6  a double standard for a Colorado citizen versus a
7  citizen from another state. There also seems to be
8  a low incident of problems regarding permit holders
9  from other states.
10        But as we understand this bill, there
11 may be another problem with it. A citizen from
12 another state who has a permit in a reciprocity
13 state would also be affected by this bill. For
14 instance, a Virginia resident gets a permit from
15 South Dakota. Now, Colorado has reciprocity with
16 South Dakota. But even though Colorado has
17 reciprocity with South Dakota, it does not appear
18 that that Virginia resident would be able to carry
19 in Colorado, because he would not have a South
20 Dakota driver's license to go with (inaudible)
21 permit.
22        Another concern we have is retribution
23 from states that currently have agreements with
24 Colorado. We're concerned that they may abrogate
25 their agreements because of the change, (inaudible)

**Page 25**

1  information that we have from the National Rifle
2  Association, thousands of permit holders could
3  possibly be affected by this (inaudible).
4         That's the only testimony I have here.
5  Thank you very much. Are there any questions?
6         CHAIRMAN: Any questions for the
7  witness? Thank you very much for coming down.
8         Anthony Fabian. Mr. Fabian, welcome
9  to Senate Judiciary. Please introduce yourself,
10 indicate who you represent, if anybody, and then
11 proceed with your testimony.
12        MR. FABIAN: Good afternoon, Mr.
13 Chairman, members of the committee. My name is
14 Anthony Fabian. I am president of the Colorado
15 Shooting Association of the National Rifle
16 Association. And combining those two organizations,
17 I'm speaking for tens of thousands of Colorado
18 shooters, hundreds of gun owners in this state.
19        CHAIRMAN: Am I to understand you
20 represent a shooting organization and the Rifle
21 Association, NRA?
22        MR. FABIAN: We are the official state
23 association of the National Rifle Association.
24        At the risk of wearing out a
25 legislative cliche, it sounds like this bill is a

Page 26

1  solution in search of a problem.
2      We -- in all the testimony here today,
3  I haven't heard yet a reason why they're dangerous
4  for somebody who's paying -- for a Florida resident
5  with a Florida permit, where it's not been good for
6  them to be carry concealed in Colorado, but it's
7  dangerous for a Colorado resident who has a Florida
8  permit issued under the same criteria, for them to
9  have a permit in Colorado.
10     Nobody's ever been able to explain
11 that. No one's made an offer. And I believe that
12 question is seriously vague here this afternoon.
13 And I think that's because I don't think anybody can
14 answer that question and explain it in any kind of
15 intelligent manner. Either we have reciprocity or
16 we don't.
17     As the gentleman preceding me said,
18 the reason the reciprocity process sometimes takes a
19 while is those laws are vetted by the attorney
20 general's office. Reciprocity isn't an automatic
21 process.
22     Also, today, we've not heard any
23 examples of someone who got a permit from another
24 state, a Colorado resident who got a permit from
25 another state, who was ineligible under Colorado law

Page 27

1  to get a permit. We've heard people who -- we heard
2  of one instance where a person was denied, but we
3  don't know why that person was denied. We don't
4  know if he was eligible or not.
5      Nobody here has given any (inaudible)
6  example here of somebody who we know for sure was
7  ineligible under Colorado law, and then was able to
8  go and get a permit from another state and use that
9  in Colorado.
10     Unfortunately, it looks here today
11 that when I'm talking about an issue of public
12 safety, we're talking about it's an issue of power
13 and authority.
14     Colorado sheriff has already been
15 mentioned here, that they have a discretionary power
16 under our conceal carry law, to deny permits in
17 certain situations. And it's looking here, from
18 some testimony, from the lack of any kind of
19 evidence, that there's an actual problem with law
20 enforcement, that it's basically a case of they
21 don't like the fact that people are getting permits
22 and basically going around the Colorado -- the
23 Colorado process, in other words, the sheriff is
24 being left out.
25     With respect to those discretionary

Page 28

1  denials, I can tell this committee here that,
2  although it's not wide spread, abuses of that
3  discretion are common. I'm an attorney. I've been
4  practicing law in Colorado for over 10 years.
5  Almost half of that time I've also spent as a
6  prosecutor. Since this law went into effect, I've
7  handled well over a dozen cases that seem to be the
8  exact of individuals who were denied their permits
9  under this discretionary clause.
10     In all but one of those incidents,
11 those -- those denials were overturned. Most of
12 them were overturned after I just basically sent the
13 sheriff a letter saying, you're not complying with
14 the law, and the criteria that could be possibly
15 cited here it wouldn't stand up in court.
16     I've never had to take one of these
17 cases to court. They've never gone before a judge.
18 And, you know, I'd like to think I'm a good lawyer,
19 but with a record like that 15, and one, that I
20 think, is an indication of a lot of these people are
21 being denied, and once -- once it's being pointed
22 out to the sheriffs that they're not using the
23 proper -- proper legal standards in making their
24 denials, they're reversing themselves in short
25 order.

