IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Walker D. Miller

Civil Action No. 10cv-00059-WDM-MEH

GRAY PETERSON,

      Plaintiff,

v.

ALVIN LACABE, individually and in his official capacity as Manager of Safety for the City and County of Denver,

      Defendant,

JOHN W. SUTHERS, Attorney General for the State of Colorado,

      Intervenor.

## ATTORNEY GENERAL'S MEMORANDUM OF LAW IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

Intervenor John W. Suthers, in his official capacity as Attorney General for the State of Colorado ("the Attorney General"), submits the following brief in support of his cross-motion for summary judgment.

## INTRODUCTION

Plaintiff Gray Peterson has challenged the constitutionality of the Colorado statute that forbids him, as a non-resident, from obtaining a permit to carry a concealed handgun in Colorado ("CHP"). As narrowed by the Court's order of October 20, 2010 (Doc. 26), Peterson's Amended Complaint alleges that Colorado's permitting scheme, when considered both independently and together with the open carry ban established by Denver ordinance, violates: 1) his constitutional right to travel; 2) the Privileges and Immunities Clause of Art. IV, § 2 of the United States Constitution; 3) the Equal Protection Clause; and 4) the Second Amendment, as interpreted by

*District of Columbia v. Heller,* 128 S.Ct. 2783 (2008), and *McDonald v. City of Chicago,* 130 S.Ct. 3020 (2010).[1]  The Attorney General intervened to defend the constitutionality of the state statute barring the issuance CHPs to non-residents.  As argued below, Colorado's permitting scheme is designed to – and does – ensure the initial and ongoing qualifications of individuals who are allowed to carry concealed weapons in the state.  The challenged statute represents an eminently reasonable exercise of the state's police power, and advances Colorado's legitimate goal of ensuring public safety.

## STATEMENT OF MATERIAL UNDISPUTED FACTS

Due to the unusual procedural posture of this case, the Attorney General's assertions of undisputed material facts are offered in two parts.  Plaintiff has stipulated to the first three statements of fact below.[2]  The Attorney General believes that Plaintiff has no reason or evidence to dispute the remaining assertions of fact, but acknowledges that they are based in part on information that would have been made available during discovery had the Attorney General been a party at the time.  Should the Plaintiff wish to dispute the facts asserted, the Attorney General would not object to the reopening of discovery for all parties.

### *Stipulated Facts*

1.      Peterson is not a resident of the State of Colorado.  *Sched. Order* (Doc. 13) at 3.

---

[1] As submitted, Peterson's Amended Complaint also raised constitutional challenges to Colorado's reciprocity arrangements with several other states.  Per the Court's order of October 20, 2010, those claims are no longer at issue.

[2] The Attorney General recognizes that Peterson and LaCabe stipulated to several more facts in the Scheduling Order, but maintains that the remaining stipulations of fact are not material, particularly in light of the Court's dismissal of Peterson's challenge to Colorado's reciprocity requirements.

2.      On or about June 2, 2009, Plaintiff filled out an application in Denver County for a permit to carry a concealed handgun.  *Id.*

3.      Defendant LaCabe, who is vested with statutory authority to issue CHPs, denied Plaintiff's application for a concealed handgun permit because Plaintiff is not a resident of the state of Colorado as required by § 18-12-203(1)(a), C.R.S. (2010).  *Id.*

### *Additional Assertions of Fact*

4.      Colorado statute requires CHP applicants to undergo a background check before they may be issued a permit to carry a concealed handgun. *See* § 18-12-206(3)(c).

5.      Completion of the background check is shared by CBI, which confirms the applicant's eligibility to possess a firearm under federal law, and the local sheriff, who is the final arbiter of the application.  Exh. A (*Ostrander Aff.*), ¶ 5, 6; Exh. B (*Spoden Aff.*), ¶ 5-8.

6.      CBI confirms the applicant's eligibility to possess a firearm under federal law by checking the applicant's fingerprint-confirmed identity against national databases such as NICS, NCIC, and III. Exh. B, ¶ 9-11

7.      NICS, NCIC, and III contain less information than state and local databases, and often omit information that would disqualify a CHP applicant under Colorado law.  Exh. A, ¶ 6; Exh. B, ¶ 9-11; Exh. C (*Senate Committee Testimony*), pp. 8-9.

