# EXHIBIT D

Page 1

1              RECORDED TRANSCRIPTION

2                SENATE BILL 34 (2007)

3

4    Senate Second Reading 2/20/07

5    Senate Third Reading; 2/23/07 - Two Files

6    House Judiciary Committee; 3/20/07; HCR 112

7    House Judiciary Committee; 3/20/07; HCR 112 (Part

8    Two)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 2

1  ******
2  (The following is the testimony
3  concerning Senate Bill 34 from 2007. This is the
4  testimony before the Senate as a whole and second
5  reading. This took place on February 20, 2007, and
6  inside of chambers. This begins at 10:10 a.m.)
7       CHAIRPERSON: Would you please read
8  Senate Bill 34 for us.
9       UNIDENTIFIED VOICE: Senate Bill 34 by
10 Senator Morse (unintelligible).
11      CHAIRPERSON: Senator Morse.
12      SENATOR MORSE: Thank you, Madame
13 Chair. I move Senate Bill 34, and I also move for
14 Amendment 5.
15      CHAIRPERSON: Would you please read
16 the amendment.
17      UNIDENTIFIED VOICE: (Unintelligible.)
18      CHAIRPERSON: Senator Morse.
19      SENATOR MORSE: Thank you, Madame
20 Chair. Floor Amendment 5 reverses the effect of the
21 show place amendment from the last time we discussed
22 this. The effect of a show place amendment was to
23 remove the bill, in essence, and say that anyone
24 with a concealed weapons permit from anyplace in the
25 country could use that as -- that concealed weapons

Page 3

1  permit here in Colorado.
2       So this amendment strikes that
3  amendment and gets the bill back to its original
4  form, which requires that everyone have a concealed
5  weapons permit from their home state. And I would
6  ask for and aye vote.
7       CHAIRPERSON: Senator
8  (unintelligible).
9       UNIDENTIFIED VOICE: Thank you, Madame
10 Chair. I would request a no vote on this. You
11 know, I think the bill, actually, the way it stands
12 right now reflects what the majority of the citizens
13 in Colorado would like to see.
14      It's a freedom bill. That's what we
15 should be about here, freedom and liberty. We
16 shouldn't be about trying to restrict gun rights of
17 good, solid individuals. And for that reason, I
18 would ask for a no vote on this amendment.
19      CHAIRPERSON: Senator Brophy.
20      SENATOR BROPHY: Thank you, Madame
21 Chair. I would ask for a no vote, also. You got it
22 right the first time. This bill is an
23 unnecessary -- and this amendment, then, would make
24 this bill an unnecessary infringement upon
25 law-abiding citizens in the state of Colorado.

Page 4

1       Let me throw out a couple of examples
2  for you of where this could really be an
3  infringement upon people. If you are a person who
4  attends a lot of firearm competitions, and you
5  happen to live in the state of Colorado, but you
6  want to have a concealed weapons permit that has
7  greater reciprocity than the Colorado permit has,
8  you may go ahead and take some additional steps and
9  get a concealed weapons permit out of a state where
10 it's more difficult to get that permit.
11      And if you do that, then that would
12 grant you reciprocity in more states than what
13 Colorado's permit will currently grant you in.
14      But if you're doing a lot of traveling
15 that could be an important thing to you, as you're
16 carrying this -- this firearm, that might be a
17 competition firearm with you, through various
18 airports, you know, getting in taxi cabs, all these
19 things where you want to have the greatest amount of
20 protection that a law-abiding citizen should be
21 allowed to have.
22      And that was the way this bill, after
23 we amended it, that bill would recognize that you
24 would have that right as a Colorado citizen.
25      The other place where this could

Page 5

1  definitely impact Colorado citizens is this, just
2  think about this. What if you are a citizen of
3  Colorado, but you go to college in another state.
4  And while you're in that other state, you turn 21
5  years old, and you have a reason and/or a desire to
6  have a concealed weapons permit in the state that
7  you're attending college in. You do all you need to
8  do in that state to get your permit. You come back
9  to Colorado, that dang thing should be good here,
10 and as we amended this bill, it would be.
11      And if you accept Senator Morse's
12 amendment to change this bill back to the old
13 restrictive anti-second amendment bill that it was,
14 you'll be failing the law-abiding citizens of
15 Colorado.
16      Don't do that. You had it right the
17 first time. Vote no on this amendment.
18      CHAIRPERSON: Senator Morse.
19      SENATOR MORSE: Yes. Madame Chair.
20 Thank you.
21      CHAIRPERSON: Is there further
22 discussion on Senate Amendment 005? Seeing none,
23 then --
24      UNIDENTIFIED VOICE: (Unintelligible.)
25      CHAIRPERSON: The division hasn't

Page 6

1  asked for it.
2          All those in favor.  Would everyone
3  sit down who cannot vote.  All those in favor of
4  Amendment 005, please stand.
5          All those opposed, please stand.
6          005 passes.
7          Senator Morse.
8          SENATOR MORSE:  Thank you, Madame
9  Chair.  To the bill, if I may?
10         CHAIRPERSON:  To the bill.
11         SENATOR MORSE:  Members, the effect of
12 this bill is to require everyone to get a permit
13 from their home state.  Coloradoans love their guns,
14 and favor the right of law-abiding citizens to carry
15 guns, and so do I.  They also favor doing all we can
16 to ensure that criminals do not carry guns legally
17 or illegally.
18         The original version of this bill
19 where we stand now is a fair common-sense approach
20 to making sure that in those cases where a permit
21 has been issued, there's some oversight to make sure
22 that the law-abiding citizen that acquires the
23 permit remains a law-abiding citizen.
24         We issue driver's licenses to
25 law-abiding people, and then assure that we have a

Page 7

1  system in place to track transgressions so we can
2  take appropriate actions when issuing a driver's
3  license turns out to be inappropriate.
4          Most citizens that acquire concealed
5  weapons permits will remain law-abiding citizens
6  entitled to the permit for the rest of their lives.
7  For the few that don't, we have a duty to the public
8  to be able to revoke their privilege.
9          This bill simply requires that you
10 have a permit from your home state.  That only makes
11 sense.  Some people are criminals from a very early
12 age and will never qualify for a concealed weapons
13 permit in any state.
14         Many other people like you and me will
15 get into a bad situation often because of alcohol,
16 family problems, or even illness.  Just because
17 you've made it to age 40, doesn't mean you're home
18 free.  You may not become a bank robber, but you can
19 easily be the subject of a restraining order from a
20 nasty family situation.
21         Let's ensure a safeguard within our
22 permit system.  The home state is in the best
23 position to judge a citizen's continued confidence
24 to have a concealed weapons permit.  Let's require
25 that you get a permit from your home state.

Page 8

1          In those cases where a home state does
2  not issue a permit, let's not compromise our safety
3  by allowing a permit that's not adequately overseen.
4          I ask for an aye vote on Senate Bill
5  34.
6          CHAIRPERSON:  Mr. (unintelligible).
7          UNIDENTIFIED VOICE:  Thank you, Madame
8  Chair.  From what I see, this is a bill that is a
9  bill out of fear.  We're doing this out of fear.
10         We need to -- we need to -- we need to
11 fear not, quite frankly.  There's no -- there's no
12 real proof that, in fact, without the presence of
13 this bill we'd have a problem.
14         With (unintelligible) that had been on
15 that we would have had a problem.  And the way I
16 look at it is we need give the citizens of this
17 state and country the most maximum freedom that we
18 can in this area, and then if we have a problem,
19 then we can address the problem.
20         And I don't mean a problem by one or
21 two people, but I mean a problem that is endemic as
22 a result of this.  If we -- if we down here don't --
23 don't keep -- keep pushing for freedoms, and
24 continue the restrict and restrict, before long, our
25 freedoms will be gone.

Page 9

1          We need to -- we need to vote no on
2  this.  And I would ask for a no vote.
3          CHAIRPERSON:  Further discussion?
4  Seeing none, the motion on the floor is to adopt
5  Senate Bill 34.  All those in favor say aye.
6          UNIDENTIFIED VOICES:  Aye.
7          CHAIRPERSON:  All those opposed.
8          UNIDENTIFIED VOICES:  No.
9          CHAIRPERSON:  The ayes have it.
10 Senate Bill 34 has passed.
11                 * * * * *
12         (The following is the testimony
13 concerning Senate Bill 34, from 2007.  This is the
14 testimony before the Senate as a whole in third
15 reading.  This took place on February 23, 2007 in
16 the Senate chambers.  This begins at 9:06 a.m.)
17         CHAIRPERSON:  Third reading of the
18 bill, final passage.  Mr. Goldstein, would you
19 please read the title of Senate Bill 34.
20         MR. GOLDSTEIN:  Senate Bill 34 by
21 Senator Morse (unintelligible).
22         CHAIRPERSON:  Senator Morse.
23         SENATOR MORSE:  Thank you, Madame
24 President.  I move for the adoption of Senate Bill
25 34 on third reading and final passage and ask for

