# In The
# Supreme Court of the United States

————————◆————————

OTIS MCDONALD, ET AL.,

*Petitioners,*

v.

CITY OF CHICAGO, ILLINOIS, ET AL.,

*Respondents.*

————————◆————————

**On Writ Of Certiorari To The United States
Court Of Appeals For The Seventh Circuit**

————————◆————————

**BRIEF OF THE STATES OF TEXAS, OHIO,
ARKANSAS, GEORGIA, ALABAMA, ALASKA,
ARIZONA, COLORADO, FLORIDA, IDAHO,
INDIANA, KANSAS, KENTUCKY, LOUISIANA,
MAINE, MICHIGAN, MINNESOTA, MISSISSIPPI,
MISSOURI, MONTANA, NEBRASKA, NEVADA, NEW
HAMPSHIRE, NEW MEXICO, NORTH CAROLINA,
NORTH DAKOTA, OKLAHOMA, PENNSYLVANIA,
RHODE ISLAND, SOUTH CAROLINA, SOUTH
DAKOTA, TENNESSEE, UTAH, VIRGINIA,
WASHINGTON, WEST VIRGINIA, WISCONSIN,
AND WYOMING AS AMICI CURIAE
IN SUPPORT OF PETITIONERS**

————————◆————————

GREG ABBOTT
  Attorney General of Texas

C. ANDREW WEBER
  First Assistant Attorney
  General

DAVID S. MORALES
  Deputy Attorney General
  for Civil Litigation

JAMES C. HO
  Solicitor General
  *Counsel of Record*

SEAN D. JORDAN
  Deputy Solicitor General

CANDICE N. HANCE
  Assistant Attorney General

OFFICE OF THE
  ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700

Counsel for Amici Curiae

[Additional Counsel Listed On Inside Cover]

RICHARD CORDRAY
Attorney General of Ohio

DUSTIN MCDANIEL
Attorney General of Arkansas

THURBERT E. BAKER
Attorney General of Georgia

TROY KING
Attorney General of Alabama

DANIEL S. SULLIVAN
Attorney General of Alaska

TERRY GODDARD
Attorney General of Arizona

JOHN W. SUTHERS
Attorney General of Colorado

BILL MCCOLLUM
Attorney General of Florida

LAWRENCE G. WASDEN
Attorney General of Idaho

GREGORY F. ZOELLER
Attorney General of Indiana

STEVE SIX
Attorney General of Kansas

JACK CONWAY
Attorney General of Kentucky

JAMES D. "BUDDY" CALDWELL
Attorney General of Louisiana

JANET T. MILLS
Attorney General of Maine

MICHAEL A. COX
Attorney General of Michigan

LORI SWANSON
Attorney General of Minnesota

JIM HOOD
Attorney General of Mississippi

CHRIS KOSTER
Attorney General of Missouri

STEVE BULLOCK
Attorney General of Montana

JON BRUNING
Attorney General of Nebraska

CATHERINE CORTEZ MASTO
Attorney General of Nevada

MICHAEL A. DELANEY
Attorney General of New Hampshire

GARY K. KING
Attorney General of New Mexico

ROY COOPER
Attorney General of North Carolina

WAYNE STENEHJEM
Attorney General of North Dakota

W.A. DREW EDMONDSON
Attorney General of Oklahoma

THOMAS W. CORBETT, JR.
Attorney General of Pennsylvania

PATRICK C. LYNCH
Attorney General of Rhode Island

HENRY MCMASTER
Attorney General of South Carolina

MARTY J. JACKLEY
Attorney General of South Dakota

ROBERT E. COOPER, JR.
Attorney General of Tennessee

MARK L. SHURTLEFF
Attorney General of Utah

WILLIAM C. MIMS
Attorney General of Virginia

ROBERT M. MCKENNA
Attorney General of Washington

DARRELL V. MCGRAW, JR.
Attorney General of West Virginia

J.B. VAN HOLLEN
Attorney General of Wisconsin

BRUCE A. SALZBURG
Attorney General of Wyoming

## QUESTION PRESENTED

Whether the Second Amendment right to keep and bear arms is incorporated as against the States by the Fourteenth Amendment's Privileges or Immunities or Due Process Clauses.

## TABLE OF CONTENTS

Question Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . iii

Interest of Amici Curiae . . . . . . . . . . . . . . . . . . . . . 1

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . 6

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.  The Second Amendment Applies to the
    States Through the Fourteenth
    Amendment . . . . . . . . . . . . . . . . . . . . . . . 10

    A.  The Due Process Clause Incorporates
        "Fundamental" Rights . . . . . . . . . . . . 10

    B.  The Right to Keep and Bear Arms
        Was Considered "Fundamental"
        Under English Law and During
        the Founding Era . . . . . . . . . . . . . . . 12

    C.  The Right to Keep and Bear Arms
        Was Considered "Fundamental" When
        the Fourteenth Amendment Was
        Adopted, and It Remains So
        to This Day . . . . . . . . . . . . . . . . . . . . 17

    II.  The Federalism Concerns Invoked by
         the Court of Appeals Are Misplaced . . . . . 21

    III.  The City of Chicago Misreads *Heller* . . . . 24

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## TABLE OF AUTHORITIES

### Cases

*Alden v. Maine*,
  527 U.S. 706 (1999) . . . . . . . . . . . . . . . . . . . . . . . 12

*Andrews v. State*,
  50 Tenn. 165 (1871) . . . . . . . . . . . . . . . . . . . . . . 26

*Benton v. Maryland*,
  395 U.S. 784 (1969) . . . . . . . . . . . . . . . . . . . . . . 11

*Cockrum v. State*,
  24 Tex. 394 (1859) . . . . . . . . . . . . . . . . . . . . . . 16

*DeJonge v. Oregon*,
  299 U.S. 353 (1937) . . . . . . . . . . . . . . . . . . . . . . 11

*District of Columbia v. Heller*,
  128 S. Ct. 2783 (2008) . . . . . . . . . . . . . . . . *passim*

*Duncan v. Louisiana*,
  391 U.S. 145 (1968) . . . . . . . . . . . . . . . . . . 3, 9, 12

*Gitlow v. New York*,
  268 U.S. 652 (1925) . . . . . . . . . . . . . . . . . . . . . . 11

*Klopfer v. North Carolina*,
  386 U.S. 213 (1967) . . . . . . . . . . . . . . . . . . . . . . 11

*Mapp v. Ohio*,
  367 U.S. 643 (1961) . . . . . . . . . . . . . . . . . . . . . . 11

*Medtronic, Inc. v. Lohr,*
    518 U.S. 470 (1996) . . . . . . . . . . . . . . . . . . . . . . . 23

*Miller v. Texas,*
    153 U.S. 535 (1894) . . . . . . . . . . . . . . . . . . . . . . . 8

*Nat'l Rifle Ass'n of Am., Inc. v. City of Chicago,*
    567 F.3d 856 (7th Cir. 2009) . . . . . . . . . . 8, 21, 22

*New State Ice Co. v. Liebmann,*
    285 U.S. 262 (1932) . . . . . . . . . . . . . . . . . . . . . . . 22

*Nordyke v. King,*
    563 F.3d 439 (9th Cir. 2009) . . . . . . . . . . . . . . . 23

*Nunn v. State,*
    1 Ga. 243 (1846) . . . . . . . . . . . . . . . . . . . . . . 16, 26

*Pac. Mut. Life Ins. Co. v. Haslip,*
    499 U.S. 1 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Palko v. Connecticut,*
    302 U.S. 319 (1937) . . . . . . . . . . . . . . . . . . . . . . . 11

*Pointer v. Texas,*
    380 U.S. 400 (1965) . . . . . . . . . . . . . . . 11, 22, 24

*Presser v. Illinois,*
    116 U.S. 252 (1886) . . . . . . . . . . . . . . . . . . . . . . . 8

*Quilici v. Village of Morton Grove,*
    695 F.3d 261 (7th Cir. 1982) . . . . . . . . . . . . . . . 8

