## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

CIVIL ACTION FILE NO.  10-CV-59-WDM-MEH

GRAY PETERSON,
     Plaintiff,

v.

ALVIN LACABE, in his official capacity as Manager of Safety for the City and County of Denver,
     Defendant,

and

JOHN W. SUTHERS, Attorney General for the State of Colorado,
     Intervenor.

---

## PLAINTIFF'S RESPONSE TO INTERVENOR IN OPPOSITION TO INTERVENOR'S MOTION FOR SUMMARY JUDGMENT

**Introduction**

     Intervenor John W. Suthers ("Suthers"), Attorney General for the State of Colorado, moves for summary judgment against Plaintiff in Plaintiff's claims against Defendant.  Suthers' Motion is largely a reiteration of his arguments against Plaintiff's Motion for Summary Judgment, with the exception that Suthers introduces arguments against Plaintiff's Equal Protection claim.  Plaintiff will not burden the Court with a reiteration of his arguments in favor of his own motion for summary judgment, but rather will adopt them here in opposition to Suthers' motion, with some supplementation as needed.  Because Plaintiff did not move for summary judgment on his equal protection claim, however, he will discuss that issue in detail.

–1–

<u>**Response to Statement of Undisputed Material Facts**</u>

Facts 1-3 asserted by Intervenor were stipulated to by Plaintiff and Plaintiff therefore does not dispute them.  Plaintiff will address Intervenor's "Additional Assertions of Fact" point by point:

**4.  Colorado statute requires CHP applicants to undergo a background check before they may be issued a permit to carry a concealed handgun.**

*Response:  This is a conclusion of law and not a statement of fact.*

**5.  Completion of the background check is shared by CBI, which confirms the applicant's eligibility to possess a firearm under federal law, and the local sheriff, who is the final arbiter of the application.**

*Response:  No dispute*

**6.  CBI confirms the applicant's eligibility to possess a firearm under federal law by checking the applicant's fingerprint-confirmed identity against national databases such as NICS, NCIC, and III.**

*Response:  Disputed.  While the cited source for this fact (Exh. B, ¶¶ 9-11) contains some discussion of CBI's activities, it does not support the fact asserted.*

**7.  NICS, NCIC, and III contain less information than state and local databases, and often omit information that would disqualify a CHP applicant under Colorado law.**

*Response:  Disputed.  The cited sources illustrate how NICS, NCIC and III may contain* different *information from state and local databases, none of the sources say that they contain* less *information.*

**8.  Local databases such as CCIC and ICON more fully reflect a CHP applicant's civil and/or criminal history, and thus the applicant's qualifications for a CHP under Colorado law, than do the national databases.**

*Response:  Disputed.  The cited sources only state that CCIC and ICON may contain* different *information than do national databases.  They do not state that CCIC and ICON are more complete nor do they say that CCIC and ICON contain any information at all on new residents of Colorado.*

**9.  Other states maintain databases that are similar to CCIC and ICON.**

*Response:  Disputed.  The cited source does not say that.*

**10.  Neither the CBI nor local sheriffs have direct access to local and statewide databases maintained by other states.**

*Response:  Disputed.  Exhibit A only reflects the experiences of a single Colorado sheriff, the sheriff of Adams County (i.e., not the Defendant sheriff of Denver County).  Neither Exhibit A nor B indicates whether Colorado sheriffs generally or Defendant in particular has access to any other states' databases (nor whether Defendant would use such access if he had it).*

**11.  Local sheriffs, with the cooperation of authorities in other states, are sometimes able to acquire information concerning a CHP applicant that is maintained in that state's local or statewide databases.**

*Response:  No dispute*

**12.  Often agencies in other states are either unwilling to assist with these inquiries or require a fee that cannot, by statute, be passed along to the CHP applicant.**

*Response:  Disputed.  The cited source only provides anecdotal information about the experiences of a single sheriff.  It does not purport to represent the experiences of Colorado sheriffs generally or of Defendant specifically.  Moreover, it makes no mention of fees or the ability to pass them along.*

**13.  As a result, should non-residents become eligible for CHPs, Colorado law enforcement authorities would be unable to conduct a satisfactory background check concerning those non-resident applications.**

*Response:  Disputed.  This is a statement of opinion and not of fact.  For example, Exhibit A, ¶ 13 prefaces its statements with "In my opinion" and "I do not believe."*

