IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Walker D. Miller

Civil Action No. 10cv-00059-WDM-MEH

GRAY PETERSON,

      Plaintiff,

v.

ALVIN LACABE, in his official capacity as Manager of Safety for the City and County of Denver,

      Defendant,

and concerning

JOHN W. SUTHERS, in his official capacity as Attorney General for the State of Colorado,

      Defendant-Intervenor.

## REPLY IN SUPPORT OF ATTORNEY GENERAL'S CROSS-MOTION FOR SUMMARY JUDGMENT

      In a tacit concession that his claims have no chance of succeeding under an intermediate scrutiny standard of review, Peterson's arguments focus largely on attempting to prove that strict scrutiny applies to all of his claims. The Attorney General agrees that the applicable standards of review are central to the outcome of this case. Peterson's arguments that strict scrutiny should apply to any of his claims, however, should be rejected by this Court.

### REPLY REGARDING ASSERTIONS OF UNDISPUTED FACT

      Rather than offering rebuttal evidence in any form, Peterson "disputes" the majority of the Attorney General's assertions of fact by: (1) splitting hairs, *see, e.g.,* Resp. Br. ¶¶ 6, 7, 8, 9, 15; (2) making factual assertions unsupported by evidence, *id.,* ¶¶ 15, 16; or (3) simply by stating that a dispute exists. *Id.,* ¶¶ 12, 13, 14. However, "[t]o defeat summary judgment, it is not

enough for plaintiff to disagree with the views expressed in the affidavit; he must point to evidence creating genuine factual disputes that undermine those views." *Wardell v. Duncan,* 470 F.3d 954, 960 (10th Cir. 2006). The evidence offered in support of the Attorney General's cross-motion made a *prima facie* demonstration that no dispute of material fact exists. *See Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670-71 (10th Cir. 1998). By resting almost exclusively on unsubstantiated denials and a creative interpretation of the facts asserted in the Attorney General's cross-motion, Peterson has failed to "set forth specific facts" upon which a trier of fact could rely to rule in his favor. *Id.* at 671.

Because Plaintiff offers no evidence, a point-by-point rebuttal of the "disputes" that he raises would largely be useless. Three of his claims, however, do warrant a reply:

- Peterson claims that the evidence presented in the cross-motion is insufficient because it is "anecdotal," and not from authorities in Denver. *Resp. Br.* at p2-4, ¶¶ 10, 12. However, the CBI's experience and knowledge is <u>statewide</u>, and the affidavit from the supervisor of the CBI's InstaCheck unit details the insufficiency of national databases in assessing the qualifications of CHP applicants. *See* Cross-Motion, Ex. B. Second, whether or not evidence was gathered from Denver authorities is irrelevant. As discussed in the cross-motion, the statutory residency requirement derives from the state's substantial interest in assuring the qualifications of its CHP holders. The affidavit from the Adams County Sheriff's Office underscores the validity of the legislature's concerns.
- Peterson claims that CHP holders from reciprocity states are essentially unregulated because Colorado does not engage in independent monitoring of their qualifications. *Reply Br.* at 8. This argument ignores the fact that CHPs from reciprocity states must

themselves be valid to be honored in Colorado. § 18-12-213. To the extent that states that have reciprocity with Colorado monitor and ensure the eligibility of their own CHP holders (and there is no evidence suggesting that they do not) Peterson is incorrect.

- Peterson also claims that "nothing in Colorado law invalidates…Colorado [CHPs] when a Colorado resident moves out of state." This is wrong. Section 18-12-203(3)(a) and (b) require suspension and/or revocation of a CHP "if the issuing sheriff has a reasonable belief that a permittee no longer meets" the statutory criteria, including residency.

## ARGUMENT

The Attorney General's cross-motion amply sets forth the reasons why all of Plaintiff's claims fail under a rational basis or intermediate scrutiny standard. Those arguments will not be repeated in detail here; rather, this reply brief will focus on rebutting Peterson's assertions that strict scrutiny applies to each of his claims.

### I. The challenged provisions do not violate the Second Amendment.

Before considering what level of scrutiny should apply here, this Court must determine whether the challenged laws burden his constitutional rights at all. The Tenth Circuit has now adopted the approach advocated in the cross-motion. *See U.S. v. Reese,* 627 F.3d 792, 800-01 (10th Cir. 2010). Under *Reese,* "a reviewing court first asks whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. If it does not, the court's inquiry is complete. If it does, the court must evaluate the law under some form of means-end scrutiny." *Id.* (internal quotations, citations, and alterations omitted). As discussed below, Peterson's claim fails at the threshold because he cannot demonstrate that the

challenged laws burden his Second Amendment rights. Even if the challenged laws do so, however, intermediate (and not strict) scrutiny should apply to his claim.