Page 29

1      So I would ask this committee to look
2  at that issue also when you're looking at who is
3  pushing this bill, who is in favor of this bill, and
4  their lack of substantive reasons why we need this
5  law.
6      Thank you.
7      CHAIRMAN: (Inaudible.)
8      UNIDENTIFIED SPEAKER: You touched on
9  something that seems to be the crux of this. It
10 seems that people (inaudible) trying to circumvent
11 the Colorado process. And is that (inaudible). We
12 do have a process here, and you're probably more
13 familiar with it than I am. And it seems that by
14 mailing out an application to Florida, New
15 Hampshire, wherever you may have, they're trying to
16 get around the process here, because they think
17 there might be a doubt that they'll actually get the
18 permit issued here.
19     So maybe you could elaborate on your
20 thoughts there.
21     MR. FABIAN: I would just be
22 speculating, but I have -- I have known individuals
23 who -- that believe -- who hearing other people who
24 were denied under the discretionary policy -- I'll
25 just give you an example, Senator. In the last two

Page 30

1  weeks, I've received three sets of phone calls from
2  individuals who were denied by county sheriffs in
3  their application. The basis for the denial,
4  although it was not specifically given, they were
5  just basically told, you didn't -- we're denying you
6  under the discretionary clause, not giving a
7  specific reason.
8     The only thing (inaudible) backgrounds
9  was a non-violent misdemeanor conviction that of
10 those three cases, the most recent was six years in
11 the past.
12    And so word of that gets around to
13 people, oh, well, if you have any conviction on your
14 record at all, the sheriffs denying you. So I could
15 understand somebody hearing that, knowing that this
16 application process isn't cheap. Our application
17 process now in Colorado is knocking on the door of
18 $200. And so I can see an individual saying, oh,
19 before I waste $200, I'll just go someplace where I
20 know I can get a permit. I'm a law abiding citizen.
21 I haven't done anything wrong or I need to be
22 ashamed of in my background, why should I be subject
23 to an application fee, and then have to retain an
24 attorney to go tell a sheriff that he's wrong.
25    CHAIRMAN: Any questions for the

Page 31

1  witness? Senator Morse.
2     SENATORE MORSE: Thank you,
3  Mr. Chairman. Just one quick question (inaudible)
4  your experience as an attorney, and specifically
5  your experience as a prosecutor, did you ever run
6  into situations that in those cases where people
7  were charged with felonies that could be construed
8  as violent and were able to plead those to
9  non-violent misdemeanors, for whatever reasons under
10 the circumstances?
11    CHAIRMAN: Mr. Fabian.
12    MR. FABIAN: Of course. It happens
13 all the time. However, last I checked, in the
14 United States, you're innocent until proven guilty,
15 and you stand guilty or convicted of the charge you
16 plead guilty to or are convicted of, regardless of
17 what you were originally charged with.
18    CHAIRMAN: Senator Mitchell.
19    SENATOR MITCHELL: (Inaudible), as
20 you've observed circumstances when the DA appear to
21 charge higher than the facts would have supported in
22 order to eventually plead down to something closer
23 to the facts on the ground.
24    MR. FABIAN: I'm sorry. Yes, I've
25 seen it many times.

Page 32

1     CHAIRMAN: Further questions for the
2  witness. Seeing none. Mr. Fabian. Thank you very
3  much for coming down.
4     Dudley Brown. Mr. Brown, please come
5  forward, indicate -- introduce yourself to the
6  committee, indicate who you registration, if
7  anybody, and then and then proceed with your
8  testimony.
9     MR. BROWN: Mr. Chairman, members. I
10 am Dudley Brown, executive director of Rocky
11 Mountain Gun Owners. I think I'm the only person in
12 here that was involved on this level representing
13 gun owners since it started in 1994, when
14 (inaudible).
15    I wanted to talk real quickly about
16 the community college example, because that's the
17 only example we've really heard seems to, at least,
18 law enforcement upset. And it's the only thing they
19 could cite. And that member happens to be a member
20 of my organization, called me right when it
21 happened, lives in Denver (inaudible) in Denver,
22 because he applied before the 2003 law, but then --
23 and then the law enforcement officer started
24 entering those citizens into a database, and that
25 database was acceptable.