8.      Local databases such as CCIC and ICON more fully reflect a CHP applicant's civil and/or criminal history, and thus the applicant's qualifications for a CHP under Colorado law, than do the national databases.  Exh. A, ¶ 8-10; Exh. B, ¶ 10; Exh. C, pp. 10-11.

9.      Other states maintain databases that are similar to CCIC and ICON.  Exh. B, ¶ 10.

10.      Neither the CBI nor local sheriffs have direct access to local and statewide databases maintained by other states.  Exh. A, ¶ 10-11; Exh. B, ¶ 10, 13.

11.      Local sheriffs, with the cooperation of authorities in other states, are sometimes able to acquire information concerning a CHP applicant that is maintained in that state's local or statewide databases.  Exh. A, ¶ 11.

12.      Often agencies in other states are either unwilling to assist with these inquiries or require a fee that cannot, by statute, be passed along to the CHP applicant.  Exh. A, ¶ 11-12.

13.      As a result, should non-residents become eligible for CHPs, Colorado law enforcement authorities would be unable to conduct a satisfactory background check concerning those non-resident applications. Exh. A, ¶ 13; Exh. B, ¶ 14.

14.      Colorado residents who possess a CHP have flagged records in CCIC.  If a CHP holder is arrested in Colorado, information concerning that arrest will be "flashed" to the sheriff that issued the CHP permit for further action.  Exh. B, ¶ 12; Exh. D, pp. 69-70.

15.      No similar flagging system could be assembled for non-residents.  Thus, if a non-resident CHP holder were arrested in his home state, Colorado authorities would have no reliable way to learn of the arrest and take action on the CHP.  Exh. B, ¶ 12; Exh. D, pp. 69-70.

16.      Thirty percent of all CHP application denials in Colorado are based on information that is found in local and statewide databases, but not in national databases.  Exh. D, pp. 69-70.

## SUMMARY JUDGMENT STANDARDS

The purpose of summary judgment is to determine whether a trial is necessary.  *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Summary judgment may be granted when

the pleadings, affidavits, depositions or admissions establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).  The Court must construe facts and draw inferences from them in the light most favorable to the non-moving party.  *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 65 F.3d 1321, 1326 (10th Cir. 1999). The burden rests upon the moving party to demonstrate the absence of genuine issues of material fact.  The party opposing the motion must show that there are genuine issues for trial. Summary judgment is appropriate when a reasonable trier of fact could not return a verdict for the non-moving party.  *Celotex v Catrett,* 477 U.S. 317, 323 (1986).

## ARGUMENT

As narrowed by the Court's order of October 20, 2010, Plaintiff's Amended Complaint alleges that Colorado's denial of concealed handgun permits to non-residents violates four aspects of the United States Constitution: 1) the right to travel; 2) the Privileges and Immunities Clause; 3) the Second Amendment; and 4) the Equal Protection Clause.  Because the Attorney General thoroughly addressed the first three of these claims in his response to the Plaintiff's motion for summary judgment, they are addressed in somewhat less detail here.  Because Plaintiff did not seek summary judgment on his equal protection claim, it has not yet been substantively briefed and is fully addressed below.

**I.      The Equal Protection Clause does not require Colorado to issue concealed handgun permits to non-residents.**

As originally pled, Peterson's Amended Complaint alleged that Colorado's statutory scheme for issuing concealed handgun permits violates the Equal Protection Clause in two ways: 1) by denying CHPs to non-residents; and 2) by requiring a non-resident CHP holder who seeks

reciprocity to be a resident of the reciprocal state that issued his CHP.  The reciprocity claim was asserted solely against now-dismissed Defendant Peter Weir.  Thus, the second of these claims is no longer at issue.  As to the first claim, the Equal Protection Clause does not require Colorado to issue CHPs to non-residents.