Page 10

1   the use of the present roll call.
2       CHAIRPERSON: Senator Brophy.
3       SENATOR BROPHY: Thank you, Madame
4   President. I'd like to ask the body for permission
5   to offer a third reading amendment.
6       CHAIRPERSON: Could you explain why
7   and . . .
8       UNIDENTIFIED VOICES: Yeah. Thank
9   you, Madame President. As a senatorial courtesy, if
10  we could have this third reading amendment allowed,
11  it -- it is an amendment to put the bill back to the
12  way we did it originally when we heard this bill on
13  second reading.
14      The last time we heard the bill on
15  second reading was on the special orders calendar,
16  and it was the only bill, and I ended up unable to
17  provide a committee of the whole amendment in time
18  to it, as it was the only bill on the calendar and
19  we adopted special orders committing the whole
20  report fairly rapidly. So that's why I would like
21  to have this opportunity to offer a third reading
22  amendment to this bill.
23      CHAIRPERSON: So this is a substantive
24  amendment? Senator Brophy.
25      SENATOR BROPHY: It will be a

Page 11

1   substantive amendment, yes. And it's an amendment
2   that we've all seen already. But we can certainly
3   have it put on everybody's desk, if that would be
4   the desire of the chamber.
5       CHAIRPERSON: Senator Gordon.
6       SENATOR GORDON: Thank you, Madame
7   President. (Unintelligible.)
8       CHAIRPERSON: We'll stay in the
9   senatorial (unintelligible).
10          ******
11      (Third reading consideration of Senate
12  Bill 34 from 2007, in the Senate, continues at 9:15
13  a.m.)
14      CHAIRPERSON: The Senate will come
15  back to order. The issue before the body that
16  Senator Brophy has asked for permission for a third
17  reading amendment.
18      Senator Morse.
19      SENATOR MORSE: Thank you, Madame
20  President. As a matter of senatorial courtesy, I
21  will not object to a third reading amendment.
22      CHAIRPERSON: The issue before the
23  body is permission for a third reading amendment.
24  All those in favor say aye.
25      UNIDENTIFIED VOICES: Aye.

Page 12

1       CHAIRPERSON: Opposed, no.
2       UNIDENTIFIED VOICES: No.
3       CHAIRPERSON: The ayes have it.
4   Permission is granted. Senator Brophy.
5       SENATOR BROPHY: Thank you, Madame
6   President. I move Amendment 8.
7       CHAIRPERSON: And I need Mr. Goldstein
8   to please read Amendment 8.
9       MR. GOLDSTEIN: (Unintelligible.)
10      CHAIRPERSON: Senator Brophy.
11      SENATOR BROPHY: Thank you. I'll move
12  Amendment 8. Again -- and I thank you, Senator
13  Morse, for allowing me to run this amendment. We
14  have all seen this amendment before. What this does
15  is it does completely change the bill. And it says
16  that Colorado will recognize permits issued in other
17  states. There's -- there is nothing like a roll
18  call vote to -- to focus everybody's attention on an
19  amendment like this.
20      I'm going to hold up a map here of the
21  United States. This will be the only time that I
22  complain about red colored states in a map. But
23  these red colored states in this map don't
24  necessarily recognize a Colorado concealed weapons
25  permit.

Page 13

1       Now, if you are a Colorado resident,
2   and you happen to work in areas where you would like
3   to be able to carry a concealed weapon -- and I've
4   heard from a lot of folks who this fits the bill,
5   maybe they're working in oil fields down in Texas or
6   other states, you know, like Arkansas, where there
7   are a lot of rattle snakes, things like that, and
8   they have to be out in the country by themselves,
9   they want to be able to carry a concealed weapon.
10      And they may end up getting a
11  concealed weapons permit from a state that has
12  higher standards than even Colorado does, and if
13  they do, then their permit will be recognized in
14  numbers of other states. But if we don't adopt this
15  amendment, their permit may not be recognized in
16  Colorado, and that's a shame.
17      I don't know why it is that we are
18  punishing law-abiding citizens, instead of rewarding
19  them for being law-abiding citizens. Let's remember
20  who the criminals are here. Let's vote yes for
21  Amendment 8.
22      CHAIRPERSON: Senator Morse.
23      SENATOR MORSE: Thank you, Madame
24  President. This bill requires people to get
25  concealed weapons permits from their home state.

Page 14

1   Basically a matter of state rights. Colorado has
2   the right to figure out who has permits in Colorado,
3   and the answer clearly is yes.
4         Florida ought to decide who has
5   Florida permits. Maryland ought to decide who has
6   Maryland permits. And so I would ask for a no vote
7   on this amendment.
8         CHAIRPERSON: Senator Gordon.
9         SENATOR GORDON: Thank you, Madame
10  President. Members, we were courteous and allowed
11  permission for a third reading amendment. However,
12  I would ask you to stay with the sponsor on this
13  third reading amendment and vote no.
14        CHAIRPERSON: The issue before the
15  body is the adoption of Amendment 008. A roll call
16  has been requested. Mr. Goldstein, would you please
17  call the roll.
18        MR. GOLDSTEIN: Bacon? Bacon, no.
19        Boyd? Boyd, no.
20        Brophy? Brophy, aye.
21        Gordon? Gordon, no.
22        Groff? Groff, no.
23        Hagedorn? Hagedorn, aye.
24        Harvey? Harvey, aye.
25        Isgar? Isgar, aye.

Page 15

1         Johnson? Johnson, aye.
2         Keller? Keller, no.
3         Kester? Kester, no.
4         Kopp? Kopp, aye.
5         May? May, aye.
6         McElhaney? McElhaney, aye.
7         Mitchell? Mitchell, aye.
8         Morse? Morse, no.
9         Penry? Penry, aye.
10        Renfro? Renfro, aye.
11        Romer? Romer, no.
12        Sandovol? Sandovol, no.
13        Schultheis? Schultheis, aye.
14        Schwartz? Schwartz, no.
15        Shaffer? Shaffer, no.
16        Spence? Spence, aye.
17        Takis? Takis, no.
18        Tapia? Tapia, no.
19        Taylor? Taylor, no.
20        Tochtrop? Tochtrop, aye.
21        Tupa? Tupa, no.
22        Veiga? Veiga, no.
23        Ward? Ward, aye.
24        Wiens? Wiens, aye.
25        Williams? Williams, no.

Page 16

1         Windels? Windels, no.
2         Madame President? Madame President,
3   no.
4         CHAIRPERSON: Amendment 008 failed
5   with 15 ayes and 19 nos.
6         To the bill, Senator Morse.
7         SENATOR MORSE: Thank you, Madame
8   President. Again, I request an aye vote on Senate
9   Bill 34 on third and final passage.
10        CHAIRPERSON: The issue before the
11  body is the adoption of Senate Bill 34. Are there
12  any no votes?
13        Senator Schultheis, Senator Wiens,
14  Senator Penry -- you want a roll call?
15        A roll call has been requested on
16  Senate Bill 34. Mr. Goldstein, please call the
17  roll.
18        MR. GOLDSTEIN: Bacon? Bacon, aye.
19        Boyd? Boyd, aye.
20        Brophy? Brophy, no.
21        Gordon? Gordon, aye.
22        Groff? Groff, aye.
23        Hagedorn? Hagedorn, pass.
24        Harvey? Harvey, no.
25        Isgar? Isgar, no.

Page 17

1         Johnson? Johnson, no.
2         Keller? Keller, aye.
3         Kester? Kester, aye.
4         Kopp? Kopp, no.
5         May? May, no.
6         McElhaney? McElhaney, no.
7         Mitchell? Mitchell, no.
8         Morse? Morse, aye.
9         Penry? Penry, no.
10        Renfro? Renfro, no.
11        Romer? Romer, aye.
12        Sandovol? Sandovol, aye.
13        Schultheis? Schultheis, no.
14        Schwartz? Schwartz, aye.
15        Shaffer? Shaffer, aye.
16        Spence? Spence, no.
17        Takis? Takis, aye.
18        Tapia? Tapia, aye.
19        Taylor? Taylor, aye.
20        Tochtrop? Tochtrop, no.
21        Tupa? Tupa, aye.
22        Veiga? Veiga, aye.
23        Ward? Ward, no.
24        Wiens? Wiens, no.
25        Williams? Williams, aye.

Page 18

1   Windels?  Windels, aye.
2   Madame President?  Madame President,
3   aye.
4        CHAIRPERSON:  Senate Bill 34 is
5   adopted on third reading and final passage with 20
6   ayes and 15 nos.
7        Co-sponsors on Senate Bill 34.
8   Senator Groff, Senator Gordon, Senator Tupa, Senator
9   Bacon.
10            ******
11       (The following is the testimony
12  concerning Senate Bill 34 from 2007.  This is the
13  testimony before the House Judiciary Committee.
14  This took place on March 20, 2007 in house committee
15  room 112.  This begins a 10:47 a.m.)
16       CHAIRPERSON:  Senate Bill 34, with our
17  esteemed majority leader, Representative Madden.
18       REPRESENTATIVE MADDEN:  Thank you,
19  Mr. Chairman, and committee.  I bring you Senate
20  Bill 34.  Senate Bill 34, I want to just make sure
21  you're looking at the revised version, and then
22  there's the new physical note too, dated
23  February 15.
24       The bill concerns clarifying our
25  guidelines around reciprocity on concealed weapons