*Reno v. Flores,*
  507 U.S. 292 (1993) . . . . . . . . . . . . . . . . . . . . . . . 11

*Saenz v. Roe,*
  526 U.S. 489 (1999) . . . . . . . . . . . . . . . . . . . . . . . 1

*Schilb v. Kuebel,*
  404 U.S. 357 (1971) . . . . . . . . . . . . . . . . . . . . . . . 11

*Shapiro v. Thompson,*
  394 U.S. 618 (1969) . . . . . . . . . . . . . . . . . . . . . . . 2

*State v. Chandler,*
  5 La. Ann. 489 (1850) . . . . . . . . . . . . . . . . . . . . . 16

*State v. Reid,*
  1 Ala. 612 (1840) . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Cruikshank,*
  92 U.S. 542 (1875) . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Guest,*
  383 U.S. 745 (1966) . . . . . . . . . . . . . . . . . . . . . . . 1

*United States v. Miller,*
  307 U.S. 174 (1939) . . . . . . . . . . . . . . . . . . . . . . . 27

*Washington v. Glucksberg,*
  521 U.S. 702 (1997) . . . . . . . . . . . . . . . . . . . . . . . 11

**Statutes, Rules, and Constitutional Provisions**

U.S. CONST. amend. II . . . . . . . . . . . . . . . . . . . . . . . 6

U.S. CONST. amend. XIV, § 1 . . . . . . . . . . . . . . . . . 11

ARK. CONST. of 1868, art. II, § 5 . . . . . . . . . . . . . . 19

CAL. CONST. art. I, § 1 . . . . . . . . . . . . . . . . . . . . . . . 20

IOWA CONST. art. I, § 1 . . . . . . . . . . . . . . . . . . . . . . 20

MASS. CONST. pt. 1, art. XVII . . . . . . . . . . . . . . . . . 15

MISS. CONST. of 1868, art. I, § 15 . . . . . . . . . . . . . 19

N.C. CONST. of 1776,
     DECLARATION OF RIGHTS § XVII . . . . . . . . . . . 15

N.J. CONST. art. I, ¶ 1 . . . . . . . . . . . . . . . . . . . . . . . 20

PA. CONST. of 1776,
     DECLARATION OF RIGHTS, § XIII . . . . . . . . . . . 15

TEX. CONST. of 1869, art. I, § 13 . . . . . . . . . . . . . . 20

VT. CONST. of 1777, ch. 1, art. XV . . . . . . . . . . . . . 15

Act of July 16, 1866,
     ch. 200, sec. 14, 14 Stat. 173 (1866) . . . . . . . . 19

CHICAGO, ILL., MUN. CODE § 8-20-040(a) . . . . . . . . . 7

CHICAGO, ILL., MUN. CODE § 8-20-050(c) . . . . . . . . 7

CHICAGO, ILL., MUN. CODE § 8-20-090 . . . . . . . . . . 7

CHICAGO, ILL., MUN. CODE § 8-20-200 . . . . . . . . . . 7

## Other Authorities

AKHIL REED AMAR,
    THE BILL OF RIGHTS (1998) . . . . . . . . . . . . 14, 18

WILLIAM BLACKSTONE, 1 COMMENTARIES 139
    (Legal Classics Library 1983) (1765) . . . 6, 12, 13

CONG. GLOBE,
    39th Cong., 1st Sess. (1866) . . . . . . . . . 5, 18, 19

1 ELLIOTT'S DEBATES ON THE
    FEDERAL CONSTITUTION
    (Jonathan Elliott ed., 1859) . . . . . . . . . . . . . . . 16

JOSEPH J. ELLIS, FOUNDING BROTHERS:
    THE REVOLUTIONARY GENERATION (2000) . . . . . 14

ROBERT A. GROSS,
    THE MINUTEMEN AND THEIR WORLD (1976) . 4, 13

STEPHEN P. HALBROOK, FREEDMEN,
    THE FOURTEENTH AMENDMENT, AND THE
    RIGHT TO BEAR ARMS, 1866-1876 (1998) . . . 17-19

STEPHEN P. HALBROOK, THE FOUNDERS'
    SECOND AMENDMENT (2008) . . . . . . . . . . . . . . . 15

THE FEDERALIST NO. 29 (Alexander Hamilton)
    (G. Carey & J. McClellan eds., 1990) . . . . . . . . 15

THE FEDERALIST NO. 46 (James Madison)
    (Clinton Rossiter ed., 1961) . . . . . . . . . . . . . . . 14

JOYCE L. MALCOLM,
    TO KEEP AND BEAR ARMS: THE ORIGINS OF
    AN ANGLO-AMERICAN RIGHT (1994) . . . . . . . . . . 4

JOSIAH QUINCY, OBSERVATIONS ON THE
    ACT OF PARLIAMENT COMMONLY CALLED
    THE BOSTON PORT-BILL (1774) . . . . . . . . . . . . . 13

Report of the Joint Comm. on Reconstruction,
    H.R. REP. NO. 39-30, pt. 4 (1866) . . . . . . . . . . . 5

1 THE PAPERS OF GEORGE MASON 1725-1792
    (Robert A. Rutland ed., 1970) . . . . . . . . . . . . . . 4

4 BERNARD SCHWARTZ,
    THE ROOTS OF THE BILL OF RIGHTS (1980) . . . . . 16

JOSEPH STORY, COMMENTARIES ON THE
    CONSTITUTION OF THE UNITED STATES
    (Carolina Academic Press 1987) (1833) . . . . . . 10

St. George Tucker,
  *View of the Constitution of the United States*,
  *in* WILLIAM BLACKSTONE, 1 COMMENTARIES
  (Philadelphia, Birch & Small 1803) (1765) . . . . . 3

VA. GAZETTE (Williamsburg), Aug. 5, 1775  . . . . . . 14

Robert F. Williams,
  *State Constitutional Law Processes*,
  24 WM. & MARY L. REV. (1983) . . . . . . . . . . . . . . 2

Adam Winkler,
  *The Reasonable Right to Bear Arms*,
  17 STAN. L. & POL'Y REV. 597 (2006) . . . . . . . . 28

Texas, Ohio, Arkansas, Georgia, and the other amici States have a profound interest in this case as guardians of their citizens' constitutional rights. As our Founding Fathers recognized, and as this Court reaffirmed in *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008), the Second Amendment right to keep and bear arms is a critical liberty interest, essential to preserving individual security and the right to self-defense. But uncertainty remains as to whether this right fully extends to the vast majority of citizens who live not in a federal enclave, but in one of the several States. Unless the ruling of the court of appeals below is reversed, millions of Americans will be deprived of their Second Amendment right to keep and bear arms as a result of actions by local governments, such as the ordinances challenged in this case.

Enforcement of the Second Amendment right to keep and bear arms against state and local governments is especially important in an era of robust interstate travel and commerce. As the Court has observed, "the 'constitutional right to travel from one State to another' is firmly embedded in our jurisprudence." *Saenz v. Roe*, 526 U.S. 489, 498 (1999) (quoting *United States v. Guest*, 383 U.S. 745, 757 (1966)). Indeed, the Court has described the right to interstate travel as "so important that it is 'assertable against private interference as well as governmental action . . . a virtually unconditional personal right, guaranteed by the Constitution to us all.'" *Id*. (quoting

---

1. Pursuant to Rule 37.4, the consent of the parties is not required for the States to file this brief.

*Shapiro v. Thompson*, 394 U.S. 618, 643 (1969) (Stewart, J., concurring)). Accordingly, the States have an interest in ensuring that citizens who must travel in the course of their personal or professional lives remain free from unconstitutional arrest and prosecution for engaging in their right to self-defense by carrying properly-licensed weapons. If local governments may completely ban possession of handguns—"the most popular weapon chosen by Americans for self-defense," *Heller*, 128 S. Ct. at 2818—citizens of all the States may find that they are unable to travel to certain jurisdictions unless they are willing to forego their Second Amendment rights.