**14.  Colorado residents who possess a CHP have flagged records in CCIC.  If a CHP holder is arrested in Colorado, information concerning that arrest will be "flashed" to the sheriff that issued the CHP permit for further action.**

*Response:  Disputed.  The cited source only says the system allows for notification.  It does not state that such notification actually occurs.*

**15.  No similar flagging system could be assembled for non-residents.  Thus, if a non-resident CHP holder were arrested in his home state, Colorado authorities would have no reliable way to learn of the arrest and take action on the CHP.**

*Response:  Disputed.  The cited sources do not say that a flagging system could not be assembled for non-residents.  It only observes that out of state arrests would not be captured in the Colorado system, which applies equally to residents and non-residents of Colorado.  This "fact" is therefore not material.*

**16.  Thirty percent of all CHP application denials in Colorado are based on information that is found in local and statewide databases, but no in national databases.**

*Response: Disputed. The cited source states this statistic in conjunction with firearms acquisitions (i.e., obtaining guns from gun dealers), not with CHP applications.*

**Argument**

**I.  Plaintiff is Treated Differently from Certain Similarly-Situated Colorado Residents**

Suthers claims, incorrectly, that Plaintiff is not treated differently from similarly-situated Colorado residents.  Suthers distills the distinction between residents and non-residents down to a single factor:  the availability of information.  The fatal flaw in Suthers' logic is his implicit assumption that the moment a person becomes a resident of Colorado, the new resident's life history suddenly becomes available to Colorado.  Suthers introduces no evidence to that effect, however, and there is no reason for this Court to believe it to be true.

In reality, Defendant (and Colorado) are treating Plaintiff quite differently from yesterday's Washingtonian who became a Colorado resident today.  Both were ineligible yesterday for a Colorado CHP, because, according to Suthers, no local information was available for either one. Today, however, despite the fact that the same dearth of local information still is available for both, the newly-minted Colorado resident suddenly is eligible.  Thus, despite the fact that the same volume of information is available for each, Plaintiff is denied eligibility for a CHP solely because of his non-residency.

Suthers makes a half-hearted attempt to strike this argument peremptorily by claiming Colorado sheriffs can deal with the relatively small volume of new-resident applications compared to the relatively large volume of non-resident applications.  Suthers cites no statistics indicating the volume of new-resident applications that actually are received, but he uses Florida as an example of

the number of non-resident applications he *believes* might be received in Colorado.  Suthers notes that 10% of Florida's CHPs are issued to non-residents.  He also notes that in an 8-year period, Colorado processed 109, 127 CHP applications.  Suthers stops short, then, of connecting the dots by calculating that 10% of 109,000 is 10,900, and that 10,900 applications spread over an 8-year period would be less than 1,400.  That is, using Suthers' own statistics, the entire state of Colorado would only expect just over 1,000 non-resident CHL applications if Colorado were to receive them.  This is hardly the "flood" that Suthers' direly predicts.

Moreover, Suthers provides no legal support for his argument that constitutional rights can be reduced to a statistical analysis.  The Supreme Court ruled in *Doe v. Bolton,* 410 U.S. 179, 200 (1973) that Georgia may not limit the availability of abortions to Georgia residents only.  This ruling was not qualified with "unless a lot of non-residents come to Georgia and use of Georgia's abortion-providing resources."  The rights guaranteed to the people in the Constitution are not subject to deprivation by the states on a state's theory that it is easier, cheaper, or more expedient to trample the rights of the people than to respect those rights.  If the Constitution limits a state's power, the power is so limited.  Period.  Even if there were a "flood" of non-resident CHL applications, therefore, that only would be an indication that a "flood" of non-residents desire to exercise their Constitutional rights to bear arms in Denver and Colorado.  Whether one thousand or one million citizens desire to exercise their rights is not determinative of, nor relevant to, whether the government has the power to usurp those rights.

IA.  Plaintiff's Equal Protection Claim is Subject to Strict Scrutiny

Suthers assumes, with little discussion, that Plaintiff's equal protection claim is subject only

to rational basis review because, in Suthers' view, no fundamental rights are implicated.  Suthers overlooks, however, that a fundamental right is implicated and that strict scrutiny must be applied. *Vasquez v. Cooper,* 862 F.2d 250, 252 (10th Cir. 1988), *citing Kadrmas v. Dickinson Public Schools,* 487 U.S. 450 (1988)) ("A state practice will not require strict judicial scrutiny unless it interferes with a 'fundamental right'").