### A. The challenged laws do not burden the Second Amendment.

The cross-motion demonstrates that Peterson substantially overstates the combined effect of Denver ordinance and Colorado law on his ability to possess and carry a pistol in the city. Despite the fact that he has been proven wrong, however, Peterson persists in his claim that "he is disarmed while in Denver." *Pl. Resp. Br.* at 7. However, Peterson's rights to carry a pistol in Denver are extensive. They do not prohibit him from carrying a pistol on property that he owns or controls at the time of carrying (among other things, this would include Peterson's "dwelling" while he visits), D.R.M.C. 38-117(a), while in a private automobile, D.R.M.C. 38-117(f)(2), or for defense of an immediate threat to "home, person, or property." D.R.M.C. 38-118(b)(1). *Heller* and *McDonald* declared only that the core Second Amendment right applies to "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller,* 128 S.Ct. at 2821. Peterson's unsupported claims notwithstanding, he may do that and more when he visits. Because the challenged provisions do not infringe upon the Second Amendment at all, Peterson's claim fails at the threshold.

### B. Assuming that the challenged laws do burden Plaintiff's Second Amendment rights, intermediate scrutiny applies.

Peterson's motion for summary judgment essentially conceded that intermediate scrutiny applies to Second Amendment challenges like the one at issue here. *Pl. MSJ,* p13. This concession was prudent, especially considering that no federal appellate court, including the Tenth Circuit in *Reese,* has ever applied a more stringent standard to a claim raised under the Second Amendment. *See, e.g., U.S. v. Marzzarella,* 614 F.3d 85, 97 (3d Cir. 2010); *U.S. v.*

*Skoien,* 638, 641-42 (7th Cir. 2010) (en banc).  Perhaps realizing that intermediate scrutiny gets him nowhere, Peterson now changes tack, and argues that *U.S. v. Chester,* 628 F.3d 673 (4th Cir. 2010), requires the application of strict scrutiny to his Second Amendment claim.

Although Peterson fails to identify a single appellate case applying strict scrutiny, it should be noted that the vast majority of post-*Heller* challenges, including all of those discussed above, have been raised by criminal defendants arguing that the Second Amendment nullifies dispossession laws for felons and certain misdemeanants.  These cases are distinguishable from Peterson's Complaint because they involve challenges to restrictions on <u>who</u> may possess a gun at all, rather than limitations on <u>where</u> a gun may be carried.  *Heller* and *McDonald* acknowledge the core Second Amendment guarantee of "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller,* 128 S.Ct. at 2821.  The upshot of these cases is that the government cannot restrict this core right under any circumstances.  Restrictions remain permissible on the margins, however, and with respect to the first category, the circuits have declared with one voice that laws prohibiting non "law-abiding citizens" from possessing a firearm – even "in defense of hearth and home" – are subject to intermediate scrutiny review.

Peterson offers no compelling reasons to believe that restrictions on <u>where</u> a pistol may be carried outside the home should be approached any differently.  The mere fact that a right is "fundamental" triggers strict scrutiny only occasionally: most commonly where the challenged regulation has an invidious motive, *see, e.g. Johnson v. California,* 543 U.S. 499, 505 (2005), or where the government attempts to curtail certain First Amendment rights central to the democratic process.  *See, e.g., Denver Area Educ. Telecomm. Consortium, Inc. v. FCC*, 518 U.S. 727, 741 (1996); *see also* Adam Winkler, *Scrutinizing the Second Amendment,* 105 Mich. L.

5

Rev. 683, 703-704 (2007).  There is no reason to believe that the individual rights protected by the Second Amendment – if they do extend outside the home – fall into either of these categories.  Restrictions on firearms are rooted in concerns about public safety, not by a subtle objective of discriminating against gun owners.  Likewise, there is no demonstrable connection between any right to carry a pistol and the efficient functioning of the democratic process.