Page 33

1     And there complications with that,
2  which are addressed in other legislation sessions.
3  So that is one of the reasons many people don't want
4  permits in Colorado. There are many people who are
5  residents in Colorado, don't want Colorado permits,
6  that are not entered on that database, and so they
7  go to another state.
8     To my knowledge, all of them are
9  eligible, who denied (inaudible) taking about
10 earlier, who was denied both from Denver and Jeffco,
11 before they were required to issue the permit.
12 Because they didn't issue permits. Denver didn't
13 issue (inaudible) sheriff didn't issue.
14    Reciprocity is another reason people
15 apply to other states. Now, that has changed
16 recently. And I do want to give credit to CBI for
17 seeking those reciprocity agreements. But as of a
18 few years ago, there weren't many states we had
19 reciprocity with. And, of course, before 2003, we
20 what none. And so while we have 25 now, Florida's
21 had 29 states with reciprocity -- well, actually,
22 27, for several years. And then, prior to that, it
23 was 23.
24    So for people who were traveling
25 salesmen -- somebody I wanted to testify on this

Senate Bill 34 (2007) - 1/29/2007

Page 34

1  committee, which are software developers, travel all
2  around the country. And in some areas you need --
3  feel like they need to carry a concealed weapons.
4  (inaudible) for him, because many states (inaudible)
5  applies to a great many states. That's another
6  reason.
7         Another one was publishing of the
8  names. We're contacted regularly by young women who
9  are victims of domestic violence or pursued --
10 potential victims, stalkers, and the like, who get
11 concealed weapons permits.
12        And I think Senator Mitchell is
13 alluding to that. That firearm is a great
14 equalizer. It doesn't matter how big the guy is,
15 for a young lady who is in trouble and some guy's
16 following her, and she can't get somebody to file
17 charges, because he hasn't hit her or anything, but
18 he's following her around and stalking her, a
19 firearm, and a concealed weapon permit itself, is a
20 great equalizer. In other words, it makes her feel
21 a lot safer out here, and I believe it does maker
22 her safer.
23        Well, those (inaudible) domestic
24 violence is an issue, don't want to be entered in a
25 list. They don't want their ex-spouse or boyfriend

Page 35

1  to know they have that. They think it might be some
2  kind of challenge to them. And so (inaudible)
3  people like that.
4         And they don't want to testify in
5  front of the committee. They don't want anybody
6  here to know. They're not what you jokingly call
7  gunning. You know, they're not those kind of
8  people. In fact, they really have to go through to
9  show them which end the bullet comes out of, almost.
10 They have to go through a lot of training, and it's
11 very foreign to them, and they're not excited about
12 this little (inaudible), some people do get excited
13 about.
14        Those are just some of the reasons
15 people apply to other states. And there's a lot of
16 little reasons, but those are the main reasons. And
17 I don't know of anyone who contacted me who would be
18 ineligible under Colorado law, but then applied to
19 another state. And I've probably met two or three
20 hundred people in that number of years I've been
21 doing this that have states -- permits in other
22 states, including instructors (inaudible).
23        My point is it sounds a little bit
24 dark and mysterious, but it's a mail-order permit.
25 It's not dark and mysterious. Florida has issued

Page 36

1  well over a million permits in the years they've
2  issued permits, and that number's climbing. Many
3  states (inaudible). And you've heard the number
4  from Susan Pritchard. Those numbers -- denied 105
5  out of 30,000, based on cause, potentially for the
6  sheriffs to deny. If you've got those kinds of
7  numbers in any other form (inaudible).
8         HEARING OFFICER: Questions for the
9  witness. None. Thank you very much for coming
10 down.
11        I have a person signed up for Senate
12 Bill 37, but we don't have a Senate Bill 37, it's
13 34. Is this the bill that you wanted, Leslie?
14        MS. BARROW: Leslie Ann Barrow
15 (phonetic). I represent Colorado Cease Fire, and I
16 (inaudible) we are in support of Senate Bill 07.
17 It's an issue of public safety, and we're in support
18 of the sheriffs and CBI. We apologize that
19 (inaudible) could not be here.
20        CHAIRMAN: Any questions for the
21 witness. No apology necessary. Thanks for coming
22 down.
23        That's everybody who's signed up to
24 testify for Senate Bill 34. Anybody in else in the
25 room who wishes to testify who has not had an