### A.      Applicable law and standard of review.

The Equal Protection Clause of the Fourteenth Amendment requires that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  Under the Clause, "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985).  However, the Equal Protection Clause "creates no substantive rights."  *Coalition for Equal Rights, Inc. v. Ritter,* 517 F.3d 1195, 1199 (10th Cir. 2008), *quoting Vacco v. Quill,* 521 U.S. 793, 799 (1997), and "does not require things which are different in fact or opinion to be treated in law as though they were the same." *Campbell v. Buckley,* 203 F.3d 738, 747 (10th Cir. 2000) *quoting Plyler v. Doe,* 457 U.S. 202, 216 (1982).  Moreover, "[t]he initial discretion to determine what is 'different' and what is 'the same' resides in the legislatures of the States." *Id.*  The Supreme Court "allows the States wide latitude when social or economic legislation is at issue."  *Coalition for Equal Rights,* 517 F.3d at 1199 (internal quotations omitted).

In order to assert a viable equal protection claim, a plaintiff must first make a threshold showing that he is being treated differently from others who are similarly situated to him. *Barney v. Pulsipher,* 143 F.3d 1299, 1312 (10th Cir. 1998).  If this showing is made, the rational basis test applies unless the plaintiff is able to show that the challenged statute burdens a suspect class or fundamental right.  *Vasquez v. Cooper,* 862 F.2d 250, 252 (10th Cir.1988).  The rational

basis test requires the plaintiff "to establish that the statute is irrational or arbitrary and that it cannot conceivably further a legitimate governmental interest." *Riddle v. Mondragon,* 83 F.3d 1197, 1207 (10th Cir. 1996) (quotation omitted).

    **B.**    **Plaintiff is not situated similarly to Colorado residents for the purposes of CHP applications and ongoing eligibility monitoring.**

Because he is unable to establish that he is similarly situated to Colorado residents, Peterson's equal protection claim fails at the threshold.

For persons to be similarly situated, they must be alike "in all relevant respects." *Coalition for Equal Rights,* 517 F.3d at 1199. For the purposes of Colorado's concealed carry permitting requirements, however, there is a critical difference between residents and non-residents: the availability of information. Before issuing a CHP, Colorado law enforcement authorities check national databases administered by the National Instant Criminal Background Check System ("NICS"), including the National Crime Information Center ("NCIC"), and the Interstate Identification Index ("III"). Exh. A, ¶ 5; Exh. B, ¶ 7-8; Exh. D., pp. 69-70. The information contained in these databases is important, but it is limited and can be inaccurate. *Id.* Thus, although passing through NICS is a <u>necessary</u> condition of qualifying for a CHP under Colorado law, it is not alone <u>sufficient</u>.

Despite the shortcomings of national databases, they often represent the only information that is readily available with respect to a non-resident's criminal history. State and local databases, on the other hand, are far more comprehensive. They contain a wealth of information that is highly relevant to whether an applicant would be eligible to carry a concealed weapon under Colorado law. Exh. A, ¶ 7-9. However, that information is often unavailable to law enforcement in other states. Exh. A, ¶ 10-11. This is problematic enough for new arrivals to

Colorado, but because this group represents only a small percentage of CHP applications overall, permitting authorities can devote additional resources to their applications as needed. Exh. A, ¶ 11b. Opening the door to non-resident applications would fundamentally alter the equation. By statute, CHP applications must be processed within 90 days. § 18-18-206(1), C.R.S. (2010). It would simply be impossible for Colorado sheriffs to comply with this deadline while, at the same time, comprehensively evaluating the qualifications of every member of the expected flood[3] of non-resident applicants.

Perhaps even more troubling is the fact that it would be virtually impossible for Colorado authorities to monitor the ongoing qualifications of non-resident CHP holders. In Colorado, CHP holders are flagged in the CCIC database. Exh. B, ¶ 14. If a CHP holder is arrested in Colorado, his status as a CHP holder is "flashed" via the CCIC database to the sheriff of the issuing county, who may then take action with respect to the permit. *Id.* Because law enforcement contacts are most likely to occur in an individual's state of residence, this notification system is an effective way to monitor the eligibility of Colorado's CHP holders. *Id.* No such system exists for interstate reporting, however. *Id.* Thus, if the residency restriction were lifted, issuing sheriffs would have no way to monitor the home state law enforcement contacts of non-resident CHP holders. *Id.* This would remain the case even if those contacts would affect a non-resident's eligibility to possess a CHP under Colorado law. *Id.* Short of self-reporting or blind luck, it would be virtually impossible for a sheriff who issued a CHP to a non-