Page 19

1   permit.  And I think it basically does three things.
2   If you move here and you establish residency, you're
3   not just visiting, but you move to Colorado, you get
4   90 days to get a new concealed weapons permit.  The
5   previous concealed weapons permit would be honored
6   during that time.
7        Second, it establishes there is
8   complete reciprocity.  If you visit Colorado and you
9   have a concealed weapons permit from your home
10  state, your concealed weapons permit is honored and
11  there's no time limit on that.  It's just honored,
12  complete reciprocity.
13       I know there's been some e-mails
14  saying there is no (unintelligible) reciprocity.  It
15  does not.
16       The one thing this bill does, though,
17  it prohibits state shopping.  So if a person fails
18  their home state's requirement, Colorado will not
19  honor a situation that I would call state shopping.
20  And that's -- that's the bill.
21       CHAIRPERSON:  Are there any questions
22  for the majority leader?  Seeing none, we'll proceed
23  to the public testimony phase.
24       And as we gather the list of
25  witnesses, I'll restate the rules for testifying in

Page 20

1   this committee.  Each person has three minutes to
2   testify I, (unintelligible).  Each person has three
3   minutes to testify.  The green light means that your
4   time has started.  The yellow light means that you
5   have 30 seconds remaining in your testimony time.
6   And the blinking red light means that your testimony
7   is over.
8        I ask that you keep your testimony
9   distinct and complete, simultaneously.  I know
10  that's hard for some of us.  I also ask that you
11  avoid repeating testimony that's given by a previous
12  witness.
13       And, finally, I ask that you be
14  respectful to members of the committee, to the
15  sponsor, and to other witnesses, and we will do the
16  same to you.  And with that.  We will start with
17  public testimony.
18       Madame Majority Leader, there are
19  several people who are signed up in opposition.
20  Would you like to start with the opposition?
21       REPRESENTATIVE MADDEN:  Please.
22       CHAIRPERSON:  Anthony Fabian.  Welcome
23  to the House Judiciary Committee, please identify
24  yourself and who you represent, for the record.
25       MR. FABIAN:  Morning.  My name is

Page 21

1   Anthony Fabian.  I am president of the Colorado
2   State Shooting Association.  We are a state
3   association of the National Rifle Association out of
4   Colorado -- or National Rifle Association of
5   America.
6        CHAIRPERSON:  Thank you, please
7   proceed.
8        MR. FABIAN:  Thank you.  I have not
9   had an opportunity to see the revised portion of
10  this bill.  I'm going on what house sponsor has
11  stated it does.  The original portion of this bill,
12  when I testified, I informed the Senate Judiciary
13  Committee, and I informed this committee, again,
14  once again, this is a bill that is a solution in
15  search of a problem.
16       We have not been given one example of
17  why we need to change our reciprocity policy in
18  Colorado.  No specific examples of why permits that
19  are issued from other states to Colorado residents
20  are somehow defective or inferior to Colorado
21  permits.  And this committee needs to ask itself a
22  question in addressing this bill.  Why are permits
23  that are issued by other states to state residents
24  recognized without question in Colorado, but when
25  Colorado residents, who obtain a permit from that

Page 22

1  same state, and with the same criteria, there, all
2  of a sudden, there's a safety issue or a safety
3  problem.
4       No one's been able to answer that
5  question since I've been asking it for the last two
6  months.
7       With respect to the reciprocity issue,
8  as far as this bill affecting us reciprocity, if
9  this bill, in fact, does automatically make any
10 permit issued by another state effectively valid in
11 Colorado, that's great.  That's fine.
12      If it doesn't do that, then any bill,
13 any law that we pass that says that a state's
14 criteria in issuing permits to a Colorado resident,
15 all of a sudden, makes that permit suspect, then we
16 are basically telling them that there's something
17 wrong with their system, and we're basically saying
18 that their permit system is inferior.
19      CHAIRPERSON:  Thank you.
20 Representative Morgan Carroll.
21      REPRESENTATIVE MORGAN CARROLL:  Thank
22 you, Mr. Chair.
23      Mr. Fabian, I would have actually had
24 the same concerns, but when I looked at the bill, it
25 clearly upholds reciprocity from other states.  And

Page 23

1  I guess the question is, under the current system,
2  like with other areas of law who receive
3  reciprocity, after some period of time, you
4  generally become a resident of whatever state you're
5  living in and then subject to those laws.
6       And so I guess my question is, is
7  under current law, you know, if somebody gets their
8  valid permit from whatever state and you respect it,
9  at what point in time do they become a Colorado
10 resident subject to Colorado law.
11      Generally, if -- you know, in your
12 opinion, if they're here for six months or a year,
13 or say, effectively, you know -- I think what this
14 does is it gives a pretty decent reciprocity period
15 for the benefit of 90 days for anybody's permit
16 respected, I mean, like, if they're 21.  And
17 basically, I think if -- so at some point, I guess,
18 the problem I have is, at some point people became
19 residents of Colorado and subject to Colorado law.
20      So if it's not 90 days, when would be
21 the right time period given even if we are otherwise
22 respecting reciprocity here.
23      CHAIRPERSON:  Mr. Fabian.
24      MR. FABIAN:  I don't think -- you
25 know, I don't know if there's a problem with that,

Page 24

1  somebody coming to Colorado and actually becoming a
2  resident.  The problem is somebody who is already a
3  Colorado resident who has a permit issued by another
4  state.
5       For example, there are states like
6  Florida and Utah that issue permits to
7  non-residents.  Therefore, if you are a Colorado
8  resident who hold one of those permits, one of those
9  non-resident permits from Florida or Utah, this bill
10 would invalidate that permit.
11      And what it would say is that, in
12 other words, you can only -- if you're are a
13 Colorado resident, the only kind of permit that
14 Colorado will recognize is one issued by the State
15 of Colorado.  And that was the original bill.
16      Again, I haven't had a chance to read
17 this one in detail.  I do not know if this bill
18 changes -- if this amendment changes that past bill
19 or not.  However, those permits that -- because my
20 understanding, the impetus for this bill was there
21 was a concern that individuals would obtain permits
22 from other states, and then for -- somehow, were not
23 eligible under Colorado law, and then were using
24 those permits legally in Colorado.  That was the
25 reason given in Senate Judiciary Committee.

Page 25

1       No proof -- no example has ever been
2  given of somebody who was a Colorado resident, who
3  had a permit issued from another state who was not
4  eligible or qualified under Colorado law.
5       CHAIRPERSON:  Are there any further
6  questions?  Representative Levy.
7       REPRESENTATIVE LEVY:  Thank you,
8  Mr. Chair.
9       Mr. Fabian, if you're a Colorado
10 resident, we require you to have a Colorado driver's
11 license, because you're living -- by becoming a
12 resident here, you're living under the laws of the
13 state of Colorado.  This is your domicile.  I
14 could -- my question to you is:  Why shouldn't you
15 have a Colorado concealed weapons permit, if you're
16 a resident of Colorado?
17      Why -- you know, we're a country with
18 significant state rights and state control.  And, in
19 effect, it seems to me you're federalizing or
20 nationalizing the whole idea of a concealed weapons
21 permit, so that -- so that any state's concealed
22 weapons permit should be valid anyplace in the
23 country.
24      Colorado has its own laws, its own
25 regulations.  And if you are a resident of Colorado,

Page 26

1 I guess, why wouldn't you get a Colorado concealed
2 weapons permit?
3     CHAIRPERSON: Mr. Fabian.
4     MR. FABIAN: I understand your
5 question, Representative Levy, and I can only give
6 you one example. There -- although Colorado has a
7 very good concealed carry law, we are not a pure
8 shall-issue state. Our law has a discretionary
9 element to it that says that, an otherwise qualified
10 individual, if a sheriff -- issuing sheriff, has
11 documentation or evidence that causes him a
12 reasonable concern that the individual would be a
13 danger to himself or the community, the sheriff can
14 still deny the permit.
15     Now, this is only supposed to be
16 conducted when a sheriff believes that he can prove
17 to a judge, a district court judge in the state of
18 Colorado, by clear and convincing evidence that this
19 individual is, in fact, a danger to himself or
20 others.
21     I'm a practicing attorney, and since
22 this law came into effect, I have handled 14 cases
23 where individuals were denied under this
24 discretionary denial policy. Of those 14 cases, 13
25 of them were reversed by the sheriffs themselves

Page 27

1 before they even went to court. Most of them did
2 not even go to a hearing.
3     Now, I'd like to consider myself a
4 good lawyer, but I'm not that good, Ma'am. If we've
5 got sheriffs who are denying people en masse that
6 many cases in which they're not willing to go and
7 back it up in court by clear and convincing
8 evidence, then we have an abuse of discretion going
9 on out there by the sheriffs.
10     And a lot of people in Colorado are
11 hearing about that and they don't want to subject
12 themselves to that kind of expense, that kind of
13 trial, and so they're obtaining a permit through
14 another source.
15     CHAIRPERSON: Mr. Fabian, that's 14
16 out of how many applications (unintelligible),
17 because your 14 makes no sense without any context
18 for determining what the ratio actually is.
19     MR. FABIAN: I understand that,
20 Mr. Chairman, but I would also submit that even one
21 is too many. And I can -- I've seen 13 in the last
22 three years.
23     If you have sheriffs who are denying
24 permits, and once they get a letter from a lawyer
25 saying you're in contradiction of the law, and they