Finally, the States have an interest in the proper interpretation of the Second Amendment in order to facilitate the development of similar protections under state law. Interpretive guidance from this Court, and from other federal courts, would help the States as they construe and enforce their own, analogous state-law protections—including the 44 state constitutions that guarantee a right to keep and bear arms. *See, e.g.*, Robert F. Williams, *State Constitutional Law Processes*, 24 WM. & MARY L. REV. 169, 194 n.113 (1983) ("'In a community that perceives the Supreme Court to be the primary interpreter of constitutional rights, reliance on Supreme Court reasoning can help to legitimate state constitutional decisions that build on the federal base.'") (citation omitted).

## INTRODUCTION

Over the last century, the Court has held that "virtually all" of the individual rights found in the Bill of Rights apply to state and local government through the Due Process Clause of the Fourteenth Amendment. *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 34 (1991) (Scalia, J., concurring in judgment). Under the doctrine of selective incorporation, these rights have been applied to state and local government because they are considered "fundamental"—that is, "necessary to an Anglo-American regime of ordered liberty." *Duncan v. Louisiana*, 391 U.S. 145, 149 n.14 (1968).

The right to keep and bear arms under the Second Amendment is a "fundamental" liberty interest subject to incorporation against the States. Indeed, in the Anglo-American tradition, it is among the *most* fundamental of rights because it is essential to securing all our other liberties. The Founders well understood that, without the protections afforded by the Second Amendment, all of the other rights and privileges ordinarily enjoyed by citizens would be vulnerable to governmental acts of oppression. As St. George Tucker wrote, the right protected by the Second Amendment "may be considered as the true palladium of liberty" because "[t]he right to self-defence is the first law of nature," and wherever "the right of the people to keep and bear arms is, under any colour or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink of destruction." St. George Tucker, *View of the Constitution of the United States*, *in* WILLIAM BLACKSTONE, 1 COMMENTARIES app., at 300 (Philadelphia, Birch & Small 1803) (1765).

Two familiar events in our Nation's history are particularly instructive in illustrating the fundamental nature of the right to bear arms. The very first battle of the Revolutionary War was sparked by British efforts to disarm American colonists. As news spread of these efforts, colonists formed militias to secure their arms. ROBERT A. GROSS, THE MINUTEMEN AND THEIR WORLD 59 (1976). These tensions culminated in April 1775, when British General Sir Thomas Gage sent a column of Redcoats to destroy arms and ammunition stored by colonists in Lexington and Concord, triggering the first battle of the Revolutionary War. *See* JOYCE L. MALCOLM, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 145-46 (1994). Notably, in forming their militias, the colonists were keenly aware that the right to bear arms was critical to the protection of their other liberties. When George Mason (in conjunction with George Washington and others) began organizing a militia in Fairfax County, Virginia, he noted that the colonists were being "threat'ned with the Destruction of our Civil-rights, & Liberty, and all that is dear to British Subjects & Freemen." 1 THE PAPERS OF GEORGE MASON 1725-1792, at 210-11 (Robert A. Rutland ed., 1970). After raising the militia company, Mason praised it as necessary "for the great and useful purposes of defending our country, and preserving those inestimable rights which we inherit from our ancestors." *Id.* at 229.

Nearly one hundred years later, in the aftermath of the Civil War, the Southern States engaged in a brutal campaign to disarm and thereby oppress the recently freed slaves. Those efforts included enactment of the

so-called "Black Codes" prohibiting the possession of firearms by African-Americans. *See Heller*, 128 S. Ct. at 2810. Disarmament was frequently followed by acts of lawlessness perpetrated on defenseless African-Americans. *See, e.g.*, Report of the Joint Comm. on Reconstruction, H.R. REP. NO. 39-30, pt. 4, at 49-50 (1866) (testimony that armed patrols in Texas, acting under supposed authority of the Governor, "passed about through settlements where negroes were living, disarmed them—took everything in the shape of arms from them—and frequently robbed them"); CONG. GLOBE, 39th Cong., 1st Sess. 915 (1866) (statement of Sen. Wilson) ("There is one unbroken chain of testimony from all people that are loyal to this country, that the greatest outrages are perpetrated by armed men who go up and down the country searching houses, disarming people, committing outrages of every kind and description."). The Reconstruction Congress attempted to remedy these injustices through the Fourteenth Amendment, the Freedmen's Bureau Acts, and the Civil Rights Act, with the clear understanding that an "indispensable" "safeguard[] of liberty . . . under the Constitution" is a man's "right to bear arms for the defense of himself and family and his homestead." *Heller*, 128 S. Ct. at 2811 (quoting CONG. GLOBE, 39th Cong., 1st Sess. 1182 (1866)).

The common thread in these transformative events in our Nation's history was the fundamental importance of the right to keep and bear arms as the ultimate guarantor of all the other liberties enjoyed by Americans. The source of the threat to liberty shifted from the British Crown during the Founding to oppressive local governments in the post-Civil War era,

but the cure remained the same: recognition and enforcement of an individual right to keep and bear arms, as an essential component of the natural right of self-preservation and the right of "resistance . . . to the violence of oppression." WILLIAM BLACKSTONE, 1 COMMENTARIES 139 (Legal Classics Library 1983) (1765).

As history has proven, the right to bear arms provides the foundational bulwark against the deprivation of all our other rights and privileges as Americans—including rights that have already been incorporated against the States by this Court. Accordingly, the Court should hold that the Second Amendment also secures a "fundamental" right that can no more be abrogated by local government than by the federal government.

## SUMMARY OF ARGUMENT

The Second Amendment expressly provides that "[a] well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. CONST. amend. II. Accordingly, in *Heller*, the Court held that the Second Amendment protects an individual right to keep and bear arms, 128 S. Ct. at 2816-18, and that a District of Columbia prohibition on possession of handguns violated the Amendment, *id*. at 2818. *Heller* did not decide whether the Amendment is applicable to the States. But the Court observed that its earlier, nineteenth-century decisions that the Amendment applies only to the federal government "did not engage in the sort of Fourteenth Amendment inquiry required by our later decisions." *Id*. at 2813 n.23. In doing so,

*Heller* presaged the issue presented here: whether the Second Amendment is a "fundamental right" enforceable against state and local governments under the doctrine of selective incorporation.

The City of Chicago has enacted the same type of handgun ban that the Court determined was invalid in *Heller*. *See* CHICAGO, ILL., MUN. CODE §§ 8-20-040(a) (prohibiting possession of unregistered firearms); 8-20-050(c) (providing that no registration certificates will be issued for handguns). Chicago also requires that registerable weapons must be re-registered annually, a process that must be initiated at least sixty days prior to the registration's expiration. *Id.* § 8-20-200. This re-registration process requires the payment of additional fees and the resubmission of all initial registration materials. *Id.* And if re-registration is not properly and timely completed, the particular gun becomes "unregisterable" and therefore illegal to possess in Chicago. *Id.* Likewise, if a firearm is acquired prior to its registration, it is also "unregisterable" and illegal in Chicago. *Id.* § 8-20-090.

Petitioners are residents of Chicago who challenged the validity of these ordinances because they, like the *Heller* plaintiffs, wish to own handguns for the lawful and reasonable purpose of self-defense. Petitioner Otis McDonald, for example, is a community activist who lives in a high-crime Chicago neighborhood. His efforts to make his neighborhood a better place to live have subjected him to violent threats from drug dealers, and

he wishes to own a handgun for self-protection.[2] Similarly, Petitioner Colleen Lawson is a Chicago resident whose home has been targeted by burglars. She too would like to own a handgun for self-defense.[3] Like gun owners across the Nation, Petitioners are relying on the Second Amendment to secure among the most basic of rights—the protection of one's home and family.