Plaintiff's equal protection claim in this case involves who may apply for and obtain a CHL, and who may therefore bear arms in Denver.  As the Supreme Court ruled in both *Heller* and *McDonald* (discussed at length in Plaintiff's own Motion for Summary Judgment), the right of the people to bear arms is a fundamental right.  Suthers tries to distinguish the issue in this case from *Heller* and *McDonald* by focusing on the availability of openly carrying firearms in Colorado without a license.  Suthers glosses over the fact that Denver law requires a person to have a CHL to carry a firearm, and even then it may only be carried concealed. Because Plaintiff cannot obtain a CHL, therefore, he is disarmed while in Denver.[1]  Suthers' argument, therefore, that Plaintiff has no right to carry a concealed firearm is a red herring.  Plaintiff has a right to carry arms.  Denver and Colorado may not ban openly carried arms, permit concealed carried arms, then deny Plaintiff a CHL to allow him to carry arms concealed, all the while claiming to be abiding by the Constitution.

Defendant's disparate treatment of Plaintiff and new Colorado residents, therefore, must be analyzed under strict scrutiny.  Defendant must narrowly tailor his discriminatory practices to advance a compelling governmental interest, and the burden is on Defendant to show that he has

---

1       For a more thorough discussion of the interplay between Colorado and Denver law and their implications on Plaintiff, see Plaintiff's Motion for Summary Judgment.

done so.  *See, e.g., League of United Latin American Citizens v. Perry,* 548 U.S. 399, 475 (2006).

Suthers only attempts to justify Defendants' disparate treatment of Plaintiff using a rational basis standard.  He therefore has failed to show that a compelling state interest even exists, let alone that Defendants' actions (and state law) are narrowly tailored.  Indeed, Plaintiff has shown how the Colorado scheme is not narrowly tailored, because the scheme does nothing to account for 1) the equal (un)availability of information of non-residents and new residents; 2) the equal unavailability of all CHL holders (residents and non-residents alike) regarding out-of-state arrests; 3) the cessation of the availability of "local" information for residents if they become non-residents (coupled with the continued validity of their CHLs); and 4) the cessation of the recognition of reciprocity of a CHL issued by another state if the resident of that other state moves from the state.  All four of these scenarios use residency as a proxy for the availability of information, regardless of the actual availability of information.

Suthers continues to rely on his unavailability of information theory, but fundamentally undermines his theory by failing to introduce a single shred of evidence that Defendant's decision to deny Plaintiff's CHL application was influenced at all by a lack of information about Plaintiff.  Indeed, Plaintiff has shown that his home state of Washington readily makes criminal histories available to law enforcement agencies throughout the country.[2]  Suthers can hardly claim, therefore, that local information about Plaintiff cannot be had, even if Defendant had claimed that the lack of local information had been a factor in his denial of Plaintiff's CHL application.

## II.  Defendant Violated Plaintiff's Second Amendment Rights

II.A.  Standard of Review

Suthers begins his Second Amendment analysis by declaring that intermediate scrutiny applies to all Second Amendment claims.  Plaintiff discussed this topic in conjunction with his own Motion for Summary Judgment, so he need not burden the Court with a repeat of that discussion here.  Plaintiff will, however, reiterate and expound on a case recently decided by the Court of Appeals for the Fourth Circuit.  In *United States v. Chester,* 2010 U.S, App. LEXIS 26508 (4th Cir. December 30, 2010), the court determined that "severe burdens" on the Second Amendment right should be subject to strict scrutiny and that lesser burdens should be subject to intermediate scrutiny.  *Id.* at 26.  The court also indicated that a law-abiding citizen's right to bear arms cannot be severely curtailed without being subject to strict scrutiny, while a person convicted of violent crimes may be subject to stiffer restrictions if the restrictions pass intermediate scrutiny.  *Id.* ("Although Chester asserts his right to possess a firearm in his home for the purpose of self-defense, we believe his claim is not within the core right identified in Heller—the right of a  law-abiding, responsible citizen to possess and carry a weapon for self-defense—by virtue of Chester's criminal history as a domestic violence misdemeanant.")  Conversely, a law-abiding citizen's interest in bearing arms is within the core right identified in *Heller.*  Because there is nothing in the record indicating anything other than that Plaintiff is a law-abiding citizen, the severe restrictions on his right to keep and bear arms to which Defendant and the State of Colorado have subjected him must be subject to strict scrutiny.