It is for these reasons that courts analyzing the individual right to bear arms guaranteed by <u>state</u> constitutions "have universally rejected using a 'strict scrutiny' test." Jeffrey Monks, Comment, *The End of Gun Control or Protection Against Tyranny?: The Impact of the New Wisconsin Constitutional Right to Bear Arms on State Gun Control Laws*, 2001 Wis. L. Rev. 249, 290.  In *State v. Cole,* 665 N.W.2d 328 (Wis. 2003), for example, the court acknowledged that the Wisconsin constitution established a "fundamental individual right" to bear arms, yet still refused to "agree with Cole's position that strict scrutiny or intermediate scrutiny is required in this case." *Id.* at 337.  This result is consistent with every other court of last resort that has considered the issue under state law.  See e.g., *Bleiler v. Chief, Dover Police Dep't,* 927 A.2d 1216, 1222 (N.H. 2007) (rejecting strict scrutiny); *Students for Concealed Carry on Campus, LLC v. Regents of the University of Colorado,* __P.3d__, 2010WL1492308 (Colo. App. 4/15/2010) ("we conclude that the reasonable exercise test…not the rational basis test, is the appropriate test for evaluating" claim brought under Colorado Constitution).

For his part, Peterson misreads *Chester* as attempting to enlarge the core Second Amendment right announced in *Heller*.  The two-judge *Chester* majority makes clear, however – by quoting the Supreme Court's "hearth and home" language no fewer than three times – that it has no interest in attempting to expand *Heller*'s core.  To the contrary, *Chester* leaves room for

the government to set reasonable boundaries as to when and where a citizen who is qualified to own a pistol may carry it.  *Chester,* 628 F.3d at 676, 686, 690.  Indeed, if anything useful can be gleaned from *Chester*, it is the panel's analogy to First Amendment jurisprudence that requires content-neutral time, place and manner restrictions to be reviewed under an intermediate level of scrutiny.  *Id.* at 682, *citing Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989).  In keeping with this approach, and so long as they do not attempt to eliminate the core rights announced in *Heller,* state and local governments retain the authority to determine for themselves where and when weapons may be carried in public.  So long as those regulations are related to an important objective, and so long as the means used are substantially related to achieving that objective, the government's approach will pass constitutional muster.  *See Reese,* 627 F.3d at 802.

As explained at length in the cross-motion, there are good reasons underlying both Denver's restrictions on open carry, and Colorado's statutory prohibitions on issuing CHPs to non-residents.  Given that the combined effect of these laws: 1) has no effect on the core right announced in *Heller* and *McDonald,* and 2) places, at most, reasonable time, place and manner restrictions where pistols may be carried outside the home, Peterson's Second Amendment claim should be evaluated under an intermediate scrutiny standard of review. Because the challenged laws further an important government interest in a way that is substantially related to that interest, they pass constitutional muster and Peterson's Second Amendment claim fails.

**II.     The Equal Protection Clause does not require Colorado to issue concealed handgun permits to non-residents.**

Peterson argues that strict scrutiny should apply to his equal protection claim because: 1) he is allegedly similarly situated to new Colorado residents; and 2) together, the challenged laws infringe upon his allegedly fundamental right to carry a handgun outside the home.

7

### A.     Residents and non-residents are not similarly situated.

The first of these claims offers a novel spin on the Amended Complaint, which made a general allegation that LaCabe had violated the Equal Protection Clause by denying Peterson's CHP application "on account of Plaintiff's non-residency[.]" *Id.,* ¶ 57.  Peterson now argues, however, that he is similarly situated to new Colorado residents who, like him, he claims, have no in-state history to research.  This argument suffers from two major flaws. First, it ignores the fact that the issuing sheriff has a full 90 days to conduct a thorough background check before issuing the permit. § 18-12-206, C.R.S. (2010).  It is certainly easier to confirm the eligibility of long-term residents, but even assuming that a new resident applies for a CHP on the day of his arrival, an issuing sheriff would still have three months to assess the applicant's fitness before issuing the permit.  This could easily be enough time to determine, for example, whether a new arrival has an alcohol or drug problem, § 18-12-203(1)(e)(I) and (1)(f), or has mental health issues that would create a danger to the permit holder or others.  § 18-12-203(2).