Page 37

1  opportunity to speak? Seeing none, (inaudible).
2         UNIDENTIFIED SPEAKER: (Inaudible),
3  Mr. Chair, thank you. This bill required that
4  Colorado residents meet Colorado law, and present a
5  permit, if they choose to carry a concealed weapon,
6  issued by Colorado. I submit it's just a
7  common-sense requirement. And I would like to move
8  Senate Bill 34, and ask for a yes vote.
9         CHAIRMAN: Commissioner, it's a proper
10 motion. I understand you have an amendment, as
11 well.
12        SENATORE MORSE: (Inaudible). I would
13 like to move Amendment 2 (inaudible).
14        CHAIRMAN: Okay. That's a proper
15 motion.
16        SENATORE MORSE: As I said in my
17 introductory remarks, one of the criticisms that I
18 received on this bill was that someone who lawfully
19 possessed a Florida permit, for example, who is
20 lawfully a Florida resident, who, for whatever
21 reason, decided to become a Colorado resident, and
22 they moved to Colorado, they're now a Colorado
23 resident, and technically, under my bill, they're no
24 longer permitted to use that Florida permit. They
25 have to use a Colorado permit.

10 (Pages 34 to 37)

Calderwood-Mackelprang, Inc. 303.477.3500

Page 38

1  Well, they need a Colorado driver's
2  license in order to get the Colorado permit. And
3  once they get that driver's license, then they have
4  really solidified that they do not any longer have a
5  Florida driver's license to go along with that
6  Florida permit.
7  Our licenses -- and I do park in the
8  State of Colorado -- show the dates that they are
9  issued on the face of the driver's licenses. So
10 this amendment just gives the person 90 days from
11 the date that driver's license is issued -- since
12 the sheriffs have 90 days to issue a concealed
13 weapons permit once the application has been made.
14 So the thought is, actually, at this
15 point they can issue them much faster than that, but
16 I wanted it to be consistent in law that you have 90
17 days to get the permit, and we'll give you 90 days
18 to use your old our-of-state permit. But if you
19 don't have a single day where you're not permitted
20 to carry a concealed weapon by law. That's the
21 effect.
22 CHAIRMAN: Any objection to L002?
23 Seeing none, L002 is adopted. Is
24 there discussion of Senate Bill 34?
25 Members, I apologize. I told Senator

Page 39

1  (inaudible) that I would hold the vote (inaudible)
2  going to vote on this until he was here. I think
3  he's done presenting the bill that he was working,
4  just need Gilbert to go and bring him in here so we
5  can have a vote on the bill. (Inaudible).
6  But in the meantime, we'll
7  (inaudible).
8  UNIDENTIFIED SPEAKER: Please note
9  that at this point there is a two-minute recess.
10 CHAIRMAN: The Judiciary will come
11 back to order. The proper motion on the table is
12 the passage of Senate Bill 34, and, as amended
13 (inaudible). The motion is to the committee as a
14 whole for the recommendation. Gilbert, please call
15 the roll.
16 (Inaudible.)
17 CHAIRMAN: Congratulations, Bill 34
18 passes on a four to two vote.
19 (End of CD.)
20
21
22
23
24
25

Page 40

1  CERTIFICATE
2
3  STATE OF COLORADO    )
                        )ss.
4  CITY AND COUNTY OF DENVER )
5
6  I, Angela Smith, Professional Reporter
   and Notary Public for the State of Colorado, do
7  hereby certify that this transcript of the CD was
   reduced to typewritten form by computer-aided
8  transcription, that the foregoing is a true
   transcript of the proceedings had to the best of my
9  ability; and the speakers were identified according
   to the information provided and to the best of my
10 ability.
   I further certify that I am not an
11 attorney nor counsel nor in any way connected with
   any attorney or counsel for any of the parties to
12 said action or otherwise interested in its event.
   IN WITNESS WHEREOF, I hereunto affix my
13 hand and notarial seal this 7th day of December
   2010.
14 My commission expires January 22,
   2011.
15
16
17
18 _____
   Angela Smith
19 Professional Reporter and Notary Public
   Calderwood-Mackelprang, Inc.
20
21
22
23
24
25