---

[3] As of November 30, 2010, Florida had 82,288 non-resident CHP holders; representing more than 10% of the CHPs issued statewide. *See* http://licgweb.doacs.state.fl.us/stats/cw_active.html. In contrast, between 2003 and October 2010 CBI processed a total of 109,127 CHP applications. *See* http://cbi.state.co.us/ic/Stats/2010/October%202010%20Firearm%20Statistics.pdf.

resident to discover that the non-resident had committed an act in his home state that cast doubt on his ongoing eligibility.  *Id.*

"The determination as to whether individuals are 'similarly situated' for equal protection purposes is an amorphous one."  *Tapalian v. Tusino,* 377 F.3d 1, 6 (1st Cir. 2008).   "The test is whether a prudent person, looking objectively at the [governmental actions], would think them roughly equivalent and the protagonists similarly situated.... Exact correlation is neither likely nor necessary, but the cases must be fair congeners.  In other words, apples should be compared to apples."  *Id.* (quotation omitted).  For the purposes of the evaluating the qualifications of CHP applicants, Colorado residents and non-residents come are quite clearly situated differently.  Given the statutory requirements for the issuance of CHP and the difficulties in acquiring information concerning the background of non-residents, no reasonable person would deem residents and non-residents to be similarly situated.  Plaintiff's equal protection claim therefore fails at the threshold.

**C.     Even if he is similarly situated to resident CHP applicants, Plaintiff is unable to demonstrate that there is no rational basis for Colorado's residency restriction.**

Absent a showing that the challenged statute burdens a suspect class or fundamental right, the rational basis test applies to equal protection claims.  *Vasquez,* 862 F.2d at 252.  Thus, assuming *arguendo* that Peterson is able to show that he is similarly situated to Colorado resident CHP holders, he must show that Colorado has no rational basis for its residency restriction.  Peterson has identified no authority suggesting that there is a fundamental right to carry a concealed pistol.  Indeed, the limited amount of case law addressing this issue is precisely to the contrary.  *See, e.g., Robertson v. Baldwin,* 165 U.S. 275, 281-82 (1897) ("the right of the people

to keep and bear arms...is not infringed by laws prohibiting the carrying of concealed weapons"). Under the rational basis test, Peterson bears the burden of demonstrating that Colorado's denial of CHPs to non-residents "is irrational or arbitrary and that it cannot conceivably further a legitimate governmental interest." *Riddle,* 83 F.3d at 1207.

As already discussed in detail, Colorado has very good reasons for restricting its issuance of CHPs to residents of the state.  In contrast to state residents, whose information is usually readily available, it would be virtually impossible to reliably assess the initial and ongoing eligibility of non-resident CHP applicants.  Moreover, the residency requirement is designed to further the legitimate governmental interest of ensuring public safety.  *See, e.g., Kelley v. Johnson,* 425 U.S. 238, 247 (1975) ("[t]he promotion of the safety of persons and property is unquestionably at the core of the State's police power").  Given the obvious connection between concealed carry and public safety, Peterson comes nowhere near being able to demonstrate that Colorado's residency requirements are irrational or arbitrary.  His equal protection claim therefore fails.

## II.   Colorado's residency requirement for concealed handgun permits does not violate the right to travel or the Privileges and Immunities Clause.

Plaintiff contends that the constitutional right to travel requires Colorado to issue CHPs to residents and non-residents alike.  He also asserts that Colorado's residency requirement violates the Privileges and Immunities clause.  In reality, these two claims are identical.

### A.   The right to travel as asserted in the Amended Complaint is coextensive with the Privileges and Immunities Clause.

The right to travel protects: 1) the right of a citizen of one State to enter and to leave another State; 2) the right to be treated as a welcome visitor rather than an unfriendly alien when

temporarily present in the second State, and 3) for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State. *Saenz v. Roe,* 526 U.S. 489, 501 (1999). The right is not separately enumerated by the Constitution. Rather, depending on the specific practice being challenged, it has been derived from several different sources. *See Attorney General of N.Y. v. Soto-Lopez,* 476 U.S. 898, 903 (1986).