Page 28

1 immediately reverse their decision, that's an abuse
2 of discretion, Mr. Chairman.
3     CHAIRPERSON: That seems to be a
4 stretch.
5     Representative Levy.
6     REPRESENTATIVE LEVY: Thank you,
7 Mr. Chair.
8     Mr. Fabian, yeah, the observation I
9 would make on your testimony is it sounds like the
10 system is correcting itself. There is a mechanism
11 to review whether there's an abuse of discretion.
12     But it also sounds to me from your
13 testimony is that out-of-state permits are being
14 used to go around the discretion of the sheriff.
15 And turning Colorado into a pure shall-issue state,
16 as opposed to the modified form of the -- the
17 modified standard that we have.
18     So it sounds to me like you're arguing
19 against this bill because you want people to be able
20 to avoid the legal standard for issuance of a
21 concealed weapons permit in Colorado.
22     CHAIRPERSON: Mr. Fabian.
23     MR. FABIAN: No, that's not correct.
24     CHAIRPERSON: Representative King.
25     REPRESENTATIVE KING: Mr. Fabian, in

Page 29

1 your experience, are people doing this? Are
2 people --
3     UNIDENTIFIED VOICE: (unintelligible)
4 restate the question.
5     REPRESENTATIVE KING: In your
6 experience, are people intentionally going out of
7 state to avoid having to get a permit here in
8 Colorado?
9     CHAIRPERSON: Mr. Fabian.
10     MR. FABIAN: I have no specific
11 example of that that I'm aware of.
12     CHAIRPERSON: Representative Gardner.
13     REPRESENTATIVE GARDNER: Thank you.
14 Mr. Fabian, a significant concern I have about this
15 bill is how Colorado might be treating concealed
16 permit holders from other states who are members of
17 the armed forces, who might be stationed here
18 involuntarily. I can't imagine anyone being
19 stationed here involuntarily, but pursuant to
20 federal orders.
21     Can you tell me how their permit would
22 be regarded under this bill, at least based on your
23 reading?
24     CHAIRPERSON: Mr. Fabian.
25     MR. FABIAN: It's my understanding

Page 30

1  that this bill, as amended, would recognize -- would
2  recognize an out-of-state permit validly issued by
3  another state. But again, that begs the question
4  is -- why is a person -- a permit issued by a state
5  to their resident under those criteria, that we
6  don't have a concern in Colorado, but a Colorado
7  resident with a permit issued under the same
8  criteria, all of a sudden there's a safety concern.
9       Again, where's the problem that needed
10 a solution?
11      CHAIRPERSON: Further questions for
12 Mr. Fabian? Seeing none, thank you very much for
13 your testimony.
14      Aaron Brown. Welcome to the House
15 Judiciary Committee. Please identify yourself and
16 who you represent for the record.
17      MR. BROWN: Thank you, Mr. Chairman.
18      CHAIRPERSON: Can you pull the
19 microphone a little closer to you.
20      MR. BROWN: My name is Aaron Brown.
21 I'm here representing the Rocky Mountain Gun Owners
22 Association. I actually have an out-of-state
23 permit, and I have been denied by Colorado wrongly,
24 twice now. I do have an out-of-state permit, and
25 have been using it here in Colorado. I am a

Page 31

1  Colorado resident. I have a permit from Florida. I
2  also have one from New Hampshire.
3       Until this bill came before the
4  Senate, I was also looking to obtain five other
5  states. Not that I'm state shopping, but that I'd
6  like to become a firearms instructor, and I'd like
7  to be familiar with all of the different states
8  different regulations.
9       But again, I was denied in Colorado
10 wrongly, due to incorrect information reported to
11 CBI. Once I cleared up this information, I then
12 applied again. My second application was denied
13 simply because of the first denial on the record.
14 The second sheriff, believing that there must be
15 reason that the first one denied him, we've got to
16 deny him too.
17      I did not go to court through it. I
18 am a single parent of a college student. I do not
19 have the financial resource to pursue it through the
20 court.
21      Are there any questions that I can
22 answer for you?
23      CHAIRPERSON: Representative Morgan
24 Carroll.
25      REPRESENTATIVE MORGAN CARROLL: Thank

Page 32

1  you, Mr. Chair.
2       I guess, if we have -- if we have
3  problems with Colorado's current concealed permit
4  system, it would help me to know what they are.
5  Because this bill, I think, as amended on what I'm
6  looking at now, does reciprocity. But you're
7  pointing out the situation where you think
8  Colorado's current requirement maybe aren't
9  appropriate.
10      So could you help bring me up to speed
11 on what are the requirements under Colorado's
12 current -- I apologize.
13      The question would be: What are
14 Colorado's current requirements to get a concealed
15 permit, and what part of that process broke down for
16 you and you think you should have been lawfully
17 entitled to get one?
18      CHAIRPERSON: Mr. Brown.
19      MR. BROWN: Thank you, Mr. Chairman.
20      The requirements for Colorado are very
21 similar to most of the other states. You must take
22 the court. You must not have prior felony
23 convictions, convictions for domestic violence,
24 alcohol related, all of these different things. You
25 have to get fingerprinted. You must run a

Page 33

1  background check. It's very, very similar to every
2  other state.
3       The difference with Colorado is there
4  is that clause of the sheriff's discretionary
5  denial. That is where my case fell in.
6       CHAIRPERSON: And if you don't mind if
7  I follow up. Do you know if other states
8  (unintelligible) do they also have a discretionary
9  denial? Is that typical?
10      MR. BROWN: Some states do. We're not
11 the only ones, but I believe we are in the minority.
12      CHAIRPERSON: Thank you. Are there
13 any other questions for this witness?
14 Representative Gardner.
15      REPRESENTATIVE GARDNER: Thank you.
16      Mr. Brown, if I may -- and if you
17 choose not to answer, that's fine. Was there any
18 reason given to you for your initial denial of a
19 permit in Colorado?
20      CHAIRPERSON: Mr. Brown.
21      MR. BROWN: Thank you. My original
22 denial was based upon incorrect information that was
23 reported to CBI. CBI had reported that I was
24 charged with resisting arrest twice. I have never
25 been charged with resisting arrest.

Page 34

1  I cleared that up with CBI, and then
2  applied a second time.
3      UNIDENTIFIED VOICE: And I guess, just
4  to follow up on that, was that sort of in the
5  discretion -- discretionary denial time too, from
6  what you understand?
7      MR. BROWN: Precisely. I had applied
8  originally through Denver County, and Denver had
9  already determined that resisting arrest was one of
10 the charges that -- while not specifically listed in
11 the statute, was one of the reasons that they would
12 issue their discretionary and deny, based upon any
13 charge of resisting arrest.
14     CBI was reporting to them that I had
15 been charged with resisting arrest, when, in fact, I
16 had not.
17     CHAIRPERSON: Senate Majority Leader.
18     REPRESENTATIVE MADDEN: Thank you.
19 And I would make this offer. I mean, I don't know
20 if you've -- because, you know, that doesn't sound
21 like that should have happened. I've helped people
22 talk to folks about when they've had, a -- you know,
23 hit up the bureaucratic brick wall. And I would
24 hope that you could talk to your state legislator,
25 and/or state senator, and arrange a meeting with the

Page 35

1  sheriff and see if you can straighten it out. And
2  if they won't do it, I'll try to help you.
3      I mean if there's a problem, there's
4  usually ways to get around it. I understand you're
5  a single parent, and you don't want to spend the
6  money on a court case, but this is where, actually,
7  your state representative should help you out.
8      And if you want to call them, and if
9  you don't get a response, I'll help you get one. I
10 mean, just, that's aside from this bill, and I'm not
11 trying to take away your, you know, opinion one way
12 or the other, but if that's something you want to
13 pursue, I think there's other avenues.
14     CHAIRPERSON: Any other questions for
15 this witness? Seeing none, thank you for joining us
16 with your testimony today.
17     MR. BROWN: Thank you.
18     MR. SHRINER: Good morning, Madame
19 (unintelligible), and committee. I'm Steven C.
20 Shriner. I'm the president of the Firearms
21 Coalition of colorado. We're an NRA affiliated
22 organization, and we're grassroots Colorado,
23 politically interested in what's going on here.
24     We're opposed to House Bill -- Senate
25 Bill 34, because we feel that -- not to reiterate

Page 36

1  anyone else's points, but a lot of our members of
2  the public do not want to be on a state level
3  database. And the reason they don't want to be on a
4  state level database was reviewed from Virginia last
5  week. I presented each member of the committee with
6  this document from the NRA. The only person that
7  doesn't have it is staff. I'll get a copy for you.
8      The entire concealed carry database
9  for the state of Virginia was reviewed through the
10 Freedom of information Act last weekend by the
11 (unintelligible) Times. They printed everyone's
12 names and address, and possibly other information.
13 If you print the list out, it's over a hundred pages
14 long.
15     Every permit holder -- I would assume
16 that includes law enforcement and special agents,
17 also -- was revealed to the public in the state of
18 Virginia. We don't want to see that here.
19     I think that the best way to handle
20 this is to leave the carry conceal permittees at the
21 sheriff's level. That way, the most that could be
22 revealed would be a county's worth at a time.
23     CHAIRPERSON: Representative Gardner.
24     REPRESENTATIVE GARDNER: Mr. Shriner,
25 if you could educate me and refresh my memory a

Page 37

1  little bit, where do we stand in Colorado on a
2  concealed carry database?
3      If I understand what you're saying,
4  people would rather not have a permit here in
5  Colorado because they're going to be in a database.
6  Are we required to have a database and what's the
7  state of affairs here?
8      CHAIRPERSON: Mr. Shriner?
9      MR. SHRINER: I'd have to pull that
10 out of my memory, and seems to me that when we
11 passed carry concealed in 2003, that the promise by
12 opposite numbers said that they would make the
13 database at the state level expire in July of 2007.
14     I think that the best thing to do is
15 to allow that database to expire and let it go back
16 to the sheriffs handling it. That way, if you see a
17 permit from the state of Colorado that would be
18 considered valid on its face, and the only
19 requirement then would be if someone had a doubt,
20 would be to call that county's sheriff's office and
21 say, does Joe Doe have a permit from your county.
22 And that county should be able to respond.
23     CHAIRPERSON: Any other questions
24 for -- Madame Majority Leader.
25     REPRESENTATIVE MADDEN: Thank you.