The district court held that Petitioners' claims were foreclosed by circuit precedent upholding the constitutionality of handgun bans and rejecting the application of the Second Amendment to state and local governments. Pet. App. 13-14, 17-18 (citing *Quilici v. Village of Morton Grove*, 695 F.3d 261 (7th Cir. 1982)). The court of appeals likewise concluded that this Court's precedent and its own precedent precluded enforcement of the Second Amendment against state and local government. *Nat'l Rifle Ass'n of Am., Inc. v. City of Chicago*, 567 F.3d 856, 857-58 (7th Cir. 2009) (citing *United States v. Cruikshank*, 92 U.S. 542 (1875); *Presser v. Illinois*, 116 U.S. 252 (1886); *Miller v. Texas*, 153 U.S. 535 (1894); *Quilici*, 695 F.3d 261).

But the decisions relied upon by the court of appeals are the same nineteenth-century cases that *Heller* dismissed as predating the Court's selective

---

2. *See* Petitioners' Complaint, at 1-2, *available at* http://www.chicagoguncase.com/wp-content/uploads/2008/06/complaint.pdf (last visited Nov. 23, 2009).

3. *See id.*

incorporation jurisprudence. 128 S. Ct. at 2813 n.23. As such, they do not control this case. Under this Court's selective incorporation jurisprudence, the determination whether the Second Amendment applies to state and local governments turns on whether it secures an individual right that is "fundamental"—that is, "necessary to an Anglo-American regime of ordered liberty." *Duncan*, 391 U.S. at 149 n.14.

Given the deeply rooted nature of the individual right to arms in the American experience, there can be little doubt that it meets the selective incorporation test. Grounded in English law and recognized by both our Founders and the drafters of the Fourteenth Amendment as among the most fundamental of rights because it was necessary to preserve all their other liberties, the right to arms has remained central to our Nation's regime of ordered liberty. The right to keep and bear arms also appears in the constitutions of 44 States. And the legislatures of all 50 States are united in their rejection of bans on the possession of handguns, the "quintessential self-defense weapon" in America. *Heller*, 128 S. Ct. at 2818.[4]

For the vast majority of Americans who do not live in a federal enclave, the stakes involved in this case could not be higher. If Chicago's ban is upheld, it will confirm that local governments, unrestrained by the Second Amendment, may deny American citizens what they could not be denied by the federal government:

---

4. The relevant state constitutional and statutory provisions concerning firearms are attached in the Appendix to this brief.

the right to possess "the most preferred firearm in the nation to 'keep' and use for the protection of one's home and family." *Id.* (internal quotation and citation omitted). For untold numbers of Americans, including the millions of residents of Chicago, such a result will render the Second Amendment—aptly described as the "the palladium of the liberties of the republic," JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 708 (Carolina Academic Press 1987) (1833)—effectively meaningless.

**ARGUMENT**

## I. THE SECOND AMENDMENT APPLIES TO THE STATES THROUGH THE FOURTEENTH AMENDMENT.

Under this Court's established Due Process jurisprudence, all "fundamental" rights under the Bill of Rights are enforceable against state and local governments—including the Second Amendment. The fundamental nature of the right to keep and bear arms, as necessary to the protection of all other rights, has been deeply embedded in the American conscience at every stage of our history: It was imported into the colonies from English law, sparked the American Revolution, animated the Founding spirit of this Nation, and drove the adoption of the Fourteenth Amendment and other post-Civil War measures designed to protect recently-freed slaves from both government and private oppression.

### A. The Due Process Clause Incorporates "Fundamental" Rights.

The Due Process Clause of the Fourteenth Amendment bars "any State [from] depriv[ing] any

person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. The Court has recognized that this Clause "guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint." *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997). Rather, due process also encompasses "fundamental" rights. *Reno v. Flores*, 507 U.S. 292, 301-02 (1993).

The doctrine of selective incorporation is premised on the Court's conclusion that any "fundamental right" listed in the Bill of Rights "is made obligatory on the States by the Fourteenth Amendment." *Pointer v. Texas*, 380 U.S. 400, 403 (1965). Applying this doctrine in a series of decisions over the last century, the Court has held that the Due Process Clause of the Fourteenth Amendment incorporates most of the Bill of Rights against the States. *See, e.g.*, *Schilb v. Kuebel*, 404 U.S. 357 (1971) (Excessive Bail Clause); *Klopfer v. North Carolina*, 386 U.S. 213 (1967) (Speedy Trial Clause); *Pointer*, 380 U.S. 400 (Confrontation Clause); *Mapp v. Ohio*, 367 U.S. 643 (1961) (exclusionary rule); *DeJonge v. Oregon*, 299 U.S. 353 (1937) (free assembly); *Gitlow v. New York*, 268 U.S. 652 (1925) (free speech).

In the doctrine's initial formulation, as expressed in *Palko v. Connecticut*, 302 U.S. 319 (1937), *overruled by Benton v. Maryland*, 395 U.S. 784 (1969), the Due Process Clause incorporated against the States only those rights "implicit in the concept of ordered liberty." *Palko*, 302 U.S. at 325. The analysis has since been refined to focus on the Anglo-American historical background of the right. The incorporation inquiry now turns on whether a right is "necessary to an

Anglo-American regime of ordered liberty." *Duncan*, 391 U.S. at 149 n.14. Applying this test in *Duncan* to determine that the Sixth Amendment right to jury trial in criminal cases applied to the States, the Court reviewed the history of the right in English law, as well as its importance in the Founding era. *See id.* at 151-54. The Court also reviewed the current state systems for criminal trials, noting that every State "uses the jury extensively, and imposes very serious punishments only after a trial at which the defendant has a right to a jury's verdict." *Id.* at 149 n.14. Because the Second Amendment also secures a fundamental right with a necessary place in the Anglo-American regime of ordered liberty, it too applies to the States.

**B. The Right to Keep and Bear Arms Was Considered "Fundamental" Under English Law and During the Founding Era.**

As the Court observed in *Heller*, "[b]y the time of the founding, the right to have arms had become fundamental for English subjects." 128 S. Ct. at 2798. In reaching this conclusion, the Court cited Blackstone, "whose works . . . 'constituted the preeminent authority on English law for the founding generation.'" *Id.* (quoting *Alden v. Maine*, 527 U.S. 706, 715 (1999)). Blackstone explained that "having" arms was among the five basic rights of every Englishman, those rights which secured the "primary rights" of each individual. WILLIAM BLACKSTONE, 1 COMMENTARIES 136, 139 (Legal Classics Library 1983) (1765). Indeed, Blackstone saw the right to bear arms as a natural

right because it arose from the natural right of self-preservation, and the right of "resistance . . . to the violence of oppression." *Id.* at 139. And, as *Heller* also noted, Blackstone's view was shared by his contemporaries. 128 S. Ct. at 2798 (citing several eighteenth century authorities). The right to arms recognized by Blackstone was also part of the English Declaration of Right (codified as the English Bill of Rights) of 1689, the relevant portion of which "has long been understood to be the predecessor to our Second Amendment." *Id.*

The American colonists likewise viewed the right to arms as fundamental, derivative of their rights as Englishmen. During the 1760s and 1770s, as relations between the colonists and the British Crown deteriorated, King George III "began to disarm the inhabitants of the most rebellious areas." *Id.* at 2799. This forced disarmament "provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms." *Id.* It also led to the formation of independent militias in the colonies, *see* ROBERT GROSS, THE MINUTEMEN AND THEIR WORLD 59 (1976), which were described by the patriot Josiah Quincy as "a well regulated militia composed of the freeholders, citizens, and husbandmen, who take up arms to preserve their property as individuals, and their rights as freemen." JOSIAH QUINCY, OBSERVATIONS ON THE ACT OF PARLIAMENT COMMONLY CALLED THE BOSTON PORT-BILL 413 (1774).

The colonists associated the growing presence of British regulars in America, and the Crown's policy of disarming the citizenry, as a profound threat to all of

their liberties. When stores of gunpowder were seized in Virginia, the House of Burgesses observed that Virginians were well aware of the "many attempts in the northern colonies to disarm the people, and thereby deprive them of the only means of defending their lives and property." VA. GAZETTE (Williamsburg), Aug. 5, 1775, at 2, col. 1. The prospect of disarmament was especially daunting given the well-recognized power and military prowess of the British army and navy. *See* JOSEPH J. ELLIS, FOUNDING BROTHERS: THE REVOLUTIONARY GENERATION 6 (2000) ("Taken together, the British army and navy constituted the most powerful military force in the world, destined in the course of the succeeding century to defeat all national competitors for its claim as the first hegemonic power of the modern era."). In short, for the Founding Generation, the importance of the right to arms "was not merely speculative theory. It was the lived experience of the [] age." AKHIL REED AMAR, THE BILL OF RIGHTS 47 (1998).