In the instant case, the burden on Plaintiff's Second Amendment rights is severe in the

---

2          http://www.wsp.wa.gov/crime/crimhist.htm  and http://dw.courts.wa.gov/

extreme.  Denver completely bars Plaintiff from bearing arms.[3]  Suthers makes no attempt to explain why this severe burden on Plaintiff's rights is not subject to strict scrutiny.  Moreover, while the Supreme Court did not announce a standard of review in *Heller,* the Court said the D.C. handgun ban could not withstand any level of scrutiny.  If a ban in the home (i.e., a ban on "keeping" firearms) cannot survive, it is only logical to conclude that a total ban outside the home (i.e., a ban on "bearing" firearms) must also be stricken.

Suthers mentions in passing that the Second Circuit ruled against non-resident CHL applicant in a similar case in *Bach v. Pataki,* 408 F.3d 75 (2nd Cir. 2005).  Suthers no doubt avoids relying much on this case because it was decided pre-*Heller* and *McDonald* and had as a central part of its holding that the Second Amendment does not apply to the states, a provision rejected by *McDonald.* *Bach* is more helpful in other aspects.  In *Bach,* for example, the court found that New York's discretionary licensing statute and "broad revocation discretion" were significant.  *Id.* at 91.  The court reasoned that because the local authorities had broad revocation powers, their continued ability to monitor a licensee was important.

Colorado, on the other hand, does not vest such broad revocation powers on licensing authorities.  Moreover, as Suthers concedes, Colorado is a "shall-issue" state (as opposed to New York, which is "may issue.")  The court concluded that, while it was obvious that New York

---

3        As discussed in Plaintiff's Motion, Suthers downplays Plaintiff's disarmament by pointing out the law in Denver would allow Plaintiff to bear arms in his dwelling, automobile, or place of business.  Suthers concedes that Plaintiff has no place of business, but seems to claim that wherever Plaintiff spends the night is his "dwelling."  Even assuming this to be correct, Suthers fails to explain how it is that the right to keep ***and bear*** arms really is only a right to keep arms and not a

discriminated against non-resident CHL applicants, that discrimination was justified by New York's

extremely restrictive licensing approach.  It remains to be seen whether New York's approach can

pass muster post-*Heller* and *McDonald*[4].

## II.B.  A Citizen Must Be Able to Bear Arms, Either Openly Or Concealed

Suthers continues to assert that Plaintiff has no Second Amendment right to carry a

concealed weapon.  While this may be a true statement in the abstract, Suthers' abbreviated

discussion of this topic leads to an invalid conclusion.  Plaintiff, like other citizens, has a Second

Amendment right to bear arms.  The Supreme Court ruled in *Heller* that "bear" is synonymous with

"carry."  Some states, such as Florida and Texas, permit citizens to bear arms but ***require*** that the

arms be borne concealed, so that it is a crime, even for a CHL holder, to allow one's firearm to be

seen.  Most states, however, have chosen not to restrict, generally, the open carrying of firearms.

Those states tend to require citizens to have CHLs to carry firearms concealed.

Colorado is a blend of these scenarios.  Colorado requires a CHL to carry a concealed

firearm.  Denver bans openly carried firearms.  A citizen in Denver, therefore, is much like a citizen

in Florida or Texas.  The citizen must have a CHL and must keep the firearm concealed.  In such a

scenario, the government cannot rest on the oversimplified argument that there is no constitutional

right to carry a concealed firearm.  If concealed is the only method the government allows (and even

then only with a CHL), a citizen's right to bear arms only can be exercised with concealed carry.

---

right to bear them.  Apparently Suthers believes that the "confrontation" the Supreme Court refers to
the ability to bear arms against can only happen where one sleeps.

4        Litigation has already begun against New York's permit process. See *Kachalsky et al v.
Cacace et al* NYSD 7:10-cv-05413

Suthers is trying, in effect, to engage in a back door attack of Denver's ban on open carry of firearms.  While he is free to commence his own action against Denver if he chooses to do so, this case is not the proper vehicle for his attack.  It is not *per se* unconstitutional for Denver to have such a ban, because citizens still have an adequate alternative for exercising the right to bear arms:  they may obtain a CHL and bear them concealed.  It is Defendant's (and Colorado's) refusal to allow Plaintiff to obtain a CHL that is unconstitutional.  Because Plaintiff must obtain a CHL in order to bear arms in Denver, Defendant violates Plaintiff's right to bear arms when he refuses to issue a CHL to Plaintiff solely on account of Plaintiff's non-residency.