Second, and more important, is the fact that a resident – whether newly arrived or not – has an ongoing presence in the state that sharply distinguishes him from a non-residents.  As detailed by evidence and arguments in the cross-motion for summary judgment, Colorado has a robust intrastate monitoring system.  This system effectively captures and shares information with issuing sheriffs concerning contacts between CHP holders and law enforcement that occur within the state.[1]  It does not extend beyond Colorado's borders, however, and it goes without

---

[1] In a last-ditch attempt to distinguish the challenged laws from the scheme upheld by the Second Circuit in *Bach v. Pataki,* 408 F.3d 75 (2d Cir. 2005), Peterson advances the unsupportable assertion that "Colorado…does not vest…broad revocation powers on licensing authorities." *Resp. Br.* at 10.  This claim is directly contradicted by § 18-12-204(3)(a)-(c), which authorize

saying that law enforcement contacts are far more likely to happen in a permit holder's state of residence. For the purposes of establishing the initial eligibility and ongoing status of CHP applicants in Colorado, the distinctions between residents and non-residents are obvious and substantial. In other words, residents and non-residents are not similarly situated. Peterson's equal protection claim therefore fails at the threshold.

> **B.   Even assuming *arguendo* that resident and non-resident applicants are similarly situated and that the laws at issue here infringe upon the core rights of the Second Amendment, strict scrutiny does not apply.**

Peterson asserts that strict scrutiny should apply to his Equal Protection claim because, he claims, *Heller* and *McDonald* declared that "the right of the people to bear arms is a fundamental right." Resp. Br. at 7. This argument begs two questions: (1) whether the confluence of Colorado law and Denver ordinance infringe upon the core right; and (2) if so, what standard of review should apply. If the core right is not implicated, the rational basis test applies. *See Vasquez v. Cooper,* 862 F.2d 250, 252 (10th Cir. 1988). Even if the core right extends as far as Peterson claims, however, his claim should be subject to no more than intermediate scrutiny.

As to the first question, the Attorney General has already set forth his position as to the core right as announced by *Heller* and *McDonald*. Under this precedent, Colorado and Denver would certainly be unable to prohibit Peterson from possessing a usable firearm in his dwelling. But as the cross-motion points out, the challenged statute permits Peterson to do that and far more. The rational basis test thus applies to Plaintiff's Equal Protection claim. Moreover, even if Peterson were somehow able to show that the core Second Amendment right extends to permit carrying a pistol outside the locations and situations that the challenged laws already permit, he cannot

---

immediate suspension or revocation of a CHP upon the issuing sheriff's discovery that the CHP holder no longer meets the statutory criteria, including current state residency. § 18-12-203(1)(a).

show that strict scrutiny applies. Although Peterson merely assumes that burdens on all "fundamental" rights are reviewed under a strict scrutiny standard, the foregoing discussion establishes that this position is untenable. Limitations on who may carry a pistol, as well as when and where pistols may be carried, are not invidiously motivated. Accordingly, the challenged laws should not be reviewed under any standard more demanding than intermediate scrutiny.

**III.     The challenged laws do not violate the right to travel as protected by the Privileges and Immunities Clause.**

Peterson's arguments regarding the right to travel are notable only for the fact that the opinion upon which his motion for summary judgment primarily relied, *Peruta v. County of San Diego,* 678 F.Supp.2d 1046 (S.D. Cal. 2010) (*Peruta I*), has been overruled by the same court. *See Peruta v. County of San Diego,* __F.Supp.2d__, 2010 WL 5137137 (S.D. Cal. 12/10/2010) (*Peruta II*). In *Peruta II,* the district court applied intermediate scrutiny to the plaintiff's right to travel claim and followed the reasoning of the Second Circuit in *Bach,* 408 F.3d at 91-94, to conclude that the state had a "substantial interest in monitoring gun licensees and that limiting licenses to residents and those working primarily within the state was sufficiently related to that interest." *Peruta II* at *11. This Court should follow the same approach.

## CONCLUSION

Based on the foregoing reasoning and authorities, as well as those presented in the Attorney General's cross-motion for summary judgment, the Attorney General respectfully requests that the Court deny the Plaintiff's motion for summary judgment and grant summary judgment in favor of the Defendant and Defendant-Intervenor.

Respectfully submitted this 18th day of February, 2011.

JOHN W. SUTHERS
Attorney General


s/ *Matthew D. Grove*
MATTHEW D. GROVE, *
Assistant Attorney General
Public Officials Unit
State Services Section
Attorneys for Intervenor
*Counsel of Record


## CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2011, I filed a true and complete copy of the within **REPLY IN SUPPORT OF ATTORNEY GENERAL'S CROSS-MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using ECF file-and-serve, which will automatically send email notification of such filing to all attorneys of record.


*s/Thomas R. Bovee*
THOMAS R. BOVEE
Legal Assistant
Public Officials Unit
State Services Section