Peterson's Amended Complaint alleges only that Colorado's law violates the second component: the right to be treated as a welcome visitor rather than an unfriendly alien when visiting Colorado. This right derives from the Privileges and Immunities Clause of Art. IV, § 2. *Saenz,* 526 U.S. at 489 ("by virtue of a person's state citizenship, a citizen of one State who travels in other States, intending to return home at the end of his journey, is entitled to enjoy the 'Privileges and Immunities of Citizens in the several States' that he visits").

**B.      Standard of review.**

The Supreme Court's holding in *Saenz* establishes that the right to travel as protected by the Privileges and Immunities clause is subject to intermediate scrutiny. *Saenz,* 526 U.S. at 502 (clause bars discrimination against residents of other states only "where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States") *quoting Toomer v. Witsell,* 334 U.S. 385, 396 (1948). *Compare Citizens United v. Federal Elections Comm'n,* 130 S.Ct. 876, 898 (2010) (strict scrutiny test requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest).

Prior to *Saenz,* the Tenth Circuit likewise recognized that strict scrutiny does not necessarily apply to all right to travel claims, instead noting that the Supreme Court has avoided determining whether a state-created classification penalizes the right to travel "either by

determining the purposes advanced by the government are illegitimate or, if legitimate, that the

created distinction does not even rationally further the stated goal." *Buchwald v. University of*

*New Mexico School of Medicine,* 159 F.3d 487, 498 (10th Cir. 1998). *Buchwald* suggested that

right to travel claims be reviewed under a "purpose scrutiny" standard. This approach is more

stringent than rational basis review, but is far less demanding than strict scrutiny. *Buchwald* thus

confirms that strict scrutiny does not apply to right to travel claims in the Tenth Circuit.[4]

**C.     Analysis.**

The Privileges and Immunities Clause applies only to rights that "bear upon the vitality of

the Nation as a single entity," and are thus "sufficiently basic to the livelihood of the Nation" so

as to fall within its purview. *Supreme Court v. Friedman,* 487 U.S. 59, 64-65 (1988); *see also*

*Baldwin v. Montana Fish & Game Comm'n,* 436 U.S. 371, 383, 388 (1978). In other words, the

Supreme Court prohibits classification based on residency only where the privilege at issue is

"basic to the maintenance or well-being of the Union." *Id.* at 388.

Accordingly, Art. IV § 2 requires a plaintiff to first demonstrate the asserted right falls

within the scope of the Privileges and Immunities Clause. *Id.* If it does, the reviewing court

must then consider the justifications advanced by the state for that restriction. No violation

occurs so long as: 1) "there is a substantial reason for the difference in treatment;" and 2) "the

discrimination practiced against nonresidents bears a substantial relationship to the State's

objective." *Supreme Court of New Hampshire v. Piper,* 470 U.S. 274, 284 (1985).

---

[4] Peterson relies on the opinion in *Peruta v. County of San Diego,* 678 F.Supp.2d 1046, 1059-60 (S.D. Cal. 2010), in support of his claim that strict scrutiny applies. As the holding in *Saenz* makes clear, any suggestion in *Peruta* that strict scrutiny applies to all right to travel claims is plainly incorrect. To the extent that *Peruta* correctly applied a strict scrutiny standard, the case can only be interpreted as a challenge to durational residency requirements set by the county for CHP qualification.

**1.      The Plaintiff cannot demonstrate that Colorado's statute burdens a fundamental right.**

Peterson claims that the challenged statute violates his "fundamental right" "to carry a handgun for self defense in case of confrontation." *Pl. MSJ* at 8.  This actually comprises two distinct claims: 1) that there is a fundamental right to carry a pistol outside the home (*Am. Compl.*, ¶ 55), and 2) that there is a fundamental right to carry a <u>concealed</u> pistol outside the home.  The second of these claims is easily dismissed.  As already noted, the Supreme Court noted more than a century ago that the Second Amendment does not confer any right to carry concealed weapons.  *Robertson,* 165 U.S. at 281-82.

Peterson's other claim arises from the confluence of Denver's open carry ban and § 18-12-203(1), which combine limit the times and places where Peterson can carry a pistol while in Denver.  He asserts that *Heller* and *McDonald*, which together establish that individuals may keep arms for self-defense <u>within the home</u>, also compel a finding that individuals have a fundamental right to carry pistols <u>outside the home</u>.  Whether this claim is correct depends on just how far the Second Amendment right extends.   If, as argued below, the challenged law is consistent with the Second Amendment, Peterson's Privileges and Immunities claim fails at the threshold because the limitations on Peterson's ability to carry in Denver will not have burdened a fundamental right.  If the regulatory scheme does burden a fundamental right, then the Court must consider the analysis below.