Page 38

1  I'm just curious.  Would you support this bill if
2  that bill on the Senate dies about database, the
3  sunset?  It hasn't been heard yet.  I'm just
4  curious.
5            MR. SHRINER:  There's another problem
6  here.  What if you have a college student who gets a
7  permit out of state, and they stay out of state
8  during their college career, but they come back here
9  periodically.  Are they going to be recognized
10  during a two-week Christmas stay?
11            UNIDENTIFIED VOICE:  Yes, they would
12  be.
13            MR. SHRINER:  Okay.  If you -- if you
14  can't review the database the way Virginia's got
15  reveled, then you might find a lot more people who
16  might go along with that.
17            UNIDENTIFIED VOICE:  I want to follow
18  up on that too, and I don't know if you or some
19  other witnesses could help.  I too would be
20  concerned about the foray used for the database.  I
21  don't think that's a proper use of the database.
22  And I don't know Colorado's Open Records law well
23  enough to know if that's a equivalent issue.  And
24  maybe another witness can speak to that.
25            Someone's volunteering.  So basically,

Page 39

1  if other witnesses can speak to that, that would
2  help.  But as far as reciprocity, do you think the
3  college student's situation was taken care of
4  (unintelligible).
5            CHAIRPERSON:  Are there any other
6  questions for this witness?  Seeing none.  Thank
7  you.
8            MR. SHRINER:  Thank you, Committee.
9            CHAIRPERSON:  Mr. Wyatt.  Welcome to
10  Judiciary.  If you can introduce yourself and who
11  you represent, for the record.
12            MR. WYATT:  Hi.  My name is Rick
13  Wyatt, and I'm here representing myself.  I'm a
14  retired chief of police in the state of Colorado,
15  and a former member of the Chief of Police
16  Association.
17            And I think some of this requires a
18  little bit of history.  If we look back at our
19  concealed weapons law in Colorado, the reason the
20  law was changed was because of the abuse by chiefs
21  of police.  Because the chiefs of police refused to
22  issue permits on a statewide level to people that
23  ever had a need for it whatsoever.
24            The only people that got concealed
25  weapon permits in -- especially in the metro area,

Page 40

1  were people that were friends or buddies or
2  political associates to the chief of police.
3            When I worked for the City of Aurora
4  for the police department, I came down here and
5  testified several times on that bill.  Though, I
6  think it's important to note for you, that if I came
7  down in my uniform, like some these guys behind me
8  here, I would have been terminated for that, because
9  I would have been representing the department, and
10  they didn't think that that was appropriate.
11            So it's sad to me, because in the city
12  of Aurora at the police department, we did a poll,
13  and 77 percent of the members of the police
14  department were in favor of private citizens having
15  conceal to carry.
16            Part of the -- again, part of the
17  problem is because of the abuse we suffered in the
18  past.  And I think what the real issue here today is
19  it doesn't have anything to do with public safety.
20  It has to do with sheriffs and chiefs of police
21  trying to get some of that power that they lost
22  back.
23            It's interesting that whenever I come
24  down to testify at one of these things, that I see
25  the people who are in favor of a bill that does

Page 41

1  something to restrict gun ownership are usually here
2  and being paid to be here, like the sheriffs and
3  chiefs of police I see behind me.  And people who
4  are against the bill, they're here on their own
5  dime.
6            So why are these government people who
7  are being paid to protect us not out there
8  protecting us, sitting in here trying to --
9            UNIDENTIFIED VOICE:  No.  I'm
10  actually -- I'm going to stop you there.  One of the
11  sort of unofficial rules we have is we really don't
12  speak to someone else's motive, because we never
13  really know who is here or isn't here by pay or what
14  circumstances.  And we tend to let witnesses speak
15  for themselves because there's a risk that we're
16  drawing implications and coming to conclusions that
17  we really don't know.
18            So if you don't mind keeping your
19  comments to your opinion on the bill and your
20  reasons for it.
21            MR. WYATT:  Sure.  Okay.  So this
22  bill, the reason that I think that this bill is bad
23  is because there are some people who have chosen to
24  go get and out-of-state permit.  And the reason
25  they've chosen to do so is because you're put on a

Page 42

1  database, which is run by CCIC, the Colorado Bureau
2  of Investigations, which is a criminal database, and
3  you're put on as a person of interest.
4      And most people that I know who obtain
5  a concealed weapons permit are law-abiding citizens
6  that don't want it. They've done everything
7  throughout their lives to make sure they don't get
8  on that criminal database, and then they're put on
9  that database.
10     And the reason that it's said that
11 they were put on the database is because the police
12 need to know when they contact somebody whether they
13 have a gun or not. And if that were really true,
14 then all police officers would also be on that
15 database, and they are not.
16     So some people do, I guess, state
17 shop, so they don't have to be put on a criminal
18 database, because they just don't want to be on that
19 database.
20     The other problem this presents for us
21 is that Colorado has a great industry of tourism
22 here, and we have lots of people that come in here
23 and hunt in Colorado. They're a very, very big
24 revenue generator for this state. And those people
25 maybe coming in, and they may live in a different --

Page 43

1      CHAIRPERSON: Go ahead and finish your
2  sentence.
3      MR. WYATT: They may live in a
4  different state, like New York, that doesn't give
5  them a concealed weapons permit, and therefore, they
6  can't carry their gun here, and it causes them
7  difficulty at DIA and a variety of different places.
8      CHAIRPERSON: Thank you for your
9  comments. I don't know. Let me ask you something.
10 Do you know, out of the other states that have
11 concealed carry, how many of them do or don't have a
12 database that goes with that?
13     MR. WYATT: Florida, which is the
14 primary state, and Utah being second, I think.
15 Florida has a database, but it's restricted and only
16 released by court order.
17     CHAIRPERSON: Okay. Thank you. Are
18 there any other questions for this witness?
19 Representative King.
20     REPRESENTATIVE KING: In your
21 experience as chief of police, how long were you
22 chief?
23     MR. WYATT: I was chief for two years,
24 but I'm retired from 20 years in law enforcement,
25 working for a variety of different departments.

Page 44

1      REPRESENTATIVE KING: All in Colorado?
2      MR. WYATT: Yes, sir.
3      REPRESENTATIVE KING: In your
4  experience, has a person that carried a valid
5  concealed to carry permit ever shot a police
6  officer?
7      MR. WYATT: Never.
8      CHAIRPERSON: Announcing for the
9  record who's speaking. Please proceed.
10     MR. WYATT: Sorry. I've never even
11 heard of that happening in any state, let alone
12 Colorado.
13     CHAIRPERSON: Representative King.
14     REPRESENTATIVE LEVY: Thank you. And
15 in your experience, it is your understanding that if
16 you're a felon, you will not be issued, in Colorado,
17 a conceal to carry.
18     CHAIRPERSON: Mr. Brown.
19     MR. WYATT: Wyatt. If you're a
20 domestic abuser --
21     CHAIRPERSON: Sorry, Mr. Wyatt.
22     MR. WYATT: Okay. Doesn't matter.
23     CHAIRPERSON: Mr. Wyatt. I'm
24 announcing wrong, for the record.
25     MR. WYATT: If you have been convicted

Page 45

1  of domestic violence or if you have been convicted
2  of any felony crime, your right to have possession
3  of a firearm is gone. And you will -- not only will
4  you not get a permit, you won't get a gun.
5      Colorado, the CBI does background
6  checks on people who are purchasing a gun right now.
7  And we have -- our state, one of the problems we
8  have is our state has the highest rate of
9  (unintelligible) denials. People -- I've seen
10 police officers, active-duty police officers denied
11 the ability to purchase a gun. And that's part of
12 this problem.
13     So the people who have concealed
14 weapons permits are law-abiding citizens.
15     CHAIRPERSON: Any other questions for
16 this witness? Seeing none, thank you Mr. Wyatt.
17     MR. WYATT: Thank you very much.
18     CHAIRPERSON: How about Michael Cardi
19 (phonetic).
20     UNIDENTIFIED VOICE: (Unintelligible.)
21     CHAIRPERSON: All right, we have
22 another --
23     UNIDENTIFIED VOICE: (Unintelligible.)
24     CHAIRPERSON: Hi, there. Welcome to
25 the Judiciary. You can introduce yourself and who

Page 46

1  you represent.
2         MR. CARDI:  Hi, Madame Chairman.  My
3  name is Michael Cardi.  I'm here in opposition to
4  Senate Bill 34.  I just want to say, let's say I'm
5  here for -- if I was working for my company, I was
6  here for six months, that would mean I'd have to
7  apply for a Colorado permit, where I'm only going to
8  be here for six months.
9         I just use that as an example.  And
10 I'd have to apply for a Colorado permit, instead of
11 my home state permit, would be usable in this state,
12 right?  Is that what this is -- going to have to
13 apply for a whole new permit?
14        CHAIRPERSON:  After 90 days --
15        MR. CARDI:  90 days.  But I'm only
16 going to be here for half year.
17        CHAIRPERSON:  Madame Majority Leader.
18        REPRESENTATIVE MADDEN:  Thank you,
19 Madame Chair.
20        And to be clear, there is no time
21 limit on reciprocity.  So if you visit Colorado and
22 you're from Ohio, you don't have to get a Colorado
23 concealed weapons permit.  There's no time limit on
24 the reciprocity.  It's only when you move here and
25 establish residency here, you're going to stay in