Given the colonists' experience before and during the Revolutionary War, it is unsurprising that "[t]he very text of the Second Amendment implicitly recognizes the pre-existence of the right [to keep and bear arms] and declares only that it 'shall not be infringed.'" *Heller*, 128 S. Ct. at 2797. The Framers were well aware of the central importance of this right, recognizing "the advantage of being armed, which the Americans possess over the people of almost every other nation." THE FEDERALIST NO. 46, at 296 (James Madison) (Clinton Rossiter ed., 1961).

The Framers also understood that the right to arms was essential to preserving all the other "fundamental" liberties enjoyed by the American people. Alexander Hamilton articulated this understanding in his Federalist No. 29:

> [I]f circumstances should at any time oblige the government to form an army of any magnitude that army can never be formidable to the liberties of the people, while there is a large body of citizens, little, if at all, inferior to them in discipline and the use of arms, who stand ready to defend their own rights and those of their fellow citizens.

THE FEDERALIST NO. 29, at 145 (Alexander Hamilton) (G. Carey & J. McClellan eds., 1990).

Finally, the actions of the States themselves during the Founding era establish that they too viewed the right to keep and bear arms as "fundamental." *See* STEPHEN P. HALBROOK, THE FOUNDERS' SECOND AMENDMENT 126-69 (2008) (providing State-by-State analysis). For example, after the adoption of the Declaration of Independence in 1776, several of the colonies adopted written constitutions of their own. The constitutions of Massachusetts, North Carolina, Pennsylvania, and Vermont all included provisions that guaranteed the right to bear arms. MASS. CONST. pt. 1, art. XVII; N.C. CONST. of 1776, DECLARATION OF RIGHTS § XVII; PA. CONST. of 1776, DECLARATION OF RIGHTS, § XIII; VT. CONST. of 1777, ch. 1, art. XV. And when the States voted on the ratification of the Constitution, several of them recommended amendments securing the right to keep and bear arms.

4 BERNARD SCHWARTZ, THE ROOTS OF THE BILL OF RIGHTS 912 (1980) (noting that New Hampshire, New York, North Carolina, Rhode Island, and Virginia recommended including a provision on the right to keep and bear arms); *see also* 1 ELLIOTT'S DEBATES ON THE FEDERAL CONSTITUTION 326-28 (Jonathan Elliott ed., 1859).

The States' understanding of the fundamental nature of the right to arms was further demonstrated in the decades after the adoption of the Constitution. As more States were admitted to the Union, the right to keep and bear arms was recognized by a growing number of state constitutions. By 1868, twenty-two state constitutions explicitly guaranteed a right to bear arms. *See* App. The judicial opinions of state courts during this time also consistently recognized the importance of the right to arms. *See, e.g.*, *Cockrum v. State*, 24 Tex. 394, 401-02 (1859) ("The right of a citizen to bear arms, in the lawful defence of himself . . . is absolute . . . . A law cannot be passed to infringe upon it or impair it . . . ."); *State v. Chandler*, 5 La. Ann. 489, 490 (1850) (the right to bear arms is "calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations"); *Nunn v. State*, 1 Ga. 243, 251 (1846) (stating that the right to keep and bear arms protects the "*natural* right of self-defence," and that the Second Amendment secured a right "originally belonging to our forefathers, trampled under foot by Charles I and his two wicked sons and successors, re-established by the revolution of 1688, conveyed to this

land of liberty by the colonists, and finally incorporated conspicuously in our own *Magna Charta*!").

In sum, the historical record, much of it detailed by this Court in *Heller*, demonstrates that the right to keep and bear arms was understood as a fundamental right of English subjects at the time of the Founding. Throughout this period the Framers, and Americans generally, considered the right to arms essential to preserving the other "fundamental" liberties enjoyed by our citizens at the birth of the Nation.

## C. The Right to Keep and Bear Arms Was Considered "Fundamental" When the Fourteenth Amendment Was Adopted, and It Remains So to This Day.

As it was during the Founding era and in the succeeding decades leading up to the Civil War, the right to keep and bear arms continued to be considered "fundamental" at the time the Fourteenth Amendment was adopted. The Court described this period in *Heller*, noting that, "[i]n the aftermath of the Civil War, there was an outpouring of discussion of the Second Amendment in Congress and in public discourse, as people debated whether and how to secure constitutional rights for newly freed slaves." 128 S. Ct. at 2809-10. A significant concern in these debates was the disarming of newly freed African-Americans in the Southern States, by statute as well as by vigilantism. *See id.* at 2810 (citing STEPHEN P. HALBROOK, FREEDMEN, THE FOURTEENTH AMENDMENT, AND THE RIGHT TO BEAR ARMS, 1866-1876 (1998) (hereinafter HALBROOK, FREEDMEN)).

   The Framers of the Fourteenth Amendment acted to end these oppressions by drafting the Amendment itself and by passing the Freedmen's Bureau Acts and the Civil Rights Act of 1866. A prominent constitutional scholar has noted that "[o]ne of the core purposes of the Civil Rights Act of 1866 and of the Fourteenth Amendment was to redress the grievances" of African-American citizens who had been stripped of their arms and subjected to violent attacks, and to "affirm the full and equal right of every citizen to self-defense." AMAR, *supra*, at 264. Indeed, "more evidence exists that the framers of the Fourteenth Amendment intended to protect the right to keep and bear arms from state infringement than exists for any other Bill of Rights guarantee." HALBROOK, FREEDMEN, *supra*, at at 188.

   The debates of the Thirty-Ninth Congress, which drafted the Fourteenth Amendment, are replete with evidence that the Second Amendment was understood to protect a fundamental right. For example, Senator Pomeroy listed among the "indispensable" "safeguards of liberty" one's "right to bear arms for the defense of himself and family and his homestead." CONG. GLOBE, 39th Cong., 1st Sess. 1182 (1866), *quoted in Heller*, 128 S. Ct. at 2811. Similarly, Representative Roswell Hart listed "the right of the people to keep and bear arms" as inherent in a "republican government." CONG. GLOBE, 39th Cong., 1st Sess. 1629 (1866). Even the opponents of these Reconstruction measures acknowledged that the right to keep and bear arms was fundamental; they disagreed only as to whom that right extended and whether the federal government should enforce it. *See, e.g.*, *id.* at 371 (statement of

Sen. Davis) (objecting to the Freedmen's Bureau bill but agreeing that the Founding Fathers "were for every man bearing his arms about him and keeping them in his house, his castle, for his own defense"); *cf., id.* at 914-15 (Sen. Saulsbury) (objecting to a bill to disband white southern militias, arguing that such a measure by Congress would violate the Second Amendment).

Other actions by the Thirty-Ninth Congress further confirmed the critical importance of the Second Amendment in the Reconstruction period. The Freedmen's Bureau bill specifically declared that "the right . . . to have full and equal benefit of all laws and proceedings concerning personal liberty [and] personal security . . . *including the constitutional right to bear arms*, shall be secured to and enjoyed by all the citizens." Act of July 16, 1866, ch. 200, sec. 14, 14 Stat. 173, 176 (1866) (emphasis added). "No other guarantee in the Bill of Rights was the subject of this official approval by the same Congress that passed the Fourteenth Amendment." HALBROOK, FREEDMEN, *supra*, at 42.