## II.C.  Lack of Information Does Not Operate to Eliminate Rights

Suthers also uses the "lack of local information" defense to shield Defendant from Plaintiff's Second Amendment claim.  The fallacies of this defense have been discussed above, but the defense has even less merit in a Second Amendment context.

The gist of Suthers' defense is that Denver may ban open carry, permit concealed carry with a CHL, and not issue CHLs to non-residents because "local information" may not be available for the non-residents or it may be too burdensome or expensive for Denver to try to get it.  Suthers fails to explain his legal principle that a government may exercise powers it does not have if it would be a burden not to do so.

One burden Suthers mentions is the "expected flood" of non-resident applicants.  Suthers ignores, however, that a CHL applicant in Denver is required to appear in person in Denver in order to apply (unlike Suthers' Florida example, where a CHL applicant may complete the process entirely

via mail).[5]  Suthers does not explain why he believes citizens from all over the country would flock to Denver to apply for CHLs if they were permitted to obtain them.

Another burden Suthers' complains about is the time and expense attendant with obtaining out of state "local" information.  Suthers says state law prohibits passing additional charges on to CHL applicants (though he fails to cite the law).  Assuming *arguendo* that Suthers accurately paraphrases the law, however, Suthers cannot use one state law to justify the constitutionality of another.  That is, a $10 expense to obtain criminal background information from Plaintiff's home state of Washington (see FN 2 above) cannot make Defendant's actions constitutional.  If, as Suthers asserts, Colorado prohibits charging Plaintiff the $10, that prohibition cannot be the fix to the constitutional flaws in Colorado's licensing scheme.

Consider, by way of example, if Colorado centralized the processing of CHL applications and assigned one part-time person to the task of processing them.  Suppose it took, on average, five years to process an application.  In the meantime, the CHL applicant could not carry a firearm in Denver.  Would the limitations Colorado has imposed on its own system make the unreasonably long wait times constitutional?  Of course not.  If Colorado is going to impose a regulatory scheme that burdens citizens' Second Amendment rights, it must do so in a manner that comports with the Second Amendment, and a flawed or bureaucratically-limited scheme cannot save itself from its own unconstitutionality.

**Conclusion**

---

[5] Defendant's requirements for CHL applicants can be found on his web site at
http://www.denvergov.org/CriminalInvestigationsDivision/ConcealedWeaponsPermit/tabid/3922

Suthers has failed in his burden to show this Court that he is entitled to judgment as a matter of law.  Noticeably absent from Suthers' arguments is any evidence that the lack of local information had any bearing on Defendant's denial of Plaintiff's application.  It is wholly immaterial what the sheriff of a *different* county thinks about the value of local information.  Defendant did not raise the issue of local information in his own response to Plaintiff's Motion, nor in his own motion, nor in Suthers' instant Motion.  If Suthers was not able to obtain such evidence from Defendant in Suthers' own collateral defense of Defendant's denial of Plaintiff's CHL application, one cannot help but conclude that no such evidence exists and that the lack of local information played no role in Defendant's denial.  For this and other reasons stated in this Response, Suthers' Motion should be denied.

　　　　　　　　　　/s/ John R. Monroe
John R. Monroe
Attorney for Plaintiff
9640 Coleman Road
Roswell, GA  30075
678 362 7650
John.monroe1@earthlink.net

70/Default.aspx.

## CERTIFICATE OF SERVICE

I certify that on January 21, 2010, I filed the foregoing using the ECF system, which automatically will send copies electronically to:

Linda M. Davison
Attorney for Defendant LaCabe
Assistant City Attorney
Denver Dept. of Human Services
1200 Federal Blvd., 4th Floor
Denver, CO  80204
720-944-2626
Linda.davison@denvergov.org

Matthew D. Grove
Attorney for Attorney General Suthers
Assistant Attorney General
State Services Section
303-866-5264
matthew.grove@state.co.us

_____/s/ John R. Monroe
John R. Monroe