**2.      There is a substantial reason for distinguishing between resident and non-resident CHP applicants, and Colorado's reason for doing so bears a substantial relationship to Colorado's goal of promoting public safety.**

Governments exist, in large part, to ensure the safety of their citizenry.  *See, e.g., Salerno,* 481 U.S. at 755 (a "primary concern of every government [is] the safety and indeed the lives of its citizens").   Reasonable regulation of firearms has long been acknowledged as an essential component of public safety.  *See, e.g. People v. Blue,* 544 P.2d 385, 390-91 (Colo. 1975) (upholding ban on felon firearm possession based in part upon "the state's right, indeed its duty under its inherent police power, to make reasonable regulations for the purpose of protecting the health, safety, and welfare of the people").

As discussed in detail above, the lack of information about non-residents establishes an obvious and substantial reason for treating residents and non-residents differently for the purpose of CHP permitting.  Permitting authorities have access to far more information about Coloradans than they do about residents of other states.  Exh. A, ¶ 8-10.  Databases such as CCIC and ICON contain information about state offenses and are accessible statewide, but are not available to law enforcement officials in other states.  Exh. C, pp. 8-10.  Conversely, local databases in other states contain information similar to that in CCIC and ICON, but are generally unavailable to Colorado authorities.  Exh. A, ¶ 8-10.  Permits issued by Colorado authorities are flagged by the Colorado Bureau of Investigation, and fingerprints associated with the permit will "flash" on the CBI's system should a permit holder be arrested within the state.  Exh. B, ¶ 12.  Intrastate tracking systems of this type are common, but they typically do not cross state lines.  *Id.*  Thus, aside from self-reporting, Colorado authorities would have virtually no way of ensuring the continued eligibility of a non-resident to whom they issued a CHP.

Colorado is generally considered to be a "shall issue" state for CHPs, but the issuing authority may still deny a CHP based upon "a reasonable belief that documented previous

behavior by the applicant makes it likely the applicant will present a danger to self or others if the applicant receives a permit to carry a concealed handgun[.]"  § 18-12-203(2), C.R.S. (2010). CBI determines a CHP applicant's firearm eligibility under federal law, Exh. B, ¶ 7-9, but local information, which often implicates Colorado's CHP law, commonly does not appear on national databases, nor is it widely shared between states.  Exh. A, ¶ 8-9; Exh. B, ¶ 9.

There is thus an obvious and substantial reason underlying Colorado's decision to issue CHPs to residents while denying the same to non-residents.  There is, moreover, a strong relationship between this decision and the state's objective of ensuring public safety.  This conclusion is entirely consistent with the few courts that have addressed the question.  *See Bach v. Pataki,* 408 F.3d 75, 87 (2d Cir. 2005) ("New York's interest in monitoring gun licensees is substantial and that New York's restriction of licenses to residents and persons working primarily within the State is sufficiently related to this interest.").  Requiring Colorado to issue CHPs to non-residents would compromise the safety of the state's citizens by undermining the reliability of the extensive background check that is a required component of every application. Accordingly, even if Peterson is correct in his assertion that the challenged regulatory scheme burdens a "privilege" under Art. IV, § 2, he is unable to demonstrate that Colorado's regulations violate his constitutional right to travel as protected by the Privileges and Immunities Clause.

**II.     The challenged regulatory scheme does not violate the Second Amendment.**

Peterson's challenge under the Second Amendment fares no better because there is no fundamental right to carry a pistol, and particularly a concealed pistol, outside the home.

**A.      Standard of review.**

Resolving Peterson's Second Amendment claim potentially involves several steps. First, the Court must determine whether the challenged statute implicates the Second Amendment at all. If it does, the Court must then determine the applicable standard of review and apply it to Peterson's claim. Aside from ruling out "rational basis" review, *Heller* left the standard of review open. *Heller,* 128 S.Ct. at 2817-18, n.27. Most post-*Heller* decisions have applied intermediate scrutiny to Second Amendment claims. *See, e.g., Heller v. District of Columbia ("Heller II"),* 698 F.Supp.2d 179, 186-88 (D.C. 2010) (joining "the majority of courts to have considered this issue" in applying intermediate scrutiny). Assuming that the Second Amendment is even implicated here, the Attorney General urges the Court to apply an intermediate standard of review and uphold the challenged law as substantially related to an important public interest. *See Clark v. Jeter,* 486 U.S. 456, 461 (1988).