Page 47

1  Colorado forever, just like if you're registering
2  your car or your driver's license.
3         So there's no time limit on
4  out-of-state reciprocity.
5         MR. CARDI:  But if I buy a house here,
6  while I'm here, I still have to change my permit?
7         CHAIRPERSON:  Madame Majority Leader.
8         REPRESENTATIVE MADDEN:  Where do you
9  live?  Do you live in another state or do you live
10 here.
11        MR. CARDI:  I live in Boulder, but I'm
12 just --
13        REPRESENTATIVE MADDEN:  Hypothetically,
14 where does this person live -- sir, so you can't get
15 a permit in New York, is that what you're saying?
16        MR. CARDI:  I have -- I would have a
17 permit in New York, but if I lived here, came here
18 for six months and bought a house here, would I have
19 to get a new permit?
20        REPRESENTATIVE MADDEN:  Only if you're
21 changing your legal residency.  If you're not, you
22 do not.
23        MR. CARDI:  All right.  And also,
24 it's -- I think, no matter how long the person's
25 going to be here, they should honor the other

Page 48

1  state's permit.
2         UNIDENTIFIED VOICE:  Which I think we
3  just had clarified --
4         MR. CARDI:  No, but if I'm going to
5  move here, they should still honor the other state's
6  permit, because they -- I got my permit in that
7  state, and I've -- make my permanent address here, I
8  should be able to still use that permit in Colorado.
9         CHAIRPERSON:  Are there any questions
10 for this witness?  Seeing none, thank you for
11 joining us.
12        Dudley Brown.  Welcome to Judiciary,
13 if you could introduce yourself for the record.
14        MR. BROWN:  Thank you, Madame Chair,
15 members of committee.  My name is Dudley Brown.  I'm
16 with Rocky Mountain Governors.  I think I've been
17 the longest running lobbyist down here on guns.  So,
18 been here since it started in the 1994 session.
19        I just wanted to speak to some of the
20 questions and understand -- I think we should
21 understand that there are some incidents we're not
22 really understanding.  The implication of this bill
23 is that if you're from New York -- I'm getting
24 e-mails on my BlackBerry all day long, have been for
25 a couple weeks about this bill.

Page 49

1         You know, if you live in California,
2  if you live in states that don't issue permits, and
3  you're a businessman, businesswoman, or you have
4  another home here, and you travel here, many of
5  those people get permits in Florida, because they
6  travel to a lot of different states.
7         And so they want to be able to defend
8  themselves if they (unintelligible) here.  And so
9  this bill says that you can't do that anymore.  You
10 can't get a permit from another state -- unless
11 there's some amendment that's being offered that I
12 do not know about.  And so that's a problem.
13        Please stop me if there's another
14 amendment that I don't know about.
15        UNIDENTIFIED VOICE:  Well, if I can
16 just weight in.  I think the distinction we're
17 establishing is your location isn't -- my
18 understanding is that interstate reciprocity stays
19 sort of indefinitely, in that one person -- a person
20 generally has one legal residence, and you may or
21 may not be in the state where you have it.  But at
22 some point, I think, if for legal purposes, you
23 declare yourself a resident of Colorado, then you
24 have a grace period.
25        But if you've got all of these

Page 50

1 transitory or temporary or dual home situations, I
2 don't think -- maybe Representative Madden can
3 clarify this, but I don't think those situations
4 qualify for residency for purposes of triggering the
5 90 days on this.
6        I think most of those situations do
7 respect interstate reciprocity.
8        UNIDENTIFIED VOICE: Thank you, Madame
9 Chair. If you move here, again, you have 90 days to
10 change your residency, and I don't think that's the
11 issue. But he's right, but if you're from a state
12 where you can't get a permit in your own state, this
13 bill ties your concealed weapons permit to where you
14 live.
15        And there's a reason for that, because
16 clearly you're law abiding when you get it, and
17 people -- all people, unfortunately of -- you know,
18 whether you're a concealed weapons permit or not,
19 it's no reflection on people who do or do not have
20 incidents where they should be taken away. And if
21 you're here in Colorado, there's no way we can track
22 that.
23        If you wouldn't pass this test in
24 Colorado -- and this kind of goes to the other part
25 of the bill -- if you've got a Florida concealed

Page 51

1 weapons permit, and you commit domestic violence
2 here, you're going to still have a concealed weapons
3 permit from Florida.
4        And so there needs to be a way for
5 your home state to track you. I mean, just like if
6 you -- why we have -- why we want people to get
7 driver's licenses here is so when someone drunks --
8 drives drunk, we can then, perhaps, take that
9 driver's license away.
10        So for the five states that don't have
11 concealed weapons permits, is there five?
12        MR. BROWN: I believe it's more than
13 that now.
14        UNIDENTIFIED VOICE: I think it's five
15 that they -- their residency -- their ability to get
16 a concealed weapons permit is tied to where they
17 live. Mr. Brown, is your concern that it states
18 that they're legally a resident of -- doesn't have
19 some kind of concealed permit, that if they came to
20 Colorado, there would be nothing, but they'd be
21 transporting with them?
22        CHAIRPERSON: Mr. Brown.
23        MR. BROWN: Colorado does not issue
24 non-resident permits, so -- but Florida does and
25 Utah does. So many businessmen, businesswomen, and

Page 52

1 people, vacationers, tourists, I get -- through the
2 summer months, I get e-mails all day long from
3 people saying, I'm traveling through your state,
4 what do I do, and those people want to know can they
5 carry there with a certain permit.
6        They might have reciprocity with their
7 own state. Their state might not issue, and so they
8 apply to Florida. They apply to Utah. I wish some
9 of them could be here, and I know they're listening
10 on the internet, because they're all sending --
11 e-mailing me all the time saying -- saying, please
12 kill this bill, because I can't defend myself.
13        This is just one of the areas in which
14 we believe this is a bad bill. There are reasons
15 Colorado citizens don't want this. We heard about
16 the database, and you have questions about the
17 database. No, it's not in CCIC anymore. They call
18 it something different, which also means it is
19 subject to the Freedom of Information Act request,
20 and we're going to file on that, because it can't be
21 considered judicial records then. I know people
22 that will probably argue about that.
23        However, the -- the -- some sheriffs
24 use that discretionary method to interview
25 neighbors. I got a call from a member yesterday up

Page 53

1 in Eagle County who's literally being -- has his
2 neighbors interviewed about his permit. They're
3 telling them, we're going to interview you, because
4 your neighbor's going to get a concealed weapons
5 permit.
6        Well, he won't be denied, but they
7 broadcast to his neighbors that the man has a
8 concealed weapons permit or is attempting to get
9 that. And those kind of people go, I don't want
10 that headache and I don't want those people. I'd
11 just as soon go to Florida and get a permit.
12        Now, I don't think Florida wouldn't
13 have to go through that, I understand. There's also
14 cost factor. To people who travel a lot, you want
15 to get one permit, just get one. Those criteria
16 from Florida are the same as Colorado's. They are
17 the same. You've got to go through fingerprints.
18 You have to have training. You have to show that --
19 you have to do a full background check, and it's
20 exhaustive. You have to show that you are legally
21 eligible (unintelligible) gun.
22        But let's be clear, that permit is --
23 a concealed weapons permit is not a permit to do
24 anything other than carry the weapon. It doesn't
25 say that, therefore, I can be a -- I can act like a

Page 54

1  police officer. It does not say that.
2      When we're talking about revoking the
3  permit, understand that if you commit a crime while
4  you have a permit, that permit is invalid, whether
5  it's on your person or not.
6      UNIDENTIFIED VOICE: Let me just
7  clarify. So it is your perspective that right now
8  you feel that Colorado's database could be subject
9  to Freedom of Information requests and subsequently
10  published, is that your --
11      MR. BROWN: I believe so. We're
12  actually going to file that to check that.
13      CHAIRPERSON: Representative Levy.
14      REPRESENTATIVE LEVY: Thank you,
15  Madame Chair.
16      Mr. Brown, help me here, because
17  this -- is there information that may be on your
18  records in the state of New York that -- to which
19  the State of Florida might not have access and would
20  constitute grounds for denial -- or let's frame it
21  in terms of Colorado, since New York doesn't issue
22  concealed weapons permits.
23      I guess my question is: Do all
24  background checks in any state serve the same
25  purpose? Could they get access to all the

Page 55

1  information that's in any database in Colorado that
2  would be relevant to a Colorado sheriff on issuance
3  of that permit?
4      CHAIRPERSON: Mr. Brown.
5      MR. BROWN: Mechanically, no. They
6  don't have access to that. That's my understanding.
7  I'm sure Ms. Kitchen (phonetic) would address that.
8  But understand, it's the same criteria as to
9  purchase a firearm.
10      You can go down to the Sportsman's
11  Warehouse today and buy a firearm, they're going
12  through the background check. They're going through
13  NCIC. The only thing different is they don't have
14  a -- NCIC does not have a -- doesn't have that
15  discretionary, what we were talking, documentable
16  evidence. So there is that small difference.
17      So in terms of background check,
18  that's the only additional requirement for a
19  concealed weapons permit process, is that you
20  have -- is that the sheriffs can add that little
21  section in. If they want to say, well, we found you
22  that you were noisy and we have this documentable
23  evidence that you were a danger to yourself or
24  others, we can deny you based on that. We're
25  finding that's happening.