The state constitutions adopted during the Reconstruction period, including those adopted by States that had previously joined the Confederacy, likewise demonstrate that the right to arms was considered fundamental by the States that ratified the Fourteenth Amendment. *See, e.g.*, ARK. CONST. of 1868, art. II, § 5 ("The citizens of this state shall have the right to keep and bear arms for their common defense."); MISS. CONST. of 1868, art. I, § 15 ("All persons shall have a right to keep and bear arms for

their defence."); TEX. CONST. of 1869, art. I, § 13 ("Every person shall have the right to keep and bear arms, in the lawful defence of himself or the State.").

In sum, at the time the Fourteenth Amendment was drafted and ratified, as during the Founding era, the right to keep and bear arms remained central to the American conception of liberty. The post-Civil War disarmament of the freed slaves in the Southern States—followed swiftly by the deprivation of other basic liberties—powerfully demonstrated that the Second Amendment preserves a right essential to securing all the other rights and privileges of free citizens. The Fourteenth Amendment, Freedmen's Bureau Acts and Civil Rights Act, designed to remedy these injustices, were predicated on the recognition that the right to arms is "fundamental."

Events since the adoption of the Fourteenth Amendment further confirm that the right to arms remains of central importance to the States. Today 44 state constitutions expressly protect a right to bear arms. *See* App. Three other States protect a right to self-defense and defense of property. *See* CAL. CONST. art. I, § 1 (originally adopted in 1849); IOWA CONST. art. I, § 1 (originally adopted in 1846); N.J. CONST. art. I, ¶ 1 (originally adopted in 1844). As the Court has noted, "the inherent right of self-defense has been central to the Second Amendment right." *Heller*, 128 S. Ct. at 2817. Only Maryland, Minnesota, and New York have neither guarantee in their state constitutions. Moreover, the legislatures of all 50 States have rejected bans on private handgun

ownership. As a result, every State in the Union permits private handgun ownership. *See* App.

Finally, 32 States submitted an amicus curiae brief in *Heller* arguing that the Second Amendment secures a "fundamental" right that is "properly subject to incorporation." Brief for the State of Texas et al. as Amici Curiae Supporting Respondent, at 23 n.6, *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008) (No. 07-290). In this case, 34 States urged the Court to grant review of the decision below and hold that the Second Amendment is applicable to the States. *See* Brief for the State of Texas et al. as Amici Curiae in Support of Petitioners; Brief of the State of California as Amicus Curiae in Support of Petitioners. And the submission of this amicus brief provides further evidence of the States' understanding of the fundamental importance of the arms-bearing right guaranteed by the Second Amendment.

## II. THE FEDERALISM CONCERNS INVOKED BY THE COURT OF APPEALS ARE MISPLACED.

The decision below was based in part on the belief that incorporation of the Second Amendment would raise federalism concerns. *See Nat'l Rifle Ass'n*, 567 F.3d at 859-60. Those concerns are misplaced.

To begin with, the federalism concerns expressed below are based on the mistaken premise that the Second Amendment protects state militias against federal interference. *Id.* at 859. *Heller* expressly rejected the argument that the Second Amendment addressed any concern about federal control over state militias. As the Court explained, "[t]he Second

Amendment right, protecting *only* individuals' liberty to keep and carry arms, did nothing to assuage Antifederalists' concerns about federal control of the militia." 128 S. Ct. at 2804 (emphasis added). The Founders sought to address their fear of federal abolition of state militias not through the Second Amendment, but "in separate structural provisions that would have given the States concurrent and seemingly nonpre-emptible authority to organize, discipline, and arm the militia when the Federal Government failed to do so." *Id.*

The court of appeals further suggests that incorporation may be incorrect because "the Constitution establishes a federal republic where local differences are to be cherished as elements of liberty rather than extirpated in order to produce a single, nationally applicable rule." *Nat'l Rifle Assoc.*, 567 F.3d at 860. To be sure, amici States agree that "[i]t is one of the happy incidents of the federal system" that each State may "serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) (cited in *Nat'l Rifle Assoc.*, 567 F.3d at 860). But the discretion of state and local governments to explore legislative and regulatory initiatives does not include "the power to experiment with the fundamental liberties of citizens safeguarded by the Bill of Rights." *Pointer*, 380 U.S. at 413 (Goldberg, J., concurring). As the Court stated in *Heller*, "[t]he very enumeration of the right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." 128 S. Ct. at 2821. Just as local

governments cannot constitutionally act as "laboratories" for initiatives to abrogate their citizens' right to free speech or their freedom from unreasonable searches and seizures, nor can they nullify the fundamental right to keep and bear arms secured by the Second Amendment.

State and local experimentation with reasonable firearms regulations will continue under the Second Amendment. As noted in *Heller*, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 2816. Many firearms regulations would plainly survive Second Amendment scrutiny, such as "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 2816-17. For example, in *Nordyke v. King*, the Ninth Circuit applied the Second Amendment to the States, but nonetheless upheld an Alameda County, California ordinance prohibiting firearms on county property. 563 F.3d 439, 457, 460 (9th Cir. 2009).

As "independent sovereigns in our federal system," *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996), the amici States are particularly concerned when the Court engages in constitutional or statutory interpretation that implicates federalism issues. The incorporation of the Second Amendment presents no such concerns. Denying local governments the power to nullify the Amendment will not increase federal power, mandate any state action pursuant to federal directives, or

preclude reasonable state and local regulation of firearms. It will simply prevent local governments, like the federal government, from abrogating the fundamental, individual right to keep and bear arms. *See Pointer*, 380 U.S. at 413-14 (Goldberg, J., concurring) ("[T]o deny to the States the power to impair a fundamental constitutional right is not to increase federal power, but, rather to limit the power of both federal and state governments in favor of safeguarding the fundamental rights and liberties of the individual.").

## III. THE CITY OF CHICAGO MISREADS *HELLER*.

Because the Second Amendment's right to arms applies to the States through the Due Process Clause, it necessarily follows that Chicago's complete ban on the possession of handguns, like that of the District of Columbia considered in *Heller*, is invalid. In its brief opposing certiorari, Chicago attempts to avoid this result by making three mistaken arguments about the scope of the Second Amendment as construed in *Heller*. None of Chicago's arguments was endorsed by the court of appeals below.

Chicago's first mistake is that it asks the wrong question. According to Chicago, the question is not whether the Second Amendment is incorporated against the States; rather, Chicago asks the Court to determine whether the Second Amendment is incorporated against the States on a case-by-case, weapon-by-weapon basis. *See* Resp. 9. But the Court has never taken such a piecemeal approach to incorporation.

Chicago's approach to incorporation also misunderstands *Heller*. Contrary to Chicago's assertion, the "precise Second Amendment right" recognized in *Heller* was an individual right to keep and bear arms, not merely a "right to handguns." Indeed, *Heller* made clear that the Second Amendment protects an individual right to keep and bear *any* weapons that are "in common use" by Americans—that is, the "sorts of lawful weapons that they possessed at home," and that they could therefore bring with them if called to militia duty. *Heller*, 128 S. Ct. at 2817. So when the Court invalidated the District of Columbia's handgun ban, it did so because it determined that handguns were weapons "in common use" by Americans and therefore could not be categorically banned. *Id*. at 2817-18. Accordingly, the question in this case is not whether a "right to handguns" is incorporated, as Chicago suggests, but rather whether the Second Amendment in its entirety—securing the individual right to keep and bear any weapon in common use—applies to state and local governments.

Chicago likewise misreads *Heller* when it argues that local governments may ban handguns so long as they allow citizens to have some other type of weapon in the home for self-defense. Resp. 9, 15-16. In fact, the Court has already rejected the contention that handguns may be prohibited consistent with the Second Amendment so long as long guns are permitted:

> "It is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed. It is enough to note, as

we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon. . . . and a complete prohibition of their use is invalid."

*Heller*, 128 S. Ct. at 2818.

And in any event, Chicago's apparent belief that there is no tradition upholding a right to handguns is mistaken. As the Court observed in *Heller*, "[f]ew laws in the history of our Nation have come close to the severe restriction" of the type of handgun ban enacted by the District of Columbia and Chicago, and those laws have typically been overturned. *See id.* (citing *Nunn*, 1 Ga. at 251 (striking down a prohibition on carrying pistols openly); *Andrews v. State*, 50 Tenn. 165, 187 (1871) (holding that a statute that forbade openly carrying a pistol "publicly or privately, without regard to time place, or circumstances," violated the state constitutional provision—which the court equated with the Second Amendment); *State v. Reid*, 1 Ala. 612, 616-17 (1840) ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defense, would be clearly unconstitutional.")).