### B.      Plaintiff's facial challenge fails.

To the extent that Peterson raises a facial challenge to Colorado's residency requirement, it is easily dismissed because there is no fundamental right to carry a concealed pistol. *See Robertson,* 165 U.S. at 281-82; *see also Thomas v. Members of City Council of Portland,* 730 F.2d 41, 42 (1st Cir. 1984) ("Established case law makes clear that the federal Constitution grants appellant no right to carry a concealed handgun."). Given this precedent, Peterson comes nowhere near being able to satisfy the *Salerno* standard by demonstrating that there are <u>no</u> circumstances under which a state may prohibit an individual from carrying a concealed weapon.

### C.      Plaintiff's as-applied challenge fails.

Peterson's as-applied claim challenges the confluence of municipal ordinance and state law that, together, prevent him from carrying a handgun in parts of Denver.

### 1.      The scope of the challenged regulations.

At the threshold, it is important to note the scope and effect of the laws that Peterson challenges.[5]  Because he cannot acquire a CHP, when and where Peterson can carry a weapon is controlled primarily by Denver ordinance.  When Peterson visits Denver, he may carry a pistol (openly or concealed) in his dwelling, his place of business, any property he owns or controls, in private automobiles, and for defense of an immediate threat to "home, person, or property."

### 2.      The challenged regulations do not burden a Second Amendment right.

Accurately assessing the scope of permissible and prohibited conduct is important, because Peterson cannot prevail unless "the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee."  *United States v. Marzzarella,* 614 F.3d 85, 89 (3d Cir. 2010).  This is doubly true in the context of this case because, despite Peterson's claims to the contrary, *Heller*'s holding is far narrower than he suggests.  To be sure, *Heller* took a complete ban of handguns "off the table," 128 S.Ct. at 2822, and further declared that the core conduct protected by the Second Amendment is "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 2821.  But the Supreme Court has gone no further.  Together, *Heller* and *McDonald* hold that qualified individuals have a fundamental right to possess a functional handgun within the home for the purpose of self-defense.  This core right is narrow.  Governments may still enact licensing requirements and may still restrict those who are "disqualified from the exercise of Second Amendment rights" from

---

[5] As the City and County of Denver has previously pointed out, Peterson did not expressly challenge Denver's open carry ban.  Why he did not do so is a mystery, particularly in light of the fact that his as-applied challenge stems from an allegation that Peterson has no "meaningful opportunity…to bear arms in the City and County of Denver." *Am. Compl.* ¶ 59.  If Denver's open carry ban were repealed, Peterson would have no claim whatsoever since, as discussed above, there is no Second Amendment right to carry a concealed weapon.

possessing a firearm at all.  *See Heller,* 128 S.Ct. at 2816, 2821-22.  Nothing in *Heller* or

*McDonald* credibly suggests that the core Second Amendment right extends beyond the home.

Given the narrow scope of *Heller*'s holding, it is at least arguable that state and local

governments may still prohibit non-residents – who by definition have no "home" in a foreign

state – from bringing their firearms with them when they visit.  Indeed, the New York law

upheld in the pre-*Heller* case of *Bach v. Pataki, supra*, did precisely that.  In this case, however,

the combined effect of Denver ordinance and Colorado statute is nowhere near so restrictive.

Peterson may keep and bear a pistol for self-defense in his dwelling while he is visiting Denver.

The Second Amendment demands nothing more.  Peterson thus fails to state a cognizable claim

under the Second Amendment because the combined effect of Denver ordinance and Colorado

statute does not impose a burden on conduct falling within the scope of the Second

Amendment's guarantee.