Page 56

1      (End of recording.)
        *******
2      (Part Two)
3      CHAIRPERSON: Representative Levy.
4      REPRESENTATIVE LEVY: Thank you,
5  Mr. Chair.
6      Mr. Brown, just to follow up and make
7  sure I understood your testimony correctly, then,
8  you're saying, in this small area, there isn't equal
9  access to information. But, in fact, that would be
10  some of the relevant information for issuance of a
11  concealed weapons permit. That could be domestic
12  violence calls. It could be -- it could be a
13  variety of law enforcement contacts.
14      CHAIRPERSON: Mr. Brown.
15      MR. BROWN: The (unintelligible)
16  convictions stop you from owning a gun anyway. If
17  there's a -- if you're charged or even if there's a
18  call to your house for domestic violence, and
19  they're denying you based on that, that's their
20  little discretionary period. And that's something
21  we've fought against and we think it's a gray area
22  within the law right now and whether they can issue
23  or not. And some sheriffs do a better job than
24  others, I think, in using that as an excuse, and

Page 57

1  some don't.
2      CHAIRPERSON: Senator Levy.
3      REPRESENTATIVE LEVY: Thank you,
4  Mr. Chair.
5      But my question is whether the State
6  of Florida, in issuing that concealed weapons
7  permit, is going to have access to all of that
8  information in the database that a Colorado sheriff
9  may rely on. And you're shaking your head no.
10      CHAIRPERSON: Mr. Brown.
11      MR. BROWN: Thank you, Mr. Chairman.
12      No. Clearly, is not going to have a
13  list of the officer was sent out to that house.
14  Gosh, I sure hope they don't. I thought we were --
15  we were innocent until proven guilty, not visa
16  versa. I hope we are.
17      CHAIRPERSON: Representative King.
18      REPRESENTATIVE KING: So would Florida
19  have NCIC inquiry information on counties?
20      CHAIRPERSON: Mr. Brown.
21      MR. BROWN: Thank you, Mr. Chairman.
22      Yes, and as well as information on
23  domestic violence convictions.
24      CHAIRPERSON: Are there any further
25  questions for Mr. Brown? Seeing none, thank you

15 (Pages 54 to 57)

Page 58

1  very much for your testimony today.
2      That concludes the list of persons who
3  are kind of in opposition to Senate Bill 34. We'll
4  proceed to opponents of Senate Bill 34.
5      Karen Rynerson (phonetic). Welcome to
6  the House Judiciary Committee. Please identify
7  yourself and who you represent for the record.
8      MS. RYNERSON: Thank you,
9  Mr. Chairman.
10     My name is Karen Rynerson, and I'm the
11 president of Front Range Community College. I came
12 here today to support Representative Madden's bill,
13 specifically because of an incident that occurred at
14 the Westminster campus earlier in the fall, middle
15 of October.
16     An individual student who had informed
17 our security people that he had a concealed weapons
18 permit, and who had been consistently told that it
19 was against both the state board policy, as well as
20 the student code of conduct to bring a gun on
21 campus, in fact, brought the gun to school and to a
22 classroom where his fellow students were able to see
23 it. So I guess you could have some debate on how
24 concealed it actually was.
25     The students that saw the gun reported

Page 59

1  it to the teacher in the class, who, in fact, went
2  to the student and said, do you have a weapon. He
3  showed it to her. She asked him to leave the class,
4  which he did, for which I am eternally grateful.
5  There was no incident in this.
6      In the meantime, student left the
7  building escorted by security guards. The
8  Westminster Police were called. The class was
9  completely disrupted for the day, because people
10 aren't real fond, especially less than a month after
11 the Bailey shooting, finding somebody in your
12 classroom is carrying a gun around that they, in
13 fact, can see.
14     And it turned out that, in fact, even
15 though this student had been enrolled as an in-state
16 student for the purposes of tuition, and in-state
17 support in the summer of 2004, his concealed weapons
18 permit, in fact, was from the state of Florida.
19     So I -- my position is -- and I do
20 want to say that the Westminster Police were
21 incredibly efficient and good in this case. They
22 handled the situation very well. I simply cannot
23 understand why taxpayers in the state of Colorado
24 would want to be supporting someone in their college
25 education, which, you know, is about a third the

Page 60

1  cost of an out-of-state tuition, and yet, the person
2  isn't required to get an in-state concealed weapons
3  permit in the state of Colorado.
4      CHAIRPERSON: Representative King.
5      REPRESENTATIVE KING: Ma'am, he went
6  through your security?
7      MS. RYNERSON: He had earlier, as he
8  entered the school, told the security people at our
9  school that he had a concealed weapons permit. He
10 had been told by them not to bring the gun to
11 school. But it wasn't the same day. I want to make
12 that clear.
13     REPRESENTATIVE KING: Thank you.
14     CHAIRPERSON: Representative Gardner.
15     REPRESENTATIVE GARDNER: Yes. I just
16 want to clarify. Are you here on behalf of
17 yourself?
18     MS. RYNERSON: On behalf of -- excuse
19 me. I'm sorry. I haven't done this for a long
20 time. I forget.
21     I'm here on behalf of my school, as
22 the president.
23     CHAIRPERSON: Any further questions
24 for Ms. Rynerson? Seeing none. Thank you very much
25 for your testimony.

Page 61

1      MS. RYNERSON: Thank you.
2      CHAIRPERSON: Sheriff Joe Pelle.
3  Welcome to the House Judiciary Committee. Please
4  identify yourself and who you represent for the
5  record.
6      MR. PELLE: My name is Joe Pelle. I'm
7  the sheriff of Boulder County. I'm also the
8  president of the County Sheriffs of Colorado.
9      CHAIRPERSON: Thank you. Please
10 proceed.
11     MR. PELLE: The strength of Colorado
12 CCW law permit is the fact that there is local
13 control and that sheriffs do have public safety
14 discretion in issuing permits. Applicants have to
15 come to us. We have to see them. They have to sign
16 for a permit.
17     Permits being issued by Utah or
18 Florida are mail-order permits. People package up
19 their stuff and send it away, and Florida mails them
20 back a permit.
21     I've issued almost 1500 permits in my
22 county. I've revoked about a dozen people. And
23 I've denied about four people. Never been
24 challenged in court. No one's ever taken me on.
25 And some of the issues that I've revoked and denied

16 (Pages 58 to 61)

Page 62

1  over are not issues that are available to Florida or
2  Utah by computer. They have to do with mental
3  health issues, with people that are having auditory
4  and visual hallucinations.
5        They have to do with people, an
6  applicant who was blind. A man came to my office in
7  2004 and he was blind. And he asked for a CCW
8  permit. And based on that discretion that I have in
9  the statute, I denied it.
10       So my concern is that we have folks
11 who may be denied or revoked who are able to get
12 mail-order permits from other states, and it usurps
13 and bypasses all local and state control in this
14 matter. Sheriff Hilkey (phonetic) in Mesa County
15 revoked permit of a lady who was able to get a
16 permit from Utah.
17       You heard testimony earlier from a
18 proponent who was also denied by two counties, and
19 who carries now a Florida permit. My answer to that
20 is the statute has remedies. The statute provides
21 for judicial review, when an applicant believes a
22 sheriff is wrong. And the statute places the
23 financial responsibility for payment for that review
24 on the sheriff, when the sheriff is proven wrong.
25       I think this is a matter of local

Page 63

1  control. It's a matter of the State of Colorado
2  being responsible for its residents, and for
3  sheriffs being responsible for the public safety of
4  their county.
5        I would urge you to support the bill.
6        CHAIRPERSON: Thank you. Are there
7  any questions for Sheriff Pelle?
8        Madame (unintelligible).
9        UNIDENTIFIED VOICE: This is something
10 I want to make clear. So the instance of the
11 student who came onto campus that broke our laws
12 gets to keep his Florida concealed weapons permit,
13 even though he broke -- that's what I want to know
14 is, do we have any access to -- does that
15 automatically happen, that you --
16       UNIDENTIFIED VOICE: No. Sorry.
17       UNIDENTIFIED VOICE: Or in another
18 case, let's say someone -- someone comes to your
19 home -- is there an automatic check on any arrest,
20 that someone has a concealed weapons permit from
21 some other state, and they get automatically
22 notified? Because I worry about people who have --
23 can't get it here, for whatever reason, they get it
24 someplace else, then they later break the law. Are
25 they going to lose their Florida or Utah concealed

Page 64

1  weapons permit, or are there problems with that
2  process?
3        CHAIRPERSON: Sheriff Pelle.
4        MR. PELLE: I think it's probably
5  fairly clear that if someone commits a felony, and
6  they're no longer eligible to carry a firearm, under
7  Brady or under federal law, that we can probably
8  revoke that.
9        The issue for us -- for me, is when
10 it's not -- when it's a public safety issue, that's
11 not clearly a violation, a criminal violation, like
12 when our officers takes somebody on a mental health
13 hold or takes a chronic alcoholic in on a 72-hour
14 alcohol detox hold, what -- what message or what
15 exists for us to revoke their permits out of Utah or
16 Florida or wherever they may be issued from.
17 There's no local access or local control to that.
18       Now, when people apply through Utah or
19 Florida or another state, those states do NCIC
20 checks, and they do access criminal convictions, but
21 they miss about 30 percent of the information that
22 we use.
23       We use Icon, the court system. We use
24 local records. We talk to local police
25 jurisdictions, and we make sure that there is not

Page 65

1  that police safety issue.
2        CHAIRPERSON: Representative King.
3        REPRESENTATIVE KING: Sheriff, why
4  would a blind guy want a permit?
5        MR. PELLE: I have no idea, other than
6  to, perhaps, test the system or to exercise or
7  insist on a right.
8        REPRESENTATIVE KING: Second Amendment
9  right.
10       MR. PELLE: Second Amendment right,
11 correct.
12       REPRESENTATIVE KING: A hundred
13 percent blind?
14       MR. PELLE: He had to have assistance
15 to make it through our building, and he had to have
16 assistance to find the line to sign on the
17 application.
18       REPRESENTATIVE KING: So he wasn't
19 totally blind.
20       MR. PELLE: I don't know his legal
21 status. I know that he couldn't see.
22       REPRESENTATIVE KING: Okay.
23       CHAIRPERSON: Are there any further
24 questions for Sheriff Pelle. Seeing none, thank you
25 very much for your testimony today.