Second, Chicago argues that "[t]he right recognized in *Heller* to keep and bear arms in common use [like handguns] is not implicit in the concept of ordered liberty," Resp. 11, and therefore is not incorporated. This argument turns on Chicago's belief that, although the Second Amendment "conferred an individual right, as against the federal government, to keep and bear weapons in common use," the "purpose of the common-

use rule was to protect, not individual personal liberties, but the militia-related need for militiamen to possess and be familiar with weapons necessary for their militia service." Resp. 12.

Again, Chicago misunderstands *Heller*. Although the Court acknowledged that the individual right to arms secured by the Second Amendment is limited to those weapons that are "'in common use at the time,'" *Heller*, 128 S. Ct. at 2817 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)), this limitation does not alter the Amendment's purpose to protect a fundamental, individual right to arms. Rather, the Court made clear in *Heller* that the purpose of the Second Amendment is to secure an individual right to arms that is *not* dependent upon an individual's service in the militia. *Id*. at 2815-17.

And, contrary to Chicago's formulation, wherein the Second Amendment's purpose was driven by the need for militiamen to possess and be familiar with particular weapons "necessary for their militia service," Resp. 12, the Court explained in *Heller* that "the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, *who would bring the sorts of lawful weapons that they possessed at home* to militia duty." 128 S. Ct. at 2817 (emphasis added). In short, Chicago fails to recognize that Americans' right to possess lawful weapons in common use has remained implicit in the concept of ordered liberty, even when those weapons could not be "useful against modern-day bombers and tanks" and therefore would be of limited efficacy in modern militia service. *Id*.

Finally, Chicago argues that "the scope of arms rights under state constitutions confirms that the right to keep and bear arms in common use is not so firmly entrenched that it is implicit in the concept of ordered liberty." Resp. 14. This argument is particularly puzzling, because Chicago implicitly acknowledges, as it must, that 44 state constitutions protect an individual right to arms, and all 50 state legislatures have rejected bans on handguns. *See* Resp. 14 & n.6; *see also* App. Nonetheless, according to Chicago, because state courts have routinely upheld reasonable regulations on the possession of firearms, the right to keep and bear arms has not become "so firmly entrenched" in the States as to be considered "fundamental." *See* Resp. 14-15.

But the enactment by state and local governments of reasonable regulations on firearms, subsequently upheld by state courts, can hardly be equated with a failure on the part of the States to recognize the central importance of their citizens' right to arms. Chicago points to felon-in-possession laws, bans on unusual or military weapons such as sawed off shotguns and assault rifles, and concealed carry regulations, as indicative of the States' rejection of the notion that the right to arms is "implicit in the concept of ordered liberty." *See id.* (citing Adam Winkler, *The Reasonable Right to Bear Arms*, 17 STAN. L. & POL'Y REV. 597, 599-612 (2006)). But none of these laws comes close to completely prohibiting the possession of an entire category of lawful weapons in common use, nor do any of these regulations reflect that the States do not consider the Second Amendment right to arms to be "fundamental."

Rather, as described herein, *see supra* Part I, the States' commitment to securing their citizens' right to arms in common use was evident at the Founding and continues to this day through state constitutional provisions and through the States' uniform rejection of handgun bans. As the submission of this brief further demonstrates, Chicago's position that the right to arms is of little importance, and may be abrogated at will by local government, is directly contrary to the view of the majority of the States.

## CONCLUSION

The judgment of the court of appeals should be reversed.

Respectfully submitted,

GREG ABBOTT
  Attorney General of Texas

C. ANDREW WEBER
  First Assistant Attorney
    General

DAVID S. MORALES
  Deputy Attorney General
    Civil Litigation

JAMES C. HO
  Solicitor General
    *Counsel of Record*

SEAN D. JORDAN
  Deputy Solicitor General

CANDICE N. HANCE
  Assistant Attorney
    General

OFFICE OF THE
  ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
(512) 936-1700

Counsel for Amici Curiae

November 2009

## STATE CONSTITUTIONAL PROVISIONS SECURING THE RIGHT TO ARMS:[1] AT THE FOUNDING (1776–1790s)

| STATE | PROVISION |
|---|---|
| Kentucky | KY. CONST. of 1792, art. XII, § 23 |
| Massachusetts | MASS. CONST. pt. I, art. XVII |
| North Carolina | N.C. CONST. of 1776, DECLARATION OF RIGHTS § XVII |
| Pennsylvania | PA. CONST. of 1790, art. IX, § 21; PA. CONST. of 1776, DECLARATION OF RIGHTS § XIII |
| Tennessee | TENN. CONST. of 1796, art. XI, § 26 |
| Vermont | VT. CONST. ch. I, art. 16; VT. CONST. of 1786, ch. I, art. XVIII; VT. CONST. of 1777, ch. I, art. XV |

---

1.   *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 TEX. REV. L. & POL. 191, 192-217 (2006) (further detailing the statutory and jurisprudential history of these provisions).

# STATE CONSTITUTIONAL PROVISIONS SECURING THE RIGHT TO ARMS: AT THE ADOPTION OF THE FOURTEENTH AMENDMENT (1868)

| STATE | PROVISION |
|---|---|
| Alabama | ALA. CONST. of 1868, art. I, § 28 |
| Arkansas | ARK. CONST. of 1868, art. II, § 5 |
| Connecticut | CONN. CONST. of 1818, art. I, § 15 |
| Florida | FLA. CONST. of 1868, DECLARATION OF RIGHTS § 22 |
| Georgia | GA. CONST. of 1868, art. I, § 14 |
| Indiana | IND. CONST. art. I, § 32 |
| Kansas | KAN. CONST., Bill of Rights § 4 |
| Kentucky | KY. CONST. of 1850, art. XIII, § 25 |
| Maine | ME. CONST. of 1819, art. I, § 16 |
| Massachusetts | MASS. CONST. pt. I, art. XVII |
| Michigan | MICH. CONST. of 1850, art. XVIII, § 7 |
| Mississippi | MISS. CONST. of 1868, art. I, § 15 |
| Missouri | MO. CONST. of 1865, art. I, § 8 |

| STATE | PROVISION |
|---|---|
| North Carolina | N.C. CONST. of 1868, art. I, § 24 |
| Ohio | OHIO CONST. art. I, § 4 |
| Oregon | OR. CONST. art. I, § 27 |
| Pennsylvania | PA. CONST. of 1838, art. IX, § 21 |
| Rhode Island | R.I. CONST. of 1843, art. I, § 22 |
| South Carolina | S.C. CONST. of 1868, art. I, § 28 |
| Tennessee | TENN. CONST. of 1835, art. I, § 26 |
| Texas | TEX. CONST. of 1866, art. I, § 13 |
| Vermont | VT. CONST. ch. I, art. 16 |