> **3.** **Assuming, *arguendo,* that the restrictions established by the challenged regulations burden the Second Amendment, Plaintiff's claim still fails because those restrictions pass muster under immediate scrutiny.**

If Peterson shows that the combined effect of Denver ordinance and Colorado statute

burdens his Second Amendment right, the Court must then apply a level of scrutiny that is

appropriate to the burden imposed by those laws.  As already discussed, courts applying the

Second Amendment post-*Heller* have nearly universally adopted intermediate scrutiny with

respect to the <u>core</u> right of handgun possession for self-defense in the home.  *Heller*, of course,

did not address whether and, if so, to what extent the Second Amendment applies to conduct

outside the home.  It is fair to assume, however, that future jurisprudence on this question will

largely mirror First Amendment cases that scrutinize most closely those restrictions that are

placed on the core right. *See, e.g., Burdick v. Taskushi,* 504 U.S. 428, 434 (1992) ("the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights).

As developed by post-*Heller* case law, intermediate scrutiny in the context of the Second Amendment requires (1) that the asserted governmental interest be "important or substantial" or "significant," and (2) that "the fit between the challenged regulation and the proffered objective be reasonable, not perfect." *Marzzarella,* 614 F.3d at 98. Here, where the combined effect of two laws is being challenged, both governmental objectives must be considered.

Denver has previously made its case for enforcement of its open carry ban. In *City and County of Denver v. State of Colorado,* Denver District Court Case No. 03CV3809, *aff'd by operation of law in State of Colorado v. City and County of Denver,* 139 P.3d 635 (Colo. 2006), the city sought a declaratory judgment that several of its gun control ordinances were not preempted by state law. In support of its argument that the open carry ban was a matter of a local concern (and was thus not preempted), Denver relied almost exclusively on public safety issues, including population density, organized crime rates, and the fact that "a bullet fired in Denver – whether maliciously by a criminal or negligently by a law-abiding citizen is more likely to hit something or somebody than a bullet fired in rural Colorado." Exh. E at 10.

Preemption issues notwithstanding, these are substantial public safety concerns and, assuming that the ordinance even implicates the Second Amendment right, Denver's decision to address them by adopting an open carry ban represents easily passes constitutional muster. Intermediate scrutiny only requires that "the fit between the challenged regulation and the proffered objective be reasonable, not perfect." *Marzzarella,* 614 F.3d at 98.

19

Colorado's residency requirement for the issuance of CHPs approaches the same public safety concern from a different, but equally legitimate, angle.  As already discussed in detail *supra,* the State has an abiding interest in ensuring that those who apply for permission to carry concealed pistols are qualified to do so.  Much of the information that is essential to assessing the initial and ongoing eligibility of CHP holders is simply unavailable with respect to non-residents. Given these limitations, there is surely a reasonable fit between Colorado's goal of promoting public safety and its policy decision to restrict concealed carry permits to residents of the state. Hence, assuming that Peterson has asserted a cognizable claim under the Second Amendment, Colorado's residency requirement for the issuance of CHPs easily survives intermediate scrutiny.

To summarize, although Denver ordinance and Colorado statute do combine to limit where Peterson may carry his pistol when he visits Denver, those laws still permit Peterson to arm himself for self-defense in the event of a confrontation in all of the locations protected by the Second Amendment.  And even if the challenged laws do burden the Second Amendment, they still pass constitutional muster under the intermediate scrutiny test that would be applicable to Peterson's claims.

## CONCLUSION

Based on the foregoing reasoning and authorities, the Attorney General respectfully requests that the Court grant summary judgment in his favor and uphold the constitutionality of Colorado's residency requirement for the issuance of concealed handgun permits.

JOHN W. SUTHERS
Attorney General


*s/Matthew D. Grove*
MATTHEW D. GROVE, 34269*
Assistant Attorney General
Public Officials/PUC Unit
State Services Section
Attorneys for Attorney General Suthers

1525 Sherman Street, 7th Floor
Denver, Colorado  80203
Telephone:  303-866-5264
FAX:  303 866-5671
E-Mail:  matthew.grove@state.co.us
*Counsel of Record


## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2010, I filed a true and complete copy of the within **MEMORANDUM OF LAW IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using CM/ECF Filer, which will automatically send email notification of such filing to all attorneys of record.


*s/Thomas R. Bovee*
Thomas R. Bovee
Legal Assistant
Public Officials/PUC Unit
State Services Section
Office of the Attorney General