Page 66

1  Russ Vanhelton (phonetic). Welcome to
2  the House Judiciary Committee. Identify yourself
3  and who you represent for the record.
4  MR. VANHELTON: My name is Russ
5  Vanhelton. I represent the Colorado Association of
6  Chiefs of Police.
7  CHAIRPERSON: Thank you. Please
8  proceed.
9  MR. VANHELTON: Mr. Chair,
10 representatives of the Colorado Association of
11 Chiefs of Police would like you to know that we
12 support Senate Bill 34, specifically because, in all
13 simplicity, all it does is require Colorado
14 residents to have a valid CCW permit, and that it be
15 from our state, if they are a Colorado resident.
16 Under the current statutes, Colorado
17 has no authority over its own residents without
18 out-of-state permits. The state cannot revoke a
19 permit issued by another state. Thank you.
20 CHAIRPERSON: Are there any questions
21 for Chief Vanhelton? Seeing none, thank you very
22 much for your testimony.
23 MR. VANHELTON: Thank you very much.
24 CHAIRPERSON: Amber Tafoya. Welcome
25 to the House Judiciary Committee. Please identify

Page 67

1  yourself and who you represent, for the record.
2  MS. TAFOYA: Hello, Chair Carroll,
3  members of the committee. My name is Amber Tafoya.
4  I represent the Colorado Coalition Against Domestic
5  Violence. We're a member of on organization of 86
6  members serving over 40,000 victims of domestic
7  violence in the state of Colorado annually.
8  I'm here in support of Senate Bill 34.
9  We believe it just makes good common sense for there
10 to be a concealed weapons database, is one part of
11 it. That's not the bill in hand. We're in support
12 of that, as well. But we also believe that this
13 bill makes sense.
14 If you're a Colorado resident, you
15 should have a Colorado permit. Your sheriff should
16 have the ability to examine you and see if you are
17 deserving of a permit. We feel that that just makes
18 sense. And the main objection that we hear to this,
19 that persons shouldn't be on the database.
20 A person may want to get a permit from
21 outside of the state so that they can avoid our
22 database, just doesn't ring true to us, because we
23 feel that the database, in and of itself, is a
24 useful tool so that law enforcement knows who's got
25 a concealed to carry permit.

Page 68

1  As Representative Madden said, the
2  issue is not that a person is not law abiding in the
3  moment they get their permit, it's that they maybe
4  have problems after they receive their permit. And
5  we'd like them to be able to be checked out
6  according to our laws.
7  In Colorado, it's not just whether or
8  not you have a conviction, but it's also whether or
9  not you have an order -- a restraining order against
10 you as a result of a domestic violence, and that
11 could disqualify you from having a concealed weapons
12 permit.
13 Not all of the states that issue
14 concealed weapon permits have that requirement. And
15 so we feel it's very important that if you're a
16 Colorado resident, that our state sovereignty is
17 considered and that you abide by our state laws.
18 CHAIRPERSON: Thank you. Are there
19 any questions for Ms. Tafoya? Seeing none, thank
20 you very much for your testimony.
21 Susan Kitchen (phonetic). Welcome to
22 the House Judiciary Committee. Please identify
23 yourself and who you represent for the record.
24 MS. KITCHEN: Thank you. I'm Susan
25 Kitchen, and I'm an agent in charge of the Colorado

Page 69

1  Bureau of Investigation. I'm here representing the
2  Department of Public Safety, and we're in support of
3  this bill.
4  CHAIRPERSON: Thank you, please
5  proceed.
6  MS. KITCHEN: As a department, we feel
7  that the issue here is one of public safety. The
8  CBI runs the InstaCheck unit where we do background
9  checks pursuant to firearms transfers. And I can
10 tell you that during those checks, over 30 percent
11 of our denials for gun transfers are based on
12 information that's no available to another state.
13 We do these as part of the background
14 checks for concealed weapon permit, as well. So
15 that 30 percent, by the way, doesn't include
16 information that the sheriff might find that is
17 discretionary. So that 30 percent is simply the
18 people that we would deny a gun in the first place.
19 The other thing that hasn't been
20 brought up is that in Colorado, when you apply for a
21 permit, you submit a set of fingerprints. In
22 Colorado, we keep those fingerprints in a database,
23 so that if you're subsequently arrested in Colorado,
24 it hits those fingerprints through our AFIS system,
25 or Automated Fingerprint Identification System.

Page 70

1  Those fingerprints are flagged to the
2  sheriff that submitted them. And the sheriff who
3  submitted that information is immediately notified
4  that his permit holder has been arrested, and for
5  what. That doesn't happen if you have an
6  out-of-state permit. You can't flag records at the
7  national level. We can't flag another state's
8  records.
9  Just as a piece of information,
10  Colorado has reciprocity with 25 other states. That
11  doesn't include Vermont, where a Colorado permittee,
12  even a non-permittee could carry, because they don't
13  require permits for carrying concealed weapons.
14  There are nine others states that
15  issue to non-residents. There are five states that
16  do not recognize non-resident permits.
17  Interestingly enough, there are actually two states
18  that issue to non-residents, but don't recognize
19  another state's non-resident permit, Florida being
20  one of them.
21  Part of the reason that people want to
22  have Florida permits is that Florida shares
23  reciprocity with more states than any other.
24  Florida shares reciprocity with 29 states, as
25  opposed to our 25. Their permit is valid for 10

Page 71

1  years, as opposed to our five-year permit.
2  I want to address a couple issues that
3  came up with the opposition. There was some
4  suggestion by Mr. Fabian that any law that we pass
5  similar to Senate Bill 34 would affect our
6  reciprocity with other states. But I would remind
7  you that Florida, that shares reciprocity with more
8  states than any other, has such a provision. They
9  do not recognize another state's non-resident permit
10  in Florida.
11  I kind of hesitate to address the
12  issue of the database, but since it's come up, and I
13  see people have a lot of questions, the database
14  does not exist in a person on interest file in a
15  criminal history database, as was testified to by
16  Rich Wyatt. It was removed from that file. It
17  exists in the Colorado Crime Information Center as a
18  file, not in a person of interest file.
19  The -- as far as information being
20  released from our database, we have had repeated
21  requests for database information, whether
22  pertaining to CCW files or our criminal history
23  database. Our attorney general has consistently
24  upheld our denials of those records under the Open
25  Records Act.

Page 72

1  The Open Records Act requires us to
2  provide information from our criminal history
3  databases, unless, of course, it's juvenile
4  information or sealed, when it's specifically
5  requested. It doesn't require us to respond to a
6  request for an entire database.
7  UNIDENTIFIED VOICE: I'm going to
8  interrupt here and see if there are any questions
9  for Ms. Kitchen.
10  Representative Morgan Carroll.
11  REPRESENTATIVE MORGAN CARROLL: Thank
12  you, Mr. Chair.
13  I don't know if you'd have this at the
14  top of your head, but for folks that are in
15  Colorado's database, do we have data, not just on
16  who's been charged or arrested, but on any of those
17  permit holders that have been convicted of crimes,
18  and I guess lost their permit --
19  (End of recording.)

Page 73

1
2            CERTIFICATE
3
4  STATE OF COLORADO    )
                        )ss.
5  CITY AND COUNTY OF DENVER )
6
7       I, Angela Smith, Professional Reporter
   and Notary Public for the State of Colorado, do
8  hereby certify that this transcript of the CDs were
   reduced to typewritten form by computer-aided
9  transcription, that the foregoing is a true
   transcript of the proceedings had to the best of my
10  ability; and the speakers were identified according
   to the information provided and to the best of my
11  ability.
       I further certify that I am not an
12  attorney nor counsel nor in any way connected with
   any attorney or counsel for any of the parties to
13  said action or otherwise interested in its event.
       IN WITNESS WHEREOF, I hereunto affix my
14  hand and notarial seal this 6th day of December
   2010.
15      My commission expires January 22,
   2011.
16
17
18
19  _____
    Angela Smith
20  Professional Reporter and Notary Public
    Calderwood-Mackelprang, Inc.
21
22
23
24
25