## STATE CONSTITUTIONAL PROVISIONS SECURING THE RIGHT TO ARMS: CURRENTLY GUARANTEED

| STATE | PROVISION |
|---|---|
| Alabama | ALA. CONST. art. I, § 26 |
| Alaska | ALASKA CONST. art. I, § 19 |
| Arizona | ARIZ. CONST. art. II, § 26 |
| Arkansas | ARK. CONST. art. II, § 5 |
| California | None |
| Colorado | COLO. CONST. art. II, § 13 |
| Connecticut | CONN. CONST. art. I, § 15 |
| Delaware | DEL. CONST. art. I, § 20 |
| Florida | FLA. CONST. art. I, § 8 |
| Georgia | GA. CONST. art. I, § 1, para. VIII |
| Hawaii | HAW. CONST. art. I, § 17 |
| Idaho | IDAHO CONST. art. I, § 11 |
| Illinois | ILL. CONST. art. I, § 22 |
| Indiana | IND. CONST. art. I, § 32 |
| Iowa | None |
| Kansas | KAN. CONST., Bill of Rights § 4 |

| STATE | PROVISION |
|---|---|
| Kentucky | KY. CONST. § 1, cl. 7 |
| Louisiana | LA. CONST. art. I, § 11 |
| Maine | ME. CONST. art. I, § 16 |
| Maryland | None |
| Massachusetts | MASS. CONST. pt. I, art. XVII |
| Michigan | MICH. CONST. art. I, § 6 |
| Minnesota | None |
| Mississippi | MISS. CONST. art. III, § 12 |
| Missouri | MO. CONST. art. I, § 23 |
| Montana | MONT. CONST. art. II, § 12 |
| Nebraska | NEB. CONST. art. I, § 1 |
| Nevada | NEV. CONST. art. I, § 11, cl. 1 |
| New Hampshire | N.H. CONST. pt. I, art. 2-a |
| New Jersey | None |
| New Mexico | N.M. CONST. art. II, § 6 |
| New York | None |
| North Carolina | N.C. CONST. art. I, § 30 |
| North Dakota | N.D. CONST. art. I, § 1 |

| STATE | PROVISION |
|---|---|
| Ohio | OHIO CONST. art. I, § 4 |
| Oklahoma | OKLA. CONST. art. II, § 26 |
| Oregon | OR. CONST. art. I, § 27 |
| Pennsylvania | PA. CONST. art. I, § 21 |
| Rhode Island | R.I. CONST. art. I, § 22 |
| South Carolina | S.C. CONST. art. I, § 20 |
| South Dakota | S.D. CONST. art. VI, § 24 |
| Tennessee | TENN. CONST. art. I, § 26 |
| Texas | TEX. CONST. art. I, § 23 |
| Utah | UTAH CONST. art. I, § 6 |
| Vermont | VT. CONST. ch. I, art. 16 |
| Virginia | VA. CONST. art. I, § 13 |
| Washington | WASH. CONST. art. I, § 24 |
| West Virginia | W. VA. CONST. art. III, § 22 |
| Wisconsin | WIS. CONST. art. I, § 25 |
| Wyoming | WYO. CONST. art. I, § 24 |

# FIREARMS REGULATIONS BY STATE

| STATE | HANDGUN POSSESSION / REGISTRATION / CONCEALED-CARRY REGULATIONS |
|---|---|
| Alabama | ALA. CODE §§ 13A-11-50 to -61.1, 13A-11-70 to -85 |
| Alaska | ALASKA STAT. §§ 18.65.700–.800 |
| Arizona | ARIZ. REV. STAT. ANN. §§ 13-3101 to -3119 |
| Arkansas | ARK. CODE ANN. §§ 5-73-101 to -133, 5-73-301 to -402 |
| California | CAL. PENAL CODE §§ 12000–12040, 12050–12054, 12125–12133 |
| Colorado | COLO. REV. STAT. ANN. §§ 18-12-101 to -111, 18-12-201 to -216 |
| Connecticut | CONN. GEN. STAT. ANN. §§ 29-27 to -36L |
| Delaware | DEL. CODE ANN. tit. 11, §§ 1441–1459 |

| STATE | HANDGUN POSSESSION / REGISTRATION / CONCEALED-CARRY REGULATIONS |
|---|---|
| Florida | FLA. STAT. ANN. §§ 790.001–.335 |
| Georgia | GA. CODE ANN. §§ 16-11-126 to -135 |
| Hawaii | HAW. REV. STAT. §§ 134-1 to -27 |
| Idaho | IDAHO CODE ANN. § 18-3302 |
| Illinois | 430 ILL. COMP. STAT. ANN. 65/1 to /16; 720 ILL. COMP. STAT. ANN. 5/24-1 to -10 |
| Indiana | IND. CODE ANN. §§ 35-47-2-1 to -24 |
| Iowa | IOWA CODE ANN. §§ 724.1–.30 |
| Kansas | KAN. STAT. ANN. §§ 75-7c01 to -7c26 |
| Kentucky | KY. REV. STAT. ANN. §§ 237.020–.106, 237.110–.142 |
| Louisiana | LA. REV. STAT. ANN. §§ 40:1379.3, 40:1781–:1792 |

| STATE | HANDGUN POSSESSION / REGISTRATION / CONCEALED-CARRY REGULATIONS |
|---|---|
| Maine | ME. REV. STAT. ANN. tit. 25, §§ 2001-A to 2006 |
| Maryland | MD. CODE ANN., CRIM. LAW §§ 4-201 to -209; MD. CODE ANN., PUB. SAFETY §§ 5-101 to -143, 5-301 to -314 |
| Massachusetts | MASS. GEN. LAWS ANN. ch. 140, §§ 129B, 131–131L |
| Michigan | MICH. COMP. LAWS ANN. §§ 28.421–.435, 750.222–.239a |
| Minnesota | MINN. STAT. ANN. §§ 609.66–.667, 624.71–.719 |
| Mississippi | MISS. CODE ANN. § 45-9-101 |
| Missouri | MO. REV. STAT. §§ 571.030, 571.070, 571.101–.121 |
| Montana | MONT. CODE ANN. §§ 45-8-316 to -330 |
| Nebraska | NEB. REV. STAT. §§ 28-1202, 28-1204, 69-2401 to -2448 |

| STATE | HANDGUN POSSESSION / REGISTRATION / CONCEALED-CARRY REGULATIONS |
|---|---|
| Nevada | NEV. REV. STAT. ANN. §§ 202.3653–.369 |
| New Hampshire | N.H. REV. STAT. ANN. §§ 159:1 to :22 |
| New Jersey | N.J. STAT. ANN. §§ 2C:39-3, -5, -6, 2C:58-4 |
| New Mexico | N.M. STAT. ANN. §§ 29-19-1 to -14, 30-7-1 to -16 |
| New York | N.Y. PENAL LAW §§ 265.01–.40, 400.00–.10 |
| North Carolina | N.C. GEN. STAT. ANN. §§ 14-402 to -406, 14-415.10 to -415.26 |
| North Dakota | N.D. CENT. CODE §§ 62.1-02-01 to -04-05 |
| Ohio | OHIO REV. CODE ANN. §§ 2923.12–.1213 |
| Oklahoma | OKLA. STAT. ANN. tit. 21, §§ 1272–1290.26 |
| Oregon | OR. REV. STAT. ANN. §§ 166.173–.295 |

| STATE | HANDGUN POSSESSION / REGISTRATION / CONCEALED-CARRY REGULATIONS |
|---|---|
| Pennsylvania | 18 PA. CONS. STAT. ANN. §§ 6105–6127 |
| Rhode Island | R.I. GEN. LAWS §§ 11-47-8 to -60 |
| South Carolina | S.C. CODE ANN. §§ 16-23-10 to -60, 23-31-110 to -240 |
| South Dakota | S.D. CODIFIED LAWS §§ 22-14-9 to -11, 23-7-1 to -46 |
| Tennessee | TENN. CODE ANN. §§ 39-17-1301 to -1362 |
| Texas | TEX. GOV'T CODE ANN. §§ 411.171–.208; TEX. PENAL CODE ANN. §§ 46.01–.06 |
| Utah | UTAH CODE ANN. §§ 53-5-701 to -711, 53-5a-102, 76-10-500 to -530 |
| Vermont | VT. STAT. ANN. tit. 13, § 4003 |
| Virginia | VA. CODE ANN. §§ 18.2-308 to -308.2:01 |
| Washington | WASH. REV. CODE ANN. §§ 9.41.010–.810 |

| STATE | HANDGUN POSSESSION / REGISTRATION / CONCEALED-CARRY REGULATIONS |
|---|---|
| West Virginia | W. VA. CODE ANN. §§ 61-7-3 to -14 |
| Wisconsin | WIS. STAT. ANN. §§ 941.23–.237, 941.29, 941.296 |
| Wyoming | WYO. STAT. ANN. § 6-